United States District Court
For The Western District of Pennsylvania

_____

|  |  |
|---|---|
| ( | |
| JOE MARTRANO and ( | |
| TERRY SHALLENBERGER ( | |
| 2725 Memorial Blvd. ( | |
| Connellsville, Pennsylvania 15425, ( | |
| ( | |
| TUFFY JOES EATERY, L.L.C. ( | |
| R.R. 7. Box 60 ( | |
| Mount Pleasant, Pennsylvania 15666, ( | |
| ( | |
| ( | |
| RENE VELA and GWEN VELA ( | |
| 244 Cherry Hill Rd. ( | |
| Enon Valley, Pennsylvania 16120-1902 ( | |
| ( | |
| ENON HEIGHTS ENTERPRISES, L.L.C. ( | |
| 2652 Darlington Rd. #8 ( | |
| Beaver Falls, Pennsylvania 15010 ( | Civil Action No.__2:08-cv-932____ |
| ( | |
| ( | |
| ROBERT YANNITO, PATRICK MCGOVERN ( | |
| And CHARLES MCGOVERN ( | |
| P.O. Box 606 ( | |
| New Stanton, Pennsylvania 15672 ( | |
| ( | |
| PARK PLAN DEVELOPMENT, L.L.C. ( | |
| P.O. Box 606 ( | |
| New Stanton, Pennsylvania 15672 ( | |
| ( | |
| ( | |
| RON MILLER ( | |
| 251 Rose Ct. N. ( | |
| Delmont, Pennsylvania 15626 ( | |
| ( | |
| RE: MILLER ENTERPRISES, L.L.C. ( | |
| 251 Rose Ct. N. ( | |
| Delmont, Pennsylvania 15626 ( | |
| ( | |
| ( | |
| ANDREW SCHRY ( | |
| 200 Portersville Rd. ( | |
| Ellwood City, Pennsylvania 16177 ( | |
| ( | |

1

SCHRY HOLDINGS, L.L.C.                    (
3527 Ellwood Rd.                          (
New Castle, Pennsylvania 16101            (
                                          (
                                          (
JOHN SCIARRINO                            (
3322 Cynthia Lane                         (
Building 21 Apt. 201                      (
Lake Worth, Florida 33461                 (
                                          (
SCIARRINO VENTURES, L.L.C.                (
654 Washington Rd.                        (
Rt. 19 Pittsburgh Pennsylvania 15228      (
                                          (
                                          (
JASON WOJDYLA                             (
541 Kingfred Dr.                          (
North Huntington, Pennsylvania 15642      (
                                          (
WOJDYLA ENTERPRISES Inc.                  (
1279 Julius St.                           (
North Huntington, Pennsylvania 15642      (
                                          (
THEODORE BROADWATER,  and                 (
YVONNE BROADWATER,                        (
 805 Howard St.                           (
Brownsville, Pennsylvania 15417           (
                                          (
BOYD BAGWELL, and                         (
ASHLEY HERRE-BAGWELL                      (
708 Arensburg Rd. Ext.                    (
East Millsboro, Pennsylvania 15433        (
                                          (
                                          (
BATY ENTERPRISES L.L.C.                   (
120 Pricedale Road                        (
Belle Vernon, Pennsylvania 15012          (
                                          (
CHRISTOPHER NOVAK, and                    (
CHRISTI NOVAK                             (
131 Abserdeen Dr.                         (
Cranberry, Pennsylvania 16066             (

SUBADELIC INC.                                    (
2401 Nobletown Road                              (
Pittsburgh, Pennsylvania 15205                   (
                                                 (
RICHARD D'AMICO, and                             (
CAREN D'AMICO                                    (
940 Harvard Road                                 (
Monroeville, PA 15146                            (
                                                 (
RICHARD A. D'AMICO                               (
ENTERPRISES L.L.C.                               (
940 Harvard Road                                 (
Monroeville, PA 15146                            (
                                                 (
DANIEL GROLEMUND                                 (
2728 Earl Avenue                                 (
Erie, Pennsylvania 16504                         (
                                                 (
DANIEL GROLEMUND T/D/B/A                         (
QUIZNOS                                          (
863 East 38th Street                             (
Erie, Pennsylvania 16504                         (
                                                 (
WILLIAM & LINDA SYNDER                           (
115 Central Avenue                               (
Warren, Pennsylvania 16365                       (
                                                 (
L&B L.L.C.                                       (
115 Central Avenue                               (
Warren, Pennsylvania 16365                       (


INDIVIDUALLY AND BEHALF OF ALL OTHERS SIMILARLY SITUATED,

               Plaintiffs,

   vs.


THE QUIZNO'S FRANCHISE                           (
COMPANY, L.L.C.                                  (
1475 Lawrence Street, Suite 400                  (
Denver, Colorado 80202,                          (
                                                 (

QUIZNO'S FRANCHISING, L.L.C.                  (
1475 Lawrence Street, Suite 400               (
Denver, Colorado 80202,                       (
                                              (
QUIZNO'SFRANCHIING II, L.L.C.                 (
1475 Lawrence Street, Suite 400               (
Denver, Colorado 80202,                       (
                                              (
THE QUIZNO'S MASTER, L.L.C.                    (
1475 Lawrence Street, Suite 400               (
Denver, Colorado 80202,                       (
                                              (
QFA ROYALITIES, L.L.C.                         (
1475 Lawrence Street, Suite 400               (
Denver, Colorado 80202,                       (
                                              (
QZ FINANCE, L.L.C.                             (
1475 Lawrence Street, Suite 400               (
Denver, Colorado 80202,                       (
                                              (
QIP HOLDER, L.L.C.                             (
1475 Lawrence Street, Suite 400               (
Denver, Colorado 80202,                       (
                                              (
TQSC, L.L.C.                                   (
1475 Lawrence Street, Suite 400               (
Denver, Colorado 80202,                       (
                                              (
CERVANTES CAPITAL, L.L.C.                      (
1515 Arapahoe Street                           (
Tower One, 10th Floor                          (
Denver, Colorado 80202,                        (
                                              (
RICHARD E. SCHADEN, INDIVIDUALLY               (
10563 E. Goosehaven Drive                      (
Lafayette, Colorado 80026                      (
                                              (
RICHARD F. SCHADEN, INDIVIDUALLY               (
9596 Jeffco Airport Avenue                     (
Westminster, Colorado 80021,                   (
                                              (
KEVIN CASEY, INDIVIDUALLY                      (
1475 Lawrence Street, Suite 400               (
Denver, Colorado 80202                         (
                                              (

---

4

JOHN LUBARSKI, INDIVIDUALLY               (
1475 Lawrence Street, Suite 400               (
Denver, Colorado 80202                          (


        DEFENDANTS.

---

## CLASS ACTION COMPLAINT

The Plaintiffs, individually and on behalf of all others similarly situated, allege by and through

their attorney Peter J. Daley and Associates, P.C, as follows:

### Nature of Case

1.        This is a class action brought by Pennsylvania franchisees of the Quiznos toasted

submarine sandwich restaurant chain arising from the illegal business scheme of Quiznos and

its web of affiliated entities and individual who control and operate the Quiznos franchise

system (collectively the "Defendants" or "Quiznos"), Through this scheme, Defendants

fraudulently induced Plaintiffs and the Class to purchase franchise and thereafter exploited

their control and economic power in order to extract exorbitant and unjustifiable payments

and expenditures from their franchisees. As a result, Defendants reap grossly inflated sales

and profits, creating an illusion of corporate growth and business prosperity while causing

substantial, permanent, irreparable financial harm to existing franchisees.

2.        Quiznos' illegal scheme consists of two primary components. First, Quiznos

engages in a policy of fraudulently and deceptively inducing franchisees to purchase Quiznos

franchises by intentionally misrepresenting the true nature of the contractual relationship as

well as the financial prospects for the franchise and likelihood of success. Quiznos further takes advantage of its franchisees through other illegal, deceptive and fraudulent means, including but not limited to its willful practices of: (a) saturating geographic areas with more franchises than the areas could reasonably support; (b) selling franchise in defined "trade areas" which are in fact arbitrarily defined by Quiznos without it having conducted any reasonable research into whether such trade area can support even one Quiznos franchise, let alone the multiple franchises that Quiznos sells in a given trade area; and (c) enforcing biased and discriminatory policies, procedures and practices (not applied equitably to all franchisees) for inspections and alleged "operational standards" designed to deliberately decrease or eliminate Quizno's obligation to compensate franchisees for their purchase of various mandated products, while concurrently creating an environment designed to keep outspoken franchisees "in-line" and "towing the line" regarding Quizno's unfair, unethical and deceptive business practices.

3.      Second, Quiznos exploits the overwhelming economic power it holds over its franchisees by creating a captive artificial consumer market, comprised of all of its franchisees, for products and services that Quiznos requires to begin and continue the operation of a Quiznos franchise. While concealing the full nature of its own relationships with suppliers from potential franchisees, Quiznos uses its exclusive control over the franchise system to, among other things, force its franchisees to: (a) purchase unneeded goods and services; (b) purchase needed goods and services in amounts far greater than necessary to meet the operational needs of their franchises; (c) work with Quiznos-mandated suppliers and pay to those suppliers excessive prices for goods and services that bear no relation to those that could be achieved in arm's length transaction; (d) accept coupons from

customers for free or highly-discounted food items for which franchisees receive no reimbursement from Quiznos and which therefore benefit Quiznos by increasing its sales while causing franchisees to purchase more food products for which they receive literally no compensation; and (e) pay a four to five percent (4%-5%) "advertising fee" which Quiznos, in violation of its franchise agreements and representations in its various Uniform Franchise Offering Circulars ("UFOCs"), uses for self-serving purpose, including selling more franchises to unwritten consumers and, moreover, improperly allocates advertising funds for purposes outside the accepted and defined use of the fees. Quizno's conducted inherently raised a conflict of interest that routinely results in it choosing its own interests over those of its franchisees. As such, Defendant' day-to-day activities in relation to their franchisees also violate the implied covenant of good faith and fair dealing inherent in plaintiffs' franchise agreements.

4.    The fraudulent intent underlying Quiznos' scheme of deceptively luring franchisees to participate in its system and therefore extracting supra-competitive prices and kickbacks is demonstrated by its pattern of behavior when the inevitable franchise failures come to pass. Quiznos maintains a policy by which it manipulates its unfair agreements to administer the coup de grace to franchisees when, after the franchisee can no longer bear the ruinous losses caused by Quiznos exploitation, the franchisee goes out of business only to face the initial threat of a lawsuit by Quiznos to enforce provisions of the franchise agreement that purport to make franchisees legally liable for payment of royalties over the entire fifteen years (15) year term agreement, even though the franchisee has been forced out of business due to Quiznos' fraudulent, deceptive and illegal scheme to increase its revenues and profits at the expense of its franchisees. While threatening the "stick" of a lawsuit to

7

recover the present value of fifteen (15) years worth of royalties, Quiznos then seeks a signed, unconditional waiver of all rights from the franchisee, in effect to prevent the franchisee form later seeking any redress against Quiznos. In addition, Quiznos takes advantage of failed store locations to facilitate the movement of a lengthy list of equally deceived franchisees awaiting store locations, into the same, now vacant and bankrupt locations. In the process, they are creating second-generation (and, in some cases, third-generation and fourth generation) franchisees with lower entry costs, as the new franchisees purchase the recovered equipment of the defunct franchisee, with Quiznos' assistance, from the lien-holding bank at pennies on the dollar. In this manner, Quiznos suffers no loss and only a short term interruption in royalties, while also meeting its obligation to provide locations to the excessive franchisee; Quiznos executes the same scheme against the new owner-actions geared to continue the illegal scheme of increasing revenues on the backs of those with no control.

5.      Plaintiffs bring this action alleging violations of: (a) the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962(c); (b) Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, by reason of Defendants' violation of the Sherman Act, 15 U.S.C. § 1; (c) Pennsylvania Statute Title 18 Chapter 39 § 3921; (d) Pennsylvania Statute Title 18  Chapter 39 § 3922; (e) Pennsylvania Statute Title 18 Chapter 39 § 3926; (f) Pennsylvania Statute Title 18 Chapter 41 § 4104;  (g) Pennsylvania Statute Title 18 Chapter 41 § 4107; (h) Pennsylvania Statute Title § 4108; and (i)claims of common law fraud, and breach of contract and breach of the implied covenant of good faith and fair dealing. Plaintiffs seek declaratory and injunctive relief, as well as damages, to remedy Defendants'

unconscionable, fraudulent, unlawful and anticompetitive practices in connection with the operation of its franchising scheme.

## JURISDICTION AND VENUE

6.      This court has subject matter jurisdiction over the Plaintiffs' claim brought under RICO and the federal antitrust laws pursuant to 28 U.S.C. § 1331. This Court may also exercise supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C § 1367.

7.      This Court has personal jurisdiction over each Defendant because the Defendants were engaged in an illegal, fraudulent and anticompetitive scheme that was directed at and/or caused injury to persons and entities residing in, located in, or doing business in the Commonwealth of Pennsylvania and throughout the United States. In addition, Defendants engaged in solicitation and service activities within the commonwealth or caused persons on their behalf to do so. Personal jurisdiction is also vested because this case is predicated on contracts for services to be rendered or for materials to be furnished in the state by the defendant.

8.      Venue is proper in this Court pursuant to the nationwide venue provisions of RICO, 18 U.S.C. § 1965 (a) and (b). Alternatively, venue is proper in this Court pursuant to 28 U.S.C § 1391(b) (2) because a substantial part of the events or omissions giving rise to the claims of the Plaintiffs occurred in this judicial district.

**Parties**

9.      Plaintiffs Joe Martrano & Terry Shallenberger "Martrano & Shallenberger" are residents of the State of Pennsylvania, with Martrano's home address at 2725 Memorial Blvd. Connellsville, Pennsylvania 15425 and Shallenberger's home address at 222 Vanderbilt Rd., Connellsville, Pennsylvania 15425. On September 2, 2003, Martrano & Shallenberger executed a Franchise Agreement for the operation of Quiznos Store No. 5938, located at R.R.7. Box 60, Mount Pleasant, Pennsylvania 15666.

10.      On September 2 2003, Martrano & Shallenberger formed a corporation called Tuffy Joes Eatery, Inc., which had its principle place of business at R.R.7 Box 60 Mount Pleasant, Pennsylvania and through which the Plaintiff operates the franchised Quiznos restaurant business referenced in the preceding paragraph. Tuffy Joes Eatery is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

11.      Plaintiffs Rene Vela and Gwen Vela "Vela" are residents of the Commonwealth of Pennsylvania, with their home address at 244 Cherry Hill Rd. Enon Valley, Pennsylvania 16120. In January of 2006, Vela executed a Franchise Agreement with Quiznos Store No. 10488, located at 2652 Darlington Rd. Beaver Falls Pennsylvania 15010.

12.      Enon Heights Enterprises, Inc. is a Pennsylvania corporation, which has its principle place of business at 2652 Darlington Rd. Beaver Falls Pennsylvania 15010, which was formed by the Vela's and their business partners Jason and Mary Kay Murtha to operate the franchised Quiznos restaurant business referenced in the preceding paragraph. Enon Heights Enterprises is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

13.     Plaintiffs Robert Yannito, Pat McGovern & Charles McGovern "Yannito & McGovern's" are residents of the Commonwealth of Pennsylvania, with his home address at P.O. Box 606 New Stanton, Pennsylvania 15672.  On April 10, 2002, Yannito executed a Franchise Agreement for the operation of Quiznos Store No. 3560, locate at 103 Byers Ave, New Stanton Pennsylvania 15672.

14.     Park Plan Development, Inc. is a Pennsylvania corporation, which has its principle place of business at P.O. Box 606 New Stanton 15672, which was formed by Yannito and McGovern and through which they operate the franchise Quiznos restaurant business referenced in the preceding paragraph. Park Plan Development is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

15.     Plaintiff Ron Miller, "Miller" is a resident of the Commonwealth of Pennsylvania, with his home address at 251 Rose Ct. N. Delmont, Pennsylvania 15626. In September 2003 Miller executed a Franchise Agreements for the operation of Quizno's Stores No. 5845. Store No. 5845 was located at 1340 West Pittsburgh St., Greensburg Pennsylvania 15601.

16.     In September of 2003, Miller formed a Pennsylvania corporation called RE. Miller Enterprises Inc. "Miller Enterprises", which had its principle place of business at 251 Rose Ct N. Delmont, Pennsylvania 1526, and though which they operated the franchised Quiznos restaurant business referenced in the preceding paragraph. Miller Enterprises is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

17.     Plaintiff Andy Schry "Schry" is a resident of the Commonwealth of Pennsylvania, with his home address at 200 Portersville Rd., Ellwood City Pennsylvania 16177. In March

2005, Schry executed a Franchise Agreement with Quiznos. Schry also signed a separate Franchise Agreement for another Quiznos franchise, which he has been unable to open. Schry operated Quiznos Store No. 9223, located at 102 Wagner Rd. Monaca, Pennsylvania 15061.

18.    On May 17, 2002, Schry formed a Pennsylvania corporation called Schry Holdings of New Castle, Pennsylvania 16101, and through which he operates the franchise Quiznos restaurant business referenced in the preceding paragraph Schry Holdings is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos  as alleged herein.

19.    Plaintiff John Sciarrino ("Sciarrino") is a resident of the Commonwealth of Pennsylvania, with his home address at 3322 Cynthia Lane, Building 21 Apt. 201 Lake Worth, Florida 33461. In October of 2004, Sciarrino executed a Franchise Agreement with Quiznos. Sciarrino also signed a separate Franchise Agreement for another Quiznos franchise #8323, which he has been unable to open. Sciarrino operated Quiznos store No. 6322, located at 654 Washington Rd. Rt 19 Pittsburgh Pa 15228.

20.    In January of 2005, Sciarrino formed a Pennsylvania corporation called Sciarrino Ventures Inc. of Pittsburgh Pa 15228, and though which he operates the franchise Quiznos restaurant business referenced in the preceding paragraph. Sciarrino Ventures is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein. The Sciarrino Plaintiff did not receive a UFOC prior to being asked by Defendants to execute the Franchise Agreement.

21.    Plaintiff Jason Wojdyla ("Wojdyla") is a resident of the Commonwealth of Pennsylvania, with his home address at 541 Kingfred Dr., North Huntington Pennsylvania

15642. On July 21st, 2003, Wojdyla executed a Franchise Agreement with Quiznos. Wojdyla operated Quiznos store No. 5614, located at 4475 Latrobe 30 Plaza, Latrobe Pennsylvania 15650.

22.     In November of 2003, Wojdyla formed a Pennsylvania corporation called Wojdyla Enterprises of North Huntington 15642, and though which he operated the franchise Quiznos restaurant business referenced in the preceding paragraphs. Wojdyla Enterprises is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein. The Wojdyla Plaintiff did not receive a UFOC prior to being asked by Defendant to execute Franchise Agreement.

23.     Plaintiffs Theodore Broadwater, Yvonne Broadwater, Boyd Bagwell, and Ashley Herre-Bagwell ("BATY") are residents of the Commonwealth of Pennsylvania, with their home address at 805 Howard Street. Brownsville, Pennsylvania 15417 and 708 Arensburgh Road Extension. East Millsburgh, Pennsylvania 15433. In April of 2007, BATY executed a Franchise Agreement with Quiznos Store No. 5920, located at 120 Pricedale Road. Belle Vernon, Pennsylvania 15012.

24.     BATY Enterprises, L.L.C. is a Pennsylvania corporation, which has its principle place of business at 120 Pricedale Road. Belle Vernon, Pennsylvania 15012, which was formed by the Theodore and Yvonne Broadwater and their business partners Boyd and Ashley Bagwell to operate the franchised Quiznos restaurant business referenced in the preceding paragraph. BATY Enterprises L.L.C.  is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

25. Plaintiffs Christopher Novak, and Christi Novak ("Sub-a-delic") are residents of the Commonwealth of Pennsylvania, with their home address at 131 Aberdeen Drive Cranberry, Pennsylvania 16066. On June 29th of 2004, Sub-a-delic executed a Franchise Agreement with Quiznos Store No. 7840, located at 2410 Nobletown Road Pittsburgh, Pennsylvania 15205.

26. Sub-a-delic Inc. is a Pennsylvania corporation, which has its principle place of business at 2410 Nobletown Road Pittsburgh Pennsylvania 15205, which was formed by the Christopher and Christi Novak to operate the franchised Quiznos restaurant business referenced in the preceding paragraph. Sub-a-delic Inc. is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

27. Plaintiffs Richard and Caren D'Amico ("D'Amico") are residents of the Commonwealth of Pennsylvania, with their home address at 940 Harvard Road Monroeville, Pennsylvania 15146. In June of 2000, D'Amico executed a Franchise Agreement with Quiznos Store No. 1897, located at 4896 Route 8 Allison Park, Pennsylvania 15101.

28. Richard A. D'Amico Enterprises L.L.C. is a Pennsylvania corporation, which has its principle place of business at 940 Harvard Road. Monroeville, Pennsylvania 15146, which was formed by the Richard and Caren D'Amico to operate the franchised Quiznos restaurant business referenced in the preceding paragraph. Richard A. D'Amico Enterprises L.L.C. is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

29. Plaintiff Daniel Grolemund ("Grolemund") is a resident of the Commonwealth of Pennsylvania, with his home address at 2728 Earl Avenue. Erie, Pennsylvania 16504. In

2004, Grolemund executed a Franchise Agreement with Quiznos Store No. 7896, located at 863 East 38th Street. Erie, Pennsylvania 16504.

30.     Grolemund operates a Pennsylvania corporation, which has its principle place of business at 863 East 38th Street. Erie, Pennsylvania 16504, which was formed by the Daniel Grolemund to operate the franchised Quiznos restaurant business referenced in the preceding paragraph. Grolemund is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

31.     Plaintiffs William & Linda Synder ("Snyder") is a resident of the Commonwealth of Pennsylvania, with his home address at 115 Central Avenue. Warren, Pennsylvania 16365. In 2003, Snyder executed a Franchise Agreement with Quiznos Store No. 4847, located at 1060 Pennsylvania Avenue West. Warren, Pennsylvania 16365.

32.     L & B  L.L.C. is a Pennsylvania corporation, which has its principle place of business at 1060 Pennsylvania Avenue West. Warren, Pennsylvania 16365, which was formed by the William and Linda Synder to operate the franchised Quiznos restaurant business referenced in the preceding paragraph. Synder is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

33.     Defendant The Quiznos Franchise Company LLC ("TQFC") is a Colorado limited liability company with its principle place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. TQFC, in its own right and as the successor to the rights and liabilities of the Quizno's Corporation and The Quizno's Franchise Company, was the franchisor for Quiznos franchises granted prior to July 2002 Defendant TQFC does transacts business within Pennsylvania and is amenable to personal jurisdiction in Pennsylvania.

34.     Defendant Quiznos Franchising LLC ("QF") is a Colorado limited liability company with its principle place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. QF was the franchisor for Quiznos franchises granted between July 2002 and February 2005. Defendant QF transacts business within Pennsylvania and is amenable to personal jurisdiction in Pennsylvania.

35.     Defendant Quiznos Franchising II LLC ("QFII") is a Delaware limited liability company with its principle place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. QFII was the franchisor for Quiznos franchises granted in and after February 2005. Defendant QFII transacts business within Pennsylvania and is amenable to personal jurisdiction in Pennsylvania. Upon information and belief, QFII has succeeded to the majority, if not all, of the rights and obligations of the various Quiznos defendants identified in this complaint.

36.     Defendant The Quiznos Master LLC ("TQM") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. TQM owns the Quiznos intellectual property , including without limitation trademarks, copyrights, and purportedly confidential information, used by the various Quiznos entities in their operation and control of the Quiznos franchise system. TQM was at certain times material the parent of TQFC and an affiliate of QF. Defendant TQM transacts business within Pennsylvania and is amenable to personal jurisdiction in Pennsylvania.

37.     Defendant QFA Royalties LLC ("QFA") is a Delaware limited liability company with its principle place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, as of February 2005 the owners of the Quiznos entities identified in this complaint and of other related or affiliated  Quiznos entities engaged in a

series of transactions that, after the transactions were completed, left QFA as the franchisor

for all Quiznos franchise agreements entered into before February 2005. Defendant QFA

transacts business within Pennsylvania and is amenable to personal jurisdiction in

Pennsylvania.

38.    Defendant QZ Finance LLC ("QZF") is a Delaware limited liability company

with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado,

80202. Upon information and belief, QZF succeeded to various rights and liabilities of TQFC

and QF in or about February 2005. Defendant QZF transacts business within Pennsylvania

and is amenable to personal jurisdiction in Pennsylvania.

39.    Defendant QIP Holder LLC ("QIP") is a Delaware limited liability company with

its principle place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado, 80202.

Upon information and belief, as of February 2005, QIP succeeded to certain rights and

liabilities of TQFC, QF, TQM, and/or QZF related to the franchise identified in this

Complaint. Defendant QIP transacts business within Pennsylvania and is amenable to

personal jurisdiction in Pennsylvania.

40.    Defendant TQSC LLC ("TQSC") is a Colorado limited liability company with its

principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado, 80202.

Upon information and belief, QFII and QFA have delegated their rights, duties and

obligations as franchisor under Quiznos franchise agreements in the United States to TQSC

for performance. Defendant TQSC transacts business in Pennsylvania and is amenable to

personal jurisdiction in Pennsylvania.

41.    Defendant Cervantes Capital LLC ("Cervantes") is a Colorado limited liability

company with its principal place of business at 1515 Arapahoe Street, Tower One, 10th Floor,

Denver, Colorado, 80202. At certain times material, Cervantes maintained its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado, 80202. The Registered Agent for Cervantes is Patrick E. Meyers, the recently replaced General Counsel for Quiznos. Upon information and belief, Cervantes Capital employs and pays Defendants Rick Schaden and Dick Schaden, as well as other top executives involved in decision-making for the Quiznos franchise system and various Quiznos entities, fees to Cervantes to have Cervantes and its employees run the Quiznos franchise system. In addition, upon information and belief, Cervantes owns or controls American Food Distributors, LLC and/or various affiliates thereof; CLG Leasing LLC; and Source One Distribution, LLC, among other supply companies from whom Plaintiffs and other Quiznos franchisees throughout the United States are required to purchase food products and other supplies for use in their franchised Quiznos restaurants, as well as other "captive" supply companies with which Quiznos requires Plaintiffs and other Quiznos franchise to do business. Cervantes does substantial business within Pennsylvania and is amenable to personal jurisdiction in Pennsylvania.

42.    Defendant Richard E. Schaden ("Rick Schaden") is a resident of Colorado who resides at 10563 E. Goosehaven Drive, Lafayette, Colorado 80026. Rick Schaden is, upon information and belief, the Chief Executive Officer of QFII, and upon information and belief, holds officer and director positions with one and more of the other Quiznos entities named as Defendants herein.

43.    Defendant Richard F. Schaden ("Rick Schaden") is a resident of Colorado who resides at 9596 Jeffco Airport Avenue, Westminster, Colorado 80021. Dick Schaden is, upon information is belief, an officer and/or director of one and more of the Quiznos entities named as Defendants herein.

44.    Defendant Kevin Casey ("Casey") is a resident of the State of Pennsylvania. Casey is the Senior Vice President of Development for Quiznos' and director responsible for executing franchises. Casey made representations and omissions to some of the Plaintiffs both before and after they signed their Franchise Agreements. At all times material, Casey acted as the agent and representative of Quiznos, such that his conduct is attributable to one or more of the Defendants.

45.    Defendant John Lubarski ("Lubarski") is a resident of the State of Pennsylvania. Upon information and belief, Lubarski worked as the Director of the Real Estate department for Quiznos. Lubarski made representations and omissions to some of the Plaintiffs both before and after they signed their Franchise Agreements. At all times material, Lubarski acted as the agent and representative of Quiznos, such that his conduct is attributable to one or more of the Defendants.

46.    In this Complaint, the term "Quiznos" refers to the web of affiliated companies, corporations and limited liability companies that, acting together or separately, control and manage the business of the Quiznos franchise system.

**GENERAL ALLEGATIONS**

47.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

## QUIZNO'S UNSUSTAINABLE BUSINESS PLAN

48.    Quiznos has been in business since 1981 and in 1991 begun operating a system of franchised toasted submarine sandwiches and offering franchises for sale to members of the public across the United States, including Pennsylvania.

49.    From 1994 through 2001, Quiznos operated as a publicly-traded entity. In 2001, Quiznos was taken private by Rick Schaden, Dick Schaden, certain other members of the Schaden family, and others known and unknown (collectively the "Schaden Ownership Group"), who together owned a majority of the shares.

50.    Although 95% of the non-Schaden  "outsider" shareholders objected to the going private transaction, the Schaden Ownership Group used its majority control to force the sale of minority shareholders interests at $8.50 per share.

51.    Dissenting minority shareholders brought a civil action in Colorado challenging the fairness of the price they received for their shares, and the court ultimately determined that the fair market value of the minority interests was $32.50 per share (almost four times more that the Schaden Ownership Group had paid for the shares). The court also determined that the $8.50 per share valuation had been established in bad faith.

52.    After the completion of the going-private transaction in 2001, Quiznos adopted a strategy of rapid growth of its franchise system, and at the same time adopted methods of increasing revenues by forcing franchisees to pay ever higher costs for food supplies and other products from Quiznos-affiliated companies or Quiznos-approved suppliers. These measures have been adopted to inflate Quiznos' profitability and make it more attractive to potential buyers and investors, toward the ultimate goal of allowing the Schaden and other Quiznos insiders to sell their ownership interest for billions of dollars.

53.     In or about April 2006, Quiznos sold an undisclosed stake in the company to the investment firm JP Morgan Partners and/or an affiliate of JP Morgan Partners (collectively "JP Morgan"). Upon information and belief, Quiznos sold JP Morgan Partners a 49% share of Quiznos for approximately $585 million, with JP Morgan having the opportunity to purchase the remainder of the shares still held by the Schadens Ownership Group at a specified time and for a specified price if certain conditions are met.

54.     For Quiznos to complete the sale of itself to JP Morgan, it must maintain and even improve the financial results, including substantial revenue growth, it has experienced over the last several years. To that end, Quiznos has continued and even enhanced a number of deceptive and fraudulent practices with respect to its franchisees that allow it to extract millions upon millions of dollars from the franchisees, while simultaneously making it difficult if not impossible for most Quiznos franchisees to operate profitably.

## QUIZNO'S FRAUDULENT MISREPRESENTATIONS TO FRANCHISEES

55.     At the same time Quiznos solicits new franchisees to enter into unconscionable and burdensome franchise agreements, it engages in a policy whereby it accepts substantial payments from potential franchisees, in exchange for the right to operate a franchise that Quiznos knows, or should reasonably know, will in all likelihood fail.

56.     Quiznos flaunts itself as one of the fastest-growing Quick-Service Restaurant ("QSR") franchise chains in the United States. Over the last several years, the number of franchised Outlets claimed by Quiznos had risen dramatically, from approximately 1,500 at the beginning of 2003 to over 5,000 as of the filing of this action. A continued rapid increase

in the number of Quiznos franchise sold is an important element in Quiznos' strategy of continuing to experience substantial growth in revenues.

57.    Upon information and belief, when dealing with prospective franchise, Quiznos under-reports its closure rates, does not report its true turnover rates, and does not identify that the vast majority of its existing franchisees are single store owners, in a deliberate effort to conceal and prevent prospective franchisees from  obtaining information that would educate them as to the true risks involved in this franchise venture, the potential for loss of a franchisee's invested capital, and the lack of opportunity to become a successful multi-store franchisee (the very concept of franchising from a franchisee perspective).

58.    At the same time Quiznos was inducing Plaintiffs and others to invest its franchise system, it concealed the fact that the company was unable to support that system. For example, in a document dated December 12, 2003 prepared on Quiznos behalf by Fredric Cohen, Esq., Quiznos' attorney, Quiznos claimed that "40% of Quiznos units are not breaking even (Meyers (5/5/03) 65:23-66:1)." This material fact was never (and has never been) disclosed to any of the Plaintiffs despite Quiznos' knowledge of it. Moreover, as of December 31, 2006, the Quiznos system included 2,653 signed franchises that had not opened a location; 72.5% of those franchises (1,925 of them) had not opened within the required 12 months after signing and therefore may be terminated. During that same year, there were 571 transfers, 390 cancellations of terminations, and an additional 402 franchisees left the system. While not expressly stated in its UFOC, Quiznos' turnover rate in 2006 was an astounding 30%, which is more than three time the industry standard.

59.    Further, during required corporate training for new franchisees, Quiznos represents through the use of inaccurate and deceptive graphs, charts and related calculations

that within five years, a Quiznos location would be debt free and maintain a substantial resale value.  Based upon these deceptive figures, Quiznos encourages and induces existing franchisees to purchase multiple locations, before they can become aware of the true lack of profitability resulting from Quiznos fraudulent policies and practices.

## QUIZNO'S UNCONSCIONABLE AND UNENFORCEABLE FRANCHISE AGREEMENTS

60.    Based upon the misrepresentations stated throughout this Complaint, Quiznos exploits its overwhelming bargaining power to require the franchisees to sign unconscionably one-sided adhesive franchise agreements, without any potential for negotiation of their terms.

61.    These misleading and deceptive franchise agreements purport, among many other things, to give Quiznos unilateral control over all significant aspects of franchisee operations, to unreasonably truncate any statutes of limitation that may apply to franchisees' legal claims, to disclaim any responsibility for the effect of Quiznos' decisions and actions on the franchisees' viability, and to restrict the ability of franchisees to litigate in their home states, to join with other franchisees to press claims, and to enjoy their constitutionally-guaranteed right to a jury trial.

62.    The terms of the agreements, and their "Operations Manual" (which Quiznos routinely updates and uses as an extension of the franchise agreement in order to expand upon the terms of the original agreement), are in combination so burdensome of franchisees and so one-sided in favor of Quiznos that they can only be regarded as unconscionable and unenforceable. The net effect on Quiznos' franchisees of its approach to franchising is to ensure unconscionably overboard contracts that purport to circumvent meaningful legal rights belonging to the franchisee, impenetrable systematic barriers to economic success for

the franchisee, and negative incentives to pursue legal remedies to redress injuries caused by Quiznos' conduct.

## QUIZNOS' POLICY OF EXTRACTING UNLAWFUL PROFITS FROM ITS FRANCHISEES

63.     Once the franchisees are ensnared in the Quiznos' scheme, Quiznos defrauds them though tying the franchisees' use of the Quiznos trademark and right to participate in the franchise system to the supply of food products, supplies, services, and other things necessary for operation of the franchised restaurants ("Essential Goods").

64.     The franchise agreements provide that the franchisee must "purchase all equipment, products, services, supplies and materials required for the operation of the Restaurant from manufacturers, suppliers or distributors designated by Franchisor or its affiliates." These products include fungible staple food items such as meat, cheese, and condiments, as well as services such as cash register system leases, accounting services, approved architects, and/or approved building contractors.

65.     Quiznos franchisees enter into their franchise agreements with limited and deceptive information regarding the nature of these tying policies. The agreements contain a provision allowing the use of "undesignated" suppliers with Quiznos' approval, but this provision is meaningless and misleading because such approval is rarely, if ever, granted. Moreover, the very process for alternate-supplier approval is deliberately vague, complex and with no timelines for approval, and as a result Quiznos frequently never responds to franchisees' requests for such approval, or fails to provide any reasonable explanation for disapprovals.

66.    After locking franchisees into the system, Quiznos exploits its unilateral control over the purchases that franchisees must make in two principal ways. First, with respect to Essential Goods that Quiznos or one of its affiliated corporations such as American Food Distributors LLC and Continental Leasing LLC sells directly and/or through their suppliers or distributors to franchisees, Quiznos charges prices for those Essential Goods that Quiznos knows to be higher than franchisees could obtain for products, materials and services of equal or even higher quality form independent third-party vendors in a competitive market. This practice results in Quiznos and/or its affiliated companies reaping revenues and profits greatly in excess of what they would be if franchisees were not bound to buy from Quiznos at the peril of being deemed in default and losing their franchise if they don't. Second, Quiznos requires franchisees to purchase certain Essential Goods that are sold by Quiznos-approved vendors, in which Quiznos maintains a financial interest. It is Quiznos' policy in such cases to require that independent suppliers, as a condition of becoming an approved source of products, services or materials to Quiznos franchises, pay kickbacks and/or rebates to Quiznos, which are euphemistically termed "rebates" by Defendants. Quiznos requires approved vendors/distributors to pass along the cost of the kickbacks and/or rebates to its franchisees, resulting in the franchisees' being required, once again to pay prices for products, services and materials that are higher than franchisees could obtain from independent third-parties in a competitive market.

67.    Through its "rebate" scheme, Quiznos and companies and individuals affiliated with it reap substantial revenues and profits that come at the direct expense of its franchisees. This deliberate coercion, carried out using threats and intimidation, creates an environment where franchisees and their invested capital are preyed upon as  the most important,

immediate and dependable source of revenue and cash flow for the franchisor, with little concern demonstrated by the franchisor regarding the franchisees' positive cash flow generated through the sale of the franchisor's actual food products, even though these products are purported by the franchisor to be their primary business interest, but in fact are not. Moreover, once franchisees become aware of this fraudulent scheme, the sunk costs, onerous contractual provisions, and costs of switching to another franchisor make it economically prohibitive to escape the fifteen (15) year Quiznos franchise agreement, thus finding them in long-term indentured servitude.

68.     Even after signing the franchise agreement, as a condition of franchisee ownership, Quiznos requires franchisees to sign supplemental contracts for franchisor-mandated services. These contracts are equally one-sided, favoring Quiznos, and designed to prevent the prospective franchisee from being able to comprehend the actual impact to the franchisee's bottom line. Quiznos promotes these mandated services as being critical to "the brand" when in fact they have no direct connection to the brand whatsoever, and on direct relation to quality standards. In fact, the true purpose of these mandated services is to provide kickbacks to Quiznos.

69.     Defendants' practice of knowingly overcharging  franchisees and requiring kickbacks and/or rebates from approved vendors are directly contrary to Quiznos' representations to franchisees made in its various UFOCs, which provide, for example, in 2003  and 2004, that "We and our affiliates negotiate purchase agreements with suppliers for the benefit of Franchisees." These practices as described herein are also directly contrary to statements routinely made by Quiznos' Area Directors (who supervised the franchisees regionally) and other involved in the process of inducing the public to purchase Quiznos

franchises, to the effect that Quiznos uses its "buying power" created by the size of its franchise system to negotiate volume discounts from suppliers and pass those discounts on to franchisees. Recently-appointed Chief Executive Officer Gregory D. Brenneman concedes in a February 24, 2007 article in the New York Times that franchisee profitability is a problem at Quiznos, claiming "it was clear [when he got involved with the company] that food costs, as a percent of revenue were, quite honestly out of line…"

70.     Quiznos and its affiliated entities receive substantial revenues from Quiznos' systematic and fraudulent overcharging on direct sales to franchisees and kickbacks on sales made by approved vendors to franchisees. For example, upon information and belief the Cervantes-owned American Food Distributors LLC had $93,324,012 in 2005 revenues, in addition to $33,353,377 in kickbacks from approved food vendors. Upon information and belief, Cervantes-owned Source One Distributor LLC, which sells equipment directly and/or through suppliers and distributors to Quiznos franchisees for their stores, received kickbacks from approved equipment vendors of $4,809,233 in addition to revenues of $60,365,204 in 2005.

## CLASS ACTION ALLEGATIONS

71.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs bring this action on behalf of themselves and the Class of similarity situated persons defined as:

> All Pennsylvania residents (including persons and business entities)
> that owned a Quiznos franchise during the longest period permitted
> by the applicable statutes of limitations. Excluded from the Class
> are the Officers, directors and employees of Defendants and their

27

respective legal representatives, heirs, successors and assigns.

**Rule 23(a)**

72.    **Numerosity:** Members of the Class are so numerous that their individual joinder is impractical. The precise identities, number and addresses of members of the Class are unknown to Plaintiffs, but may and should be known with proper and full discovery of Defendants, third parties, and their respective records.

73.    **Existence of Common Questions of Fact and Law:** There is a well defined commonality and community of interest in the questions of fact and law affecting the members of the Class. The common questions of fact and law include, among other things:

(A) Whether and to what extent Defendants' practice, conduct, and misrepresentations violate federal or state law;

(B) Whether Defendant have engaged in mail and wire fraud;

(C) Whether Defendant engaged in a pattern of racketeering activity;

(D) Whether the Quiznos franchise system is an enterprise within the meaning of 18 U.S.C. § 1961 (4);

(E) Whether Defendants conducted or participated in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(F) Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. § 1962(a) and (c) proximately caused injury to the Plaintiffs' and class members' business and property;

(G) Whether the market for participation in the Quiznos franchise system constitutes a product market in which  Defendants maintain substantial market power;

(H) Whether Defendants unlawfully coerced franchisees to purchase specific goods and services from them as a condition for the right to participate in the Quiznos franchise system;

(I)  Whether such anti-competitive tying violates state and/or federal law,

(J)  Whether Defendants' unlawful anticompetitive practices violates 15 U.S.C. § 1;

(K) Whether in connection with filing, offer, or sale of the subject franchises, Defendants directly or indirectly employed any devices, schemes, or artifices to defraud Plaintiffs within the meaning of Pennsylvania Common Law;

(L) Whether, in connection with filing, offer, or sale of the subject franchises, Defendants directly or indirectly make any untrue statements of material fact or omitted certain material facts necessary in order to make the statement(s) made, in the light of the circumstances under which they are made, not misleading under the IFDA or the ICFA;

(M)    Whether, in connection with filing, offer, or sale of the subject franchises, Defendants directly or indirectly engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, within the meaning of the IFDA or the ICFA;

(N) Whether Defendants' affirmative statements and material omissions constitute intentional fraud;

(O) Whether Quiznos' UFOC contained fraudulent misrepresentations and omissions;

(P) Whether Quiznos breached the terms of the agreement contained in the UFOCs;

(Q) Whether Plaintiffs sustained injury as a result of Quiznos' breaches of the Franchise Agreement and/or the implied covenant of good faith and fair dealing;

(R) Whether any of the provisions of the subject Quiznos' breaches of the franchise agreements were void and/or unenforceable under the terms of the IFDA or the ICFA;

(S) Whether Plaintiffs and Class members are entitled to recover compensatory, exemplary, treble, statutory, or punitive damages based on Defendants' fraudulent, illegal, anticompetitive conduct or practices and/or otherwise; and

(T) Whether Plaintiffs and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit

74.    **Typicality:** Plaintiffs are members of the Class. Plaintiffs' claims have a common origin and share common bases. Their claims originate from the same illegal, fraudulent and confiscatory practices of the Defendants, and the Defendants act in the same way toward the Plaintiffs and the Class members. If brought and prosecuted individually, the claims of each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

75.    **Adequacy:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained competent counsel, and intend to prosecute this action vigorously. Plaintiffs' counsel will fairly and adequately protect the interest of the members of the Class. **Rule 23(b)(2) and(3)**

76.    This lawsuit may be maintained as a class action pursuant to **Federal Rule of Civil Procedure 23(b)(2)** because Plaintiffs and the Class seek declaratory and injunctive relief, and all of the above factors or numerosity, common questions of fact and law,

typicality and adequacy are present. Moreover, Defendants have acted on grounds generally applicable to Plaintiffs and the Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable remedies.

77.    This lawsuit may be maintained as a class action under **Federal Rule of Civil Procedure 23(b)(3)** because questions of fact and law common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior  to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices. Additionally, effective redress for each and every class member against Defendants may be limited or even impossible where serial, duplicated, or concurrent litigation occurs arising from these disputes. Even if individual class member could afford or justify the prosecution of their separate claims, such as approach would compound the judicial inefficiencies, and could lead to incongruous judgments against Defendants.

**Statute of Limitations Estoppel :**

78.    Throughout the implementation of their fraud and continuing until the present day, Defendants have engaged in affirmative conduct and made representations, including those described herein, with the intent and effect of preventing Plaintiffs and the Class from becoming aware of their rights or otherwise dissuading then from pursuing legal action to vindicate those rights.

79.    In particular, various Quiznos representatives have consistently and routinely represented that the franchisees' concerns raised in this Complaint and elsewhere were of the

utmost importance to Quiznos and would be rectified, which have served the deliberate purpose of lulling Plaintiffs into believing that Quiznos had their best interest at heart and that the pursuit of legal action was unnecessary. The following serve as examples.

(A) When Quiznos reached the milestone of having opened 1800 franchises in or about 2003, it falsely represented to its franchisees that it constituted a "buying club" and that prices for food and supplies would be going down;

(B) In Spring of 2007, a Quiznos representative based in Pennsylvania, represented to Plaintiff Vela, when Vela inquired about the reasons for lower than expected financial returns, that they should "sit tight" and that the matter was entirely seasonal and that "sales would pick up in the summer";

(C) In fall of 2005, Plaintiff Vela learned that she was on Quiznos "Endangered Species" list and was told by Quiznos Vice President at the time that help was on its way through Quiznos Assistantship Program and that Quiznos cared about her long-term economic viability;

(D) In an Annual Meeting Quiznos falsely stated that food and supply pricing would be lower and that Pepsi Cola would be providing revenue for advertising;

(E) In regular meetings of the regionally-based Marketing Action Teams ("MATs"), Quiznos falsely impresses upon MAT members Quiznos, including Chief Executive Officer Brenneman, is concerned about changes to help franchisees become profitable and deliberately requests members of the MAT team to contact store owners and advise of Quiznos intent to resolve the problems with the franchise system;

(F) In a videotaped presentation from 2005, Steve Shaffer, Quiznos' former President, stated: "In 2005 franchise profitability is one of my top priorities. There are two ways

for franchisees to make more money: (1) Increase sales and (2) Lower costs. We've made some strides by increasing sales and we've shown some improvement in lowering costs but discounts remain way too high. Rest assured, we will lower discount rates."

(G) In a videotaped presentation from 2006, President Shaffer claimed: "Our top priority for 2006 is to help you reduce your Food, Labor, Paper, Discounts ("FLPD"). In 2005, our chain's FLPDs were around 59% and that is just too high."

80. The purpose of these ongoing communications was to dissuade franchisees from taking any action, legal or otherwise, to enforce their rights.

81. Defendants have also actively concealed information necessary for Plaintiffs and the Class to discover the existence of their cause of action. Plaintiffs and the Class relied on the Defendants' actions and/or omissions in failing to discover the factual and legal basis of their claims.

82. As a Result of Defendants' self-concealing fraud, affirmative misconduct, misrepresentations and omissions, Plaintiffs and Class did not know, and could not know in the exercise of reasonable diligence, the basis of their claims. Accordingly, Defendants are stopped from raising affirmatively defenses relying upon any statutes of limitations or contractual limitation periods otherwise applicable to the claims asserted herein by Plaintiffs.

## FIRST CLAIM FOR RELIEF

## CIVIL RICO (18 U.S.C. @ 1962(C))

## (FRAUDLENT SCHEME TO SELL ESSENTIAL GOODS AT INFLATED PRICES) ON

## BEHALF OF ALL PLAINTIFFS

83.     Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

84.     Defendants QFII, QFA, TQSC, Cervantes, Rick Schaden and Dick Schaden have violated 18 U.S.C. @ 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

85.      The Quiznos franchise system, which is comprised of Defendants QFII, QFA,TQSC, TQM, Cervantes and its affiliates and/or subsidiaries that sell products, services and materials to franchisees, and all of Quiznos franchisees nationwide, is an "association-in-fact" enterprise within the meaning of 18 U.S.C. @ 1961 (4). This enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs; the structure of the enterprise is imposed by, among other things, the terms of the various franchise agreements upon which defendants have relied in requirements plaintiffs to take certain actions and to refrain from taking other actions. There are numerous aspects of the operation of this enterprise that do not involve conduct that is intrinsically criminal or illegal, including but not limited to the sale of submarine sandwiches and other products by Plaintiffs to members of the general public, the advertising of plaintiffs' stores and of Quiznos generally by both Plaintiffs and by the Quiznos defendants themselves, the hiring of employees by employees by franchise, and many other day-to-day business activities that do not partake of criminality.

86.    The Defendants conduct the affairs of the enterprises, as opposed to merely their own affairs, by, among other things, invoking provisions of the franchise agreement to require the Plaintiffs to take certain actions and to refrain from taking certain actions, in general by asserting control over the activities of franchisees in a hierarchical manner.

87.    Defendant QFII participated in the conduct of the enterprise through the exercise of its control, granted to it by the franchise agreements, over the Plaintiff's purchase of products, services and materials by requiring the Plaintiff to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater that the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources. Defendants further gained control over franchisees by sanctioning unreasonable lean and financing arrangements for inflated prices for store establishment that could not be reasonable loan and financing arrangements for inflated prices for store establishment that could not be reasonably repaid by the average Quiznos store's cash flow, placing Plaintiffs in submissive positions for fear of losing their only cash flow and facing imminent bankruptcy. The Defendants also engage or engage third-parties in the resale of Quiznos franchisees across the country at sales prices significantly below the original investment of the original franchisee, thereby devaluing the overall market value of a Quiznos franchise and making it difficult for any franchisees to recoup its investment.

88.     If it were not for the separate legal existence of the franchisees, the Defendants would not have been able to effectuate their scheme of conducting the affairs of the enterprise so as to defraud the plaintiffs of money and/or property. For Example, only by virtue of the separate existence of individuals and companies who agree to purchase Quiznos

franchisees can the defendants fraudulently induce such purchases. This would be impossible if Quiznos operated exclusively through company-owned stores, and this, among other reasons, is why Quiznos divested itself of all corporate stores except two, having once owned 35 in their early growth years.

89.     Defendant QFA participated in the conduct of the enterprise through the exercise of its control, granted to it by the franchise agreement, over the Plaintiffs' purchase of products, services and materials by requiring the Plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

90.     To the extent that rights to enforce and apply the franchise agreements of the Plaintiffs have in fact been delegated to Defendant TSQC, Defendant TSQC has participated in the conduct of the enterprise though the exercise of its control, granted to it by the franchise agreements, over the Plaintiffs' purchase of products, services and materials by requiring the Plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

91.     Defendant Cervantes has participated in the conduct of the enterprise by its provision of products and services to the Plaintiffs through its affiliates.

92.     Defendants Rick Schraden and Dick Schraden have participated in the affairs of the enterprise by virtue of their positions as officers and/or directors of Defendants QFII,

QFA, and TQSC in which positions, upon information and belief, they either made or approved decisions to knowingly overcharge Plaintiffs for products, services and materials which Plaintiffs were required to buy in order to operate their franchises, and to require Plaintiffs to purchase products, services and materials from approved vendors whose prices to franchisees were known by Dick Schraden and Richard Schraden to be inflated beyond fair market value because of kickbacks and/or rebates that the approved vendors were required to pay one or more Quiznos entities in order to become approved vendors.

93.    The predicate crimes committed by Defendants are mail **Fraud** as defined by 18 U.S.C. @ 1341 and wire **Fraud** as defined by 18 U.S.C. @ 1343.

94.    In violation of 18 U.S.C @ 1341 and 18 U.S.C. @ 1343, Defendant QFII devised and effected a scheme to defraud the Plaintiffs that have franchise agreements signed in and after February 2005, which scheme consisted of deliberately the knowingly overcharging the knowingly causing the Plaintiffs to be overcharged (on purchases made directly from Quiznos as a condition of becoming approved) for products, services and materials they are required to purchase in order to operate their franchises.

95.    The execution of the scheme to defraud by Defendant QFII involved numerous individual instances of the use of the United States mail and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by Defendant QFII.

96.    Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of Defendant's fraudulent scheme are as follows: payments made by Plaintiffs for products, services, and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers

made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by Defendant's fraudulent overcharging practices.

97.    In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, Defendant QFA devised and effected a scheme to defraud the Plaintiffs that have franchise agreements signed prior to February 2005, which scheme consisted of deliberately and knowingly overcharging the Plaintiffs (on purchases made directly from Quiznos- controlled entity) or deliberately and knowingly cause the Plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services, and materials they are required to purchase in order to operate their franchises.

98.    The execution of the scheme to defraud by Defendant QFA involved numerous individual instances of the United States mails and interstate wire facilities in furtherance, of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by Defendant QFA.

99.    Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of the Defendants fraudulent scheme are as follows: payments made by Plaintiffs for Products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails;

and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by Defendant's fraudulent overcharging practices.

100.    To the extent that the franchisor's right under Plaintiff's franchise agreements have been delegated to Defendant TQSC, Defendant TQSC devised and effected a scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, which scheme consisted of deliberately and knowingly overcharging the Plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and knowingly causing the Plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services, and materials they are required to purchase in order to operate their franchises.

101.    The execution of the scheme to defraud by Defendant TQSC involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendant TQSC. The acts of mail fraud and wire fraud as alleged herein threaten to continue indefinitely into the future because the practice of fraudulently overcharging the Quiznos franchisees for products, services and materials they must purchase in order to operate their stores is a crucial means by which Quiznos maintains its high revenues and profits. Indeed, the scheme is likely to continue on its present course until Quiznos existing majority shareholders achieve their ultimate goal of selling the entire company to an outside buyer.

102.    Specific instances of the uses of the United States mails and interstates wire facilities in furtherance of Defendant's fraudulent scheme are as follows: payments made by

Plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers made using interstate wire; Plaintiffs received shipments of deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by Defendant's fraudulent overcharging practices.

103.    The predicate acts committed by Defendants as alleged herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

104.    The acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities to defraud the same victims of money each time a fraudulently inflated price is charged to the franchisee and received, in the form of a direct payment to Quiznos or a kickback paid to Quiznos by an approved supplier, by Quiznos or an affiliated entity. In addition, all of the Quiznos franchisees across the United States, current and past have also been victimized by this fraudulent scheme, meaning that the scheme has literally thousands of victims.

105.    Plaintiffs have been damaged by reason of the Defendant's conducting the affairs of the Quiznos franchise system though the pattern of racketeering activity as alleged herein, and more specifically have been damaged by the predicate acts of wire fraud that result in payments being debited by electronic transfer from their bank accounts, in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c).

# SECOND CLAIM FOR RELIEF

# CIVIL RICO(18 U.S.C. § 1962(C))

# (FRAUDULENT SCHEME TO SELL FRANCHISE AGREEMENTS)

# ON BEHALF OF ALL PLAINTIFFS

106.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

107.    Defendants QFII, QFA, TQSC, Rick Schraden, Dick Schraden, Kevin Casey, John Lubarski, have violated 18 U.S.C. § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

108.    The Quiznos franchise system, which is comprised of Defendants QFII, QFA, TQSC, TQM, Cervantes and its affiliates and/or subsidiaries that sell products, services and materials to franchisees, and all of Quiznos franchisees nationwide, is an "association-in-fact" enterprise within the meaning of 18 U.S.C. §1916(4). This enterprise is separate and distinct from the individual Defendants that participated in it and direct its affairs; the structure of the enterprise is imposed by, among other things, the terms of the various franchise agreements upon which Defendants have relied in requiring plaintiffs to take certain actions and to refrain from taking other actions. There are numerous aspects of the operation of this enterprise that do not involve conduct that is intrinsically criminal or illegal, including but not limited to the sale of submarine sandwiches and other products by Plaintiffs to members of the general public, the advertising of Plaintiffs' stores and of Quiznos generally by both Plaintiffs and by the Quiznos Defendants themselves, the hiring of

employees by franchisees, and many other day to day business activities that do not partake of criminality.

109.    The Defendants conduct the affairs of the enterprise, as opposed to merely their own affairs, by, among other things, invoking provisions of the franchise agreement to require the plaintiffs to take certain actions and to refrain from taking certain actions, and in general by asserting control over the activities of franchisees in a hierarchical manner.

110.    Defendant QFII participated in the conduct of the enterprise though inducting the purchase of franchises by Plaintiffs, among thousands of others, by knowingly misrepresenting facts about the revenues and profit margins that franchises could expect to receive, as alleged specifically herein.

111.    If it were not for the separate legal existence of the franchisees, the Defendants would not have been able to effectuate their scheme of conducting the affairs of the enterprise so as to defraud the Plaintiffs of money and/ or property. For example, only by virtue of the separate existence of individuals and companies who agree to purchase Quiznos franchisees can the defendants fraudulently induce such purchases. This would be impossible if Quiznos operated exclusively through company-owned stores.

112.    Defendant QFA participated in the conduct of the enterprise through inducing the purchase of franchises by Plaintiffs, among thousands of others, by knowingly misrepresenting facts about Quiznos' policies and procedures, about the costs of running a Quizno's franchise, about the revenue and profit margins that franchises could expect to receive, as alleged specifically herein.

113.    Defendants Cervantes has participated in the conduct of the enterprise by its provision of products and services to the Plaintiffs through its affiliates.

114.    Defendants Rick Schraden and Dick Schraden have participated in the affairs of the enterprise by virtue of their positions as officers and/or directors of Defendants QFII, QFA, and TQSC in which positions, upon information and belief, they either made or approved decisions to knowingly induce franchise sales through misrepresentation and deceit.

115.    Defendants Kevin Casey and John Lubarski and other Quiznos employees and representatives like them have participated for their own financial benefits in the affairs of the enterprise by knowingly making misrepresentations of fact to Plaintiffs and other prospective franchisees for the purpose of inducing them to purchase Quiznos franchises.

116.    The predicate crimes committed by Defendants are mail fraud as defined by 18 U.S.C. § 1343.

117.    In violation of 18 U.S.C §1341 and 18 U.S.C. § 1343, Defendants devised and effected a scheme to defraud prospective franchisees by knowingly and deliberately making false representations of fact, and/or omitting material true facts, to prospective franchises in order to induce them to purchase a Quiznos franchise.

118.    The execution of the scheme to defraud by Defendants involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by Defendants.

119.    Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of defendants fraudulent scheme are as follows: Uniform Franchise Offering Circulars and franchise agreements were distributed using the United States mails; Defendant QF,  made and received telephone calls to and from prospective franchisees in

43

which further fraudulent representations and omissions were made in order to induce entry into franchise agreements; payments made by Plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiff's bank accounts though electronic funds transfers made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by Defendants' fraudulent overcharging practices.

120.    Prior to the Plaintiffs Martrano and Schallenberger signing their Franchise Agreement and investing significant sums in store operations, Defendants QF, Kevin Casey and John Lubarski, and various other Quiznos employees and representatives, including QF's representatives assigned to sell franchise in the Commonwealth of Pennsylvania, made certain fraudulent  statements and omissions. In perpetrating of these frauds, Defendants sought to induce the Plaintiffs to sign their Franchise Agreement. In addition, after the Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and he investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A) Prior to signing the Franchise Agreement, at a meeting with Plaintiff Martrano and

      Shallenberger in or about summer of 2003 at Defendant QF's seminar in the Sheraton

      Hotel, located at 300 West Station Square Drive Pittsburgh, PA 15219,

Defendants Kevin Casey and John Lubarski intentionally misrepresented Quizno's business plan.

(B) Prior to Plaintiffs Martrano and Shallenberger signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(C) At that same meeting, Defendants Kevin Casey and John Lubarski and a Quiznos representative whose name is unknown to the Plaintiff, intentionally misrepresented that the Quiznos' real estate process was "very easy" and that they "shouldn't encounter any problems" due to their location being one of the "top five in the state".

(D) At the same meeting, Defendant Kevin Casey and John Lubarski intentionally misrepresented to Plaintiff Martrano and Shallenberger that the demographics "are excellent in that location" and they "should have no problem establishing business".

(E) At that same meeting, Defendant Kevin Casey and John Lubarski told Plaintiff Martrano and Shallenberger that "average store sales for this area are $421,000" and that he didn't see any reason why someone in their locale where Plaintiff Martrano and Shallenberger intended to operate a store would do less then that;

(F) Prior to Plaintiffs Martrano and Shallenberger signing the Franchise Agreement, during a meeting and in written marketing communications, Defendants QF, Kevin Casey and John Lubarski, and various other Quiznos representatives and employees who sold the Martrano and Shallenberger plaintiffs their franchise, affirmatively misrepresented the expense data associated with the Quiznos franchise through the use of "NET 2" data, which had no relation to the actual expenses that Martrano and Schallenberger ultimately encountered in operating the franchise, even though

Defendants knew that the "NET 2" financial data gave a false impression of a typical franchisee's experience;

(G) Prior to the Plaintiffs signing the Franchise Agreement, Defendant Kevin Casey and John Lubarski and various other Quiznos representatives and employees who sold the Plaintiff their franchise, failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated base on "NET 2" data, as opposed to "NET 3" data, which represented the revenues that would actually be received by a franchisee;

(H) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants Kevin Casey and John Lubarski, failed to disclose the substantial markups and kickbacks that add to the prices of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(I) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants Kevin Casey, failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

(J) Subsequent to the Plaintiffs signing their Franchise Agreement, Defendant Kevin Casey and various other Quiznos representatives and employees who sold the Plaintiffs their franchise, failed to reproduce essential documents Quiznos representatives fraudulently signed on behalf of the Plaintiffs.

(K) Subsequent to the Plaintiffs signing their Franchise Agreement, Defendant Kevin Casey , failed to disclose that Form Architecture a Quizno's construction firm would

delay the construction process beyond a reasonable duration, greatly increasing the cost to the franchisee by delaying the opening of the business;

(L) Subsequent to Defendant QF and various employees and representatives acknowledging the magnitude of financial strain on Plaintiffs Martrano and Shallenberger, Quiznos claimed they would offer a "delivery plan" through the Quiznos Assistantship Program which would alleviate up to $35,000, which never materialized;

121.    These representations and omissions made to the Plaintiff are extrinsic to their Franchise Agreement. The Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitation.

122.    Prior to the Plaintiffs Rene and Gwen Vela signing their Franchise Agreement and investing significant sums in store operations, Defendant QF and various employees and representatives assigned to sell franchise in the Commonwealth of  Pennsylvania, made certain fraudulent statements and omissions. In perpetrating these frauds, Defendants sought to induce the Plaintiffs to sign their Franchise Agreement. In addition, after Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A)  Prior to the Plaintiffs signing their Franchise Agreement, during a Quiznos sales seminar in Robinson Town Center, in or around July of 2005, Defendants remarked that "they could expect annual profit of over $100,000 from their store" and that they should have "no problem paying off their mortgage in three years'';

47

(B)  Prior to Plaintiffs Vela signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(C)  Prior to the Plaintiffs signing the Franchise Agreement, but subsequent to the seminar in Robinson, Plaintiff Vela viewed a CD and other marketing materials that QF provided, which falsely claimed that "the average Quiznos store was doing over $400,000 per year";

(D)  Prior to the Plaintiffs signing the Franchise Agreement, and during the Quiznos sales seminar at Robinson, in July of 2005 a video presented by Defendants QF and various employees and representatives, which falsely claimed that "8 out of 10 independent franchisee go bankrupt within 5 years" but that "this would not happen to them because Quizno's corporation stands behind their franchisee and would provide them with assistance throughout the operation process";

(E) Subsequent to the Plaintiffs signing their Franchise Agreement Defendants falsely represented in a meeting that the Quiznos location which Plaintiff Vela had purchased was a "prime" location and should be "extremely profitable" as the "ideal Quiznos store";

(F) Subsequent to the Plaintiffs signing their Franchise Agreement, Defendants claimed that the Plaintiffs franchise was "properly operated" and that this franchise had the "lowest turnover rate" of any franchise in the district.

(G) Subsequent to the Plaintiffs signing their Franchise Agreement, and during a routine store meeting, Defendants acknowledged that Vela's franchise was having "financial

difficulties", but to "sit tight" and that the Plaintiffs store location was "the number one store" in that region;

(H) Subsequent to Defendant QF and various employees and representatives acknowledging the magnitude of financial strain on Plaintiff Vela, Quiznos claimed they would offer a "delivery plan" through the Quiznos Assistantship Program, which never materialized;

(I)   Defendants QF and various Quiznos employees and representatives, including the Quiznos representative who sold the Plaintiff their franchise, and a QF representative Webster, failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services, and other materials that must be purchased from Quiznos or its approved suppliers.

123.    These representations and omissions made to the Plaintiffs are extrinsic to their Franchise Agreement. The Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

124.    Prior to the Plaintiffs Yannito & the McGovern's signing their Franchise Agreement and investing significant sums in store operations, Defendant Kevin Casey and various other Quiznos employees and representatives, including QF's representatives assigned to sell franchises in the Commonwealth of Pennsylvania, made certain fraudulent statements and omissions. In perpetrating these frauds, Defendants sought to induce the Plaintiffs to sign their Franchise Agreement. In addition, after the Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow

the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A) Prior to pursuing store operations at Quiznos Store No. 3560, at a training seminar in Robinson, Defendants QF represented that "the average Quiznos store was doing over $360,000 per year" and that Plaintiff should have "no problem" making at least $70,000 a year after all expenses was paid;

(B) Prior to Plaintiffs Yannito & McGovern's signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(C) Prior to the Plaintiffs signing the Franchise Agreement, and during the Quiznos sales seminar at Robinson, in July of 2005 a video presented by Defendants QF and various employees and representatives, which falsely claimed that "9 out of 10 independent franchisee go bankrupt" but that "this would not happen to them because Quizno's corporation stands behind their franchisee and would provide them with assistance throughout the operation process";

(D) Prior to signing the Franchise Agreement, during meetings and in written marketing communications, Defendants Casey and various other Quiznos representatives and employees who sold the Plaintiffs their franchise, affirmately misrepresented the expense data associated with the Quiznos franchise through the use of "NET 2" data, which had no relation to the actual expenses that the Plaintiff ultimately encountered in operating the franchise, even though Defendants knew that the "NET 2" financial data gave a false impression to a typical franchisee's experience.

(E) Prior to Plaintiff Yannito & McGovern's, his partner at the time, signing the Franchise Agreement Defendants Kevin Casey failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "NET 2" data, as opposed to "NET 3" data, which represented the revenues that would actually be received by a franchisee;

(F) Prior to the Plaintiffs signing the Franchise Agreement and before commencing store operations, Defendant Kevin Casey and various others employees and representatives, failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services, and other materials that must be purchased from Quiznos or its approved suppliers.

125.    These representatives and omissions made to the Plaintiff are extrinsic to their Franchise Agreement. The Plaintiffs discovered these misrepresentation and omissions with the applicable state of limitation.

126.    Prior to the Plaintiff Ron Miller signing his Franchise Agreement and investing significant sums in some operations,  Casey, Lubarski various other Quiznos employees and representatives, including TQFC's representatives assigned to sell franchises in the Commonwealth of Pennsylvania, made certain fraudulent statement and omissions. In perpetrating these frauds, Defendants sought to induce the Plaintiffs signed their Franchise Agreement. In addition, after the Plaintiff signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A) Prior to the Plaintiffs signing the Franchise Agreement, Defendants TQFC

51

represented to the Plaintiff that their Quiznos store would do "between $60,000 and $70,000 a month" and they would realize a profit of 30% of their gross",

(B) Prior to the Plaintiffs signing the Franchise Agreement, and before commencing store operations, Defendants Casey failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services, and other materials that must be purchased from Quiznos or its approved suppliers;

(C) Prior to Plaintiff Miller signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(D) Prior to Plaintiffs signing the Franchise Agreement, Casey failed to disclose actual failure rates for a Quiznos franchise and deliberately misrepresenting the data on franchise turnovers contained in the UFOC which understates the failure rates;

(E) Prior to the Plaintiffs signing the Franchise Agreement, during meetings and in written marketing communications, Defendants Casey and various other Quiznos representatives and employees who sold the Plaintiffs their franchise, affirmatively misrepresented and expenses data associated with a Quiznos franchise through the use of "NET2" data, which had no relation to the actual expenses that the Plaintiffs ultimately encountered in operating the franchise, even though Defendant knew that the "NET2" financial data gave a false impression of a typical franchisee's experience;

(F) Prior to the Plaintiffs signing the Franchise Agreement, Defendants TQFC and failed

to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated base on "NET2" data, as opposed to "NET3" data, which represented the revenues that would actually be received by a franchisee; and

(G) Prior to the Plaintiffs signing the Franchise Agreement and before commencing store operations, Defendant Casey and various others employees and representatives, failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services, and other materials that must be purchased from Quiznos or its approved suppliers.

127.    These representations and omissions made to the Plaintiff Ron Miller are extrinsic to their franchise Agreement. The Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

128.    Prior to the Plaintiff Andrew Schry signing their Franchise Agreement and investing significant sums in store operations, Defendants and various other Quiznos employees and representatives, including QF representatives assigned to sell franchises in the Commonwealth of Pennsylvania, made certain fraudulent statements and omissions. In perpetrating these frauds, Defendant sought to induce the Plaintiff to sign their Franchise Agreement. In addition, after the Plaintiffs signed their Franchise Agreement, Defendant Casey continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow the franchise to operate .These fraudulent statements and omissions were made at various times and locations as follows:

(A) Prior to pursuing store operations at Quiznos Stores 9222 & 9223, at a sale

53

seminar in Pittsburgh, Defendants QF represented that "the average Quiznos store was doing over $420,000 per year" and that Plaintiffs should have "no problem" making "even better then that" after all expenses were paid;

(B) Prior to Plaintiff Schry signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without    providing proper notification to its franchisees;

(C) Prior to Plaintiff  Andrew Schry signing the Franchise Agreement and before commencing store operations, Defendants QF failed to disclose that Quiznos does not reimburse franchise owners for coupons, promotional offers, and other discounts, thus concealing the true cost of operating a franchise;

(D) Prior to the Plaintiff signing the Franchise Agreement, during meetings and in written marketing communications, Defendants other Quiznos representatives and employees who sold the Plaintiffs their franchise, affirmatively misrepresented the expense data associated with a Quiznos franchise through the use of "NET 2" data which had no relation to the actual expenses that the Plaintiffs ultimately encountered in operating the franchise, even though Defendants knew that the "NET2" financial data gave a false impression of a typical franchisee's experience; and

(E) Prior to the Plaintiff signing the Franchise Agreement, Defendants failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated base on "NET 2" data, opposed t "NET 3" data, which represented the revenues that would actually be received by a franchisee.

(F) Prior to the Plaintiff Schry signing the Franchise Agreement and before commencing

store operations, Defendant QF failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, service and other materials that must be purchased from Quiznos of its approved suppliers.

(G) Subsequent to the Plaintiff Schry signing the Franchise Agreement and commencing store operations, Defendant QF falsely represented that the Quiznos location which Plaintiff Schry had purchased was a "excellent" location and should be "extremely profitable" as the "ideal Quiznos store". This location was not however available for purchase and the Plaintiff was forced to sell the nonexistence store back to Quiznos with no compensation;

129.    These representations and omissions made to the Plaintiffs are extrinsic to their franchise Agreement. The Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

130.    Prior to the Plaintiffs John Sciarrino signing their Franchise Agreement and investing significant sums in store operations, Defendant QF and various employees and representatives, including John Lubarski ("Lubarski") representatives assigned to sell franchise in the Commonwealth of Pennsylvania, made certain fraudulent statements and omissions. In perpetrating these frauds, Defendants sought to induce the Plaintiffs to sign their Franchise Agreement. In addition, after Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A)  Prior to the Plaintiffs signing their Franchise Agreement, during a Quiznos sales seminar in Robinson Town Center, in or around January 1st, 2005, Defendants and other representative remarked that "they could expect annual profit of over $100,000 from their store" and that they should have "no problem" running a successful business;

(B) Prior to Plaintiff Sciarrino signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(C) Prior to the Plaintiffs signing the Franchise Agreement, but subsequent to the seminar in Robinson, Plaintiff Sciarrino viewed a CD and other marketing materials that QF provided, which falsely claimed that "the average Quiznos store was doing over $400,000 per year";

(D)  Prior to the Plaintiffs signing the Franchise Agreement, and during the Quiznos sales seminar at Robinson, a video presented by Defendants QF and various employees and representatives, which falsely claimed that "9 out of 10 independent franchisee go bankrupt" but that "this would not happen to them because Quizno's corporation stands behind their franchisee and would provide them with assistance throughout the operation process";

(E) Prior to Plaintiffs signing the Franchise Agreement, Defendants failed to disclose actual failure rates for a Quiznos franchise and deliberately misrepresenting the data on franchise turnovers contained in the UFOC which understates the failure rates;

(F) Subsequent to the Plaintiff signing their Franchise Agreement Defendant Lubarski Falsely represented in a meeting that the Quiznos location which Plaintiff Sciarrino

56

had purchased was a "excellent" location and should be "extremely profitable" as the "ideal Quiznos store". This location was not however available for purchase;

(G) Prior to the Plaintiffs signing the Franchise Agreement, during meetings and in written marketing communications, Defendants and various other Quiznos representatives and employees who sold the Plaintiffs their franchise, affirmatively misrepresented the expense data associated with a Quiznos franchise through the use of "NET 2" data which had no relation to the actual expenses that the Plaintiffs ultimately encountered in operating the franchise, even though Defendants knew that the "NET2" financial data gave a false impression of a typical franchisee's experience; and

(H) Prior to the Plaintiffs signing the Franchise Agreement, Defendants failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated base on "NET 2" data, opposed t "NET 3" data, which represented the revenues that would actually be received by a franchisee.

(I)  Defendants QF and various Quiznos employees and representatives, including the Quiznos representative who sold the Plaintiff their franchise, and a QF representative Lubarski, failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services, and other materials that must be purchased from Quiznos or its approved suppliers.

131.    These representations and omissions made to the Plaintiffs are extrinsic to their Franchise Agreement. The Plaintiff discovered these misrepresentations and omissions within the applicable statute of limitations.

132.    Prior to the Plaintiff Jason Wojdyla signing his Franchise Agreement and investing significant sums in store operations, Defendant TQM and various employees and representatives, including Kevin Casey, and John Lubarski, representatives assigned to sell franchise in the Commonwealth of Pennsylvania, made certain fraudulent statements and omissions. In perpetrating these frauds, Defendants sought to induce the Plaintiffs to sign their Franchise Agreement. In addition, after Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A) Prior to the Plaintiffs signing their Franchise Agreement, during a Quiznos sales seminar in Station Square in Pittsburgh, in or around April of 2003, Defendants Kevin Casey a Quiznos representative remarked that "they could expect annual profit of over $100,000 from their store" and that they should have "no problem paying off their mortgage in three years'';

(B) Prior to Plaintiff Wojdyla signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(C) Prior to the Plaintiffs signing the Franchise Agreement, but subsequent to the seminar in Robinson, Plaintiff Wojdyla viewed a CD and other marketing materials that TQM provided, which falsely claimed that "the average Quiznos store was doing over $400,000 per year";

(D)  Prior to the Plaintiffs Wojdyla signing the Franchise Agreement, and during the Quiznos sales seminar at Station Square in Pittsburgh, in July of 2003 a video presented by Defendants QF and various employees and representatives, which falsely claimed that "9 out of 10 independent franchisee go bankrupt" but that "this would not happen to them because Quizno's corporation stands behind their franchisee and would provide them with assistance throughout the operation process";

(E) Subsequent to the Plaintiffs signing their Franchise Agreement Defendant Lubarski falsely represented in a meeting that the Quiznos location which Plaintiff Wojdyla had purchased was a "prime" location and should be "extremely profitable" as the "ideal Quiznos store";

(F) Subsequent to the Plaintiffs signing their Franchise Agreement, Defendants claimed that the Plaintiffs franchise was "properly operated" and that this franchise was doing well".

(G) Subsequent to the Plaintiffs signing their Franchise Agreement, and during a routine store meeting, Defendants acknowledged that Wojdyla's franchise was having "financial difficulties", but that "everything would be okay" and that "business is expected to slow down this time of year"

(H) Subsequent to Defendant TQM and various employees and representatives acknowledging the magnitude of financial strain on Plaintiff Wojdyla, Quiznos claimed they would offer "help" through an assistantship program which never came to fruition;

(I)   Defendants TQM and various Quiznos employees and representatives, including the Quiznos representative who sold the Plaintiff Wojdyla their franchise, and a TQM representative Webster, failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services, and other materials that must be purchased from Quiznos or its approved suppliers.

133.    These representations and omissions made to the Plaintiffs are extrinsic to their Franchise Agreement. The Plaintiff discovered these misrepresentations and omissions within the applicable statute of limitations.

134.    Prior to the Plaintiffs Broadwater's and Bagwell's signing their Franchise Agreement and investing significant sums in store operations, Defendants QF, and various other Quiznos employees and representatives, including QF's representatives assigned to sell franchise in the Commonwealth of Pennsylvania, made certain fraudulent  statements and omissions. In perpetrating of these frauds, Defendants sought to induce the Plaintiffs to sign their Franchise Agreement. In addition, after the Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and he investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A)Prior to signing the Franchise Agreement, at a meeting with Plaintiff Broadwater's and Bagwell's in or about winter of 2006 after seeking out Quizno's franchise, Defendants QF through its representatives intentionally misrepresented Quizno's business plan.

(B) Prior to Plaintiffs Broadwater's and Bagwell's signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(C) At the same meeting, a Quiznos representative whose name is unknown to the Plaintiff, intentionally misrepresented to Plaintiff Broadwater's and Bagwell's that the demographics "are excellent in that location" and they "should have no problem establishing business".

(D) At that same meeting, a Quiznos representative whose name is unknown to the Plaintiffs told Broadwater's and Bagwell's that "average store sales for this area are annually $80,000" and that he "didn't see any reason why someone in their locale" where Plaintiff Broadwater intended to operate a store would do less then that;

(E) Prior to Plaintiffs Broadwater and Bagwell signing the Franchise Agreement, during a meeting and in written marketing communications, Defendants QF, and various other Quiznos representatives and employees who sold Plaintiff Broadwater and Bagwell his franchise, affirmatively misrepresented the expense data associated with the Quiznos franchise through the use of "NET 2" data, which had no relation to the actual expenses that Plaintiffs Broadwater and Bagwell ultimately encountered in operating the franchise, even though Defendants knew that the "NET 2" financial data gave a false impression of a typical franchisee's experience;

(F) Prior to the Plaintiffs signing the Franchise Agreement, Defendants QF and various other Quiznos representatives and employees who sold the Plaintiff their franchise, failed to disclose that the food costs and other percentages specified in Quiznos

marketing materials were calculated base on "NET 2" data, as opposed to "NET 3" data, which represented the revenues that would actually be received by a franchisee;

(G) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants QF, failed to disclose the substantial markups and kickbacks that add to the prices of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(H) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants QF, failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

(I) Subsequent to Defendant QF and various employees and representatives acknowledging the magnitude of financial strain on Plaintiffs Broadwater and Bagwell, Quiznos claimed they would offer a "Assistantship Program" and send representatives which would alleviate plaintiffs burden, which never materialized;

135.    These representations and omissions made to the Plaintiff are extrinsic to their Franchise Agreement. The Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitation.

136.    Prior to the Plaintiffs Novak's signing their Franchise Agreement and investing significant sums in store operations, Defendants QF, John Lubarski, and various other Quiznos employees and representatives, including QF's representatives assigned to sell franchise in the Commonwealth of Pennsylvania, made certain fraudulent  statements and omissions. In perpetrating of these frauds, Defendants sought to induce the Plaintiffs to sign their Franchise Agreement. In addition, after the Plaintiffs signed their Franchise Agreement,

Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and he investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A) Prior to signing the Franchise Agreement, at a meeting with Plaintiff Novak's in or about May of 2004 at Defendant QF's seminar in the Sheraton Hotel, located at 300 West Station Square Drive Pittsburgh, PA 15219, Defendants Kevin Casey and John Lubarski intentionally misrepresented Quizno's business plan.

(B) Prior to Plaintiffs Novak's signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(C) At that same meeting, Defendants John Lubarski and a Quiznos representative whose name is unknown to the Plaintiff, intentionally misrepresented that the Quiznos' real estate process was "very easy" and that they "shouldn't encounter any problems" due to their location being one of the "top five in the state".

(D) At the same meeting, Defendant John Lubarski intentionally misrepresented to Plaintiff Novak's that the demographics "are excellent in that location" and they "should have no problem establishing business".

(E) At that same meeting, Defendant John Lubarski told Plaintiff Novak's that "average store sales for this area are $80,000" and that he didn't see any reason why someone in their locale where Plaintiff's Novak intended to operate a store would do less then that;

(F) Prior to Plaintiffs Novak's signing the Franchise Agreement, during a meeting and in written marketing communications, Defendants QF, John Lubarski, and various other Quiznos representatives and employees who sold the Novak's plaintiffs their franchise, affirmatively misrepresented the expense data associated with the Quiznos franchise through the use of "NET 2" data, which had no relation to the actual expenses that the Novak's ultimately encountered in operating the franchise, even though Defendants knew that the "NET 2" financial data gave a false impression of a typical franchisee's experience;

(G) Prior to the Plaintiffs signing the Franchise Agreement, Defendant Kevin Casey and John Lubarski and various other Quiznos representatives and employees who sold the Plaintiff their franchise, failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated base on "NET 2" data, as opposed to "NET 3" data, which represented the revenues that would actually be received by a franchisee;

(H) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants John Lubarski, failed to disclose the substantial markups and kickbacks that add to the prices of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(I) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants John Lubarski, failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

137.    These representations and omissions made to the Plaintiff are extrinsic to their Franchise Agreement. The Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitation.

138.    Prior to the Plaintiffs D'Amico's signing their Franchise Agreement and investing significant sums in store operations, Defendants QF, Kevin Casey and John Lubarski, and various other Quiznos employees and representatives, including QF's representatives assigned to sell franchise in the Commonwealth of Pennsylvania, made certain fraudulent statements and omissions. In perpetrating of these frauds, Defendants sought to induce the Plaintiffs to sign their Franchise Agreement. In addition, after the Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and he investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A) Prior to signing the Franchise Agreement, at a private meeting with Plaintiff D'Amico in or about summer of 2000, Defendant Kevin Casey and John Lubarski and other Quiznos representative whose names are unknown to the Plaintiffs intentionally misrepresented Quizno's business plan.

(B) Prior to Plaintiffs D'Amico signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(C) At that same meeting, Defendants Kevin Casey and John Lubarski and a Quiznos representative whose name is unknown to the Plaintiff, intentionally misrepresented

that the Quiznos' real estate process was "very easy" and that they "shouldn't encounter any problems" due to their location being one of the "top five in the state".

(D) At the same meeting, Defendant Kevin Casey and John Lubarski intentionally misrepresented to Plaintiff D'Amico that the demographics "are excellent in that location" and they "should have no problem establishing business".

(E) Prior to Plaintiffs D'Amico signing the Franchise Agreement, during a meeting and in written marketing communications, Defendants QF, Kevin Casey and John Lubarski, and various other Quiznos representatives and employees who sold the D'Amico's their franchise, affirmatively misrepresented the expense data associated with the Quiznos franchise through the use of "NET 2" data, which had no relation to the actual expenses that the D'Amico's ultimately encountered in operating the franchise, even though Defendants knew that the "NET 2" financial data gave a false impression of a typical franchisee's experience;

(F) Prior to the Plaintiffs signing the Franchise Agreement, Defendant Kevin Casey and John Lubarski and various other Quiznos representatives and employees who sold the Plaintiff their franchise, failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated base on "NET 2" data, as opposed to "NET 3" data, which represented the revenues that would actually be received by a franchisee;

(G) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants Kevin Casey and John Lubarski, failed to disclose the substantial markups and kickbacks that add to the prices of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(H) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants Kevin Casey, failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

139.    These representations and omissions made to the Plaintiff are extrinsic to their Franchise Agreement. The Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitation.

140.    Prior to the Plaintiff Grolemund signing his Franchise Agreement and investing significant sums in store operations, Defendants TQM, and various other Quiznos employees and representatives, including TQM's representatives assigned to sell franchise in the Commonwealth of Pennsylvania, made certain fraudulent statements and omissions. In perpetrating of these frauds, Defendants sought to induce the Plaintiff to sign their Franchise Agreement. In addition, after the Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A) Prior to signing the Franchise Agreement, at a meeting with Plaintiff Grolemund in or about summer of 2004 at Defendant TQM's seminar in Erie, PA 16504, Defendants intentionally misrepresented Quizno's business plan.

(B) Prior to Plaintiff Grolemund signing the Franchise Agreement, Defendants TQM failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(C) At that same meeting, Defendants TQM and a Quiznos representative whose name is unknown to the Plaintiff, intentionally misrepresented that the Quiznos' real estate process was "very easy" and that they "shouldn't encounter any problems" due to their location being one of the "top five in the state".

(D) At the same meeting, Defendants intentionally misrepresented to Plaintiff Grolemund's that the demographics "are excellent in that location" and they "should have no problem establishing business".

(E) At that same meeting, Defendants told Plaintiff Grolemund that "average store sales for this area are $425,000" and that he didn't see any reason why someone in their locale where Plaintiff's Grolemund intended to operate a store would do less then that;

(F) Prior to Plaintiffs Grolemund signing the Franchise Agreement, during a meeting and in written marketing communications, Defendants TQM, and various other Quiznos representatives and employees who sold plaintiff Grolemund his franchise, affirmatively misrepresented the expense data associated with the Quiznos franchise through the use of "NET 2" data, which had no relation to the actual expenses that the Grolemund ultimately encountered in operating the franchise, even though Defendants knew that the "NET 2" financial data gave a false impression of a typical franchisee's experience;

(G) Prior to the Plaintiffs signing the Franchise Agreement, Defendants TQM  and various other Quiznos representatives and employees who sold the Plaintiff their franchise, failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated base on "NET 2" data, as opposed to

68

"NET 3" data, which represented the revenues that would actually be received by a franchisee;

(H) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants TQM, failed to disclose the substantial markups and kickbacks that add to the prices of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(I) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants, failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

(J) Subsequent to the Plaintiffs signing their Franchise Agreement, Defendant TQM and various other Quiznos representatives and employees who sold the Plaintiff his franchise, failed to reproduce essential documents Quiznos representatives fraudulently signed on behalf of the Plaintiff.

(K) Subsequent to Defendant TQM and various employees and representatives acknowledging the magnitude of financial strain on Plaintiff Grolemund, Quiznos claimed they would offer a "delivery plan" through the Quiznos Assistantship Program;

141. These representations and omissions made to the Plaintiff are extrinsic to their Franchise Agreement. The Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitation.

142. Prior to the Plaintiffs Synder signing their Franchise Agreement and investing significant sums in store operations, Defendants QF's, and various other Quiznos employees

and representatives, including QF's representatives assigned to sell franchise in the Commonwealth of Pennsylvania, made certain fraudulent statements and omissions. In perpetrating of these frauds, Defendants sought to induce the Plaintiffs to sign their Franchise Agreement. In addition, after the Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(A) Prior to signing the Franchise Agreement, at a meeting with Plaintiffs Synder in or about summer of 2002 at Defendant QF's seminar in Station Square in Pittsburgh, PA 15219, Defendants intentionally misrepresented Quizno's business plan.

(B) Prior to Plaintiffs Synder signing the Franchise Agreement, Defendants QF failed to disclose that Quiznos continually changed its store policies without providing proper notification to its franchisees;

(C) At that same meeting, Defendants QF and Kevin Casey, intentionally misrepresented that the Quiznos' real estate process was "very easy" and that they "shouldn't encounter any problems" due to their Quiznos being a "proven method" and "nothing is marked up" because Quiznos "negotiates to the fit the franchisee needs".

(D) At the same meeting, Defendants intentionally misrepresented to Plaintiffs Synder that the demographics "are excellent in that location" and they "should have no problem establishing business since the next Quiznos is more than 60 miles away".

(E) At that same meeting, Defendants told Plaintiffs Synder that "average store sales for this area are $385,000 and 46% percent of that do better " and that he didn't see any

reason why someone in their locale where Plaintiff's Synder intended to operate a store would do less then that;

(F) Prior to Plaintiffs Synder signing the Franchise Agreement, during a meeting and in written marketing communications, Defendants QF, and various other Quiznos representatives and employees who sold Plaintiffs Synder their franchise, affirmatively misrepresented the expense data associated with the Quiznos franchise through the use of "NET 2" data, which had no relation to the actual expenses that the Synder ultimately encountered in operating the franchise, even though Defendants knew that the "NET 2" financial data gave a false impression of a typical franchisee's experience;

(G) Prior to the Plaintiffs signing the Franchise Agreement, Defendants QF  and various other Quiznos representatives and employees who sold the Plaintiffs their franchise, failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated base on "NET 2" data, as opposed to "NET 3" data, which represented the revenues that would actually be received by a franchisee;

(H) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants QF, failed to disclose the substantial markups and kickbacks that add to the prices of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(I) Prior to the Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants, failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

143.    These representations and omissions made to the Plaintiffs are extrinsic to their Franchise Agreement. The Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitation.

144.    The predicate acts committed by Defendants as alleged herein constitute a "pattern of racketeering activity: within the meaning of 18 U.S.C. § 1961 (5).

145.    The acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities to defraud the franchisees through their payment of the initial franchise fee, as well as other future payments to be received by Quiznos, such as for overpriced products, services, materials, and the like. In addition, all of the Quiznos franchisees across the United States have also been victimized by this fraudulent scheme, meaning that the scheme has literally thousands of victims.

146.    The acts of mail fraud and wire fraud as alleged herein threaten to continue indefinitely into the future because Quiznos business model is built upon continually increasing the number of new franchises coming into the system. Indeed, the scheme is likely to continue on its present course until Quiznos existing majority shareholders achieve their ultimate goal of selling the entire company to an outside buyer.

147.    Plaintiffs have been damaged by reason of the defendants' conducting the affairs of the Quiznos franchise system through the pattern of racketeering activity as alleged herein.

# THIRD CLAIM FOR RELIEF

# ILLEGAL TYING UNDER § 1 OF THE SHERMAN ACT

# ON BEHALF OF ALL PLAINTIFFS

148.    Plaintiffs repeat and reallege each of the following paragraphs of this complaint as if set forth in full.

149.    There exists a market for ownership interests in Quick Service Toasted Sandwich Restaurant Franchise, in which Quiznos maintains substantial market power. Quiznos maintains over 4,000 shops in the United States. It is one of the dominant players in the sandwich and bakery franchise category, and is the top ranked sandwich chain by sales growth in the United States.

150.    A separate market exists for the related goods and services associated with the operations of a quick Service Toasted Sandwich Restaurants Franchise, including raw materials, services and food products (referred to throughout this complaint as "Essential Goods").

151.    Quiznos affiliates, including entities in which it maintains a financial or other ownership interest, as well as approved vendors from which it receives contractual kickbacks to Quiznos or affiliated entities as a condition of obtaining such approval.

152.    Quiznos conceals the nature of its relationships with its affiliates and approved vendors from potential franchisees including Plaintiffs and the Class members, in order to lock them into onerous franchise agreements and create excessive switching costs.

153.    At all times Quiznos and its affiliates had monopoly power, market power and/or economic power in the relevant Quick Service Toasted Sandwich Restaurant Franchises

market, sufficient to force Plaintiffs and the Class to purchase and accept Essential Goods from Quiznos affiliated vendors.

154.    By reason of the terms of the franchise, agreements and the investments the franchisees have made in their franchises, Quiznos has substantial power in the market for both Quick Service Toasted Sandwich Restaurant Franchises and the market for Essential Goods.

155.    Quiznos manipulated its economic power in the Quick Service Toasted Sandwich Restaurant Franchises market to coerce Plaintiffs and the Class to purchase essential goods solely from its affiliates, through contractual provisions contained in franchise agreements, as well as exploitation of pre-contractual information deficiencies and post-contractual switching costs. Through these and other means, Quiznos can and does coerce franchisees to purchase nearly all of the products, services and materials they need from Quiznos itself or from approved vendors designated and controlled by Quiznos and its affiliates.

156.    Through the exercise of Quiznos' economic power as alleged herein, Quiznos has conditioned the purchase by Plaintiffs of their franchises and their continued existence as franchise upon their purchase of Essential goods from Quiznos itself or from approved vendors in which it maintains a financial interest.

157.    As a direct and proximate result of Defendants' anti-competitive tying activity, Plaintiffs and the Class have been injured by being forced to pay supra-competitive prices for Essential Goods.

158.    A substantial amount of interstate commerce in Essential Goods needed to operate a Quiznos franchise has been adversely affected and Quiznos' practices impose an unreasonable negative effect on competition in the marketplace, because Quiznos' policy of

coercing and conditioning the purchase and operation of a franchise and the purchase by franchisees of Essential Goods forecloses the ability of vendors unwilling to pay kickbacks to Quiznos and its affiliated entities from selling their products, services and materials to the Plaintiffs, even though the quality of such products, services, and materials is equal to if not better than the quality of what is supplied by Quiznos-approved vendors.

159.   Quiznos' tie of its franchises to products, services and materials from approved suppliers imposes an unreasonable restraint upon commerce and is therefore *per se* unlawful and in violation of Section One of the Sherman Act, 15 U. S. C. § 1, and has caused damage to the Plaintiffs and the Class.

160.   Alternatively, if Quizno's tying conduct in not *per se* unlawful, it is unlawful under the rule of reason; in that the anti-competitive consequences of Defendant's conduct outweigh any pro-competitive effects thereof. Not only does Quiznos' conduct impose supra-competitive prices on Plaintiffs and the Class, it impedes the ability of other suppliers to engage in competition with Quiznos' affiliates and vendors to provide higher quality raw materials, services and food products at lower costs. Moreover, consumers are injured in that they are forced to indirectly pay the kickbacks and excessive prices for product charged to franchises by Quiznos' affiliates and vendors. There is no pro-business or efficiency justification for the kickbacks and supra-competitive pricing, nor does any legitimate business purpose require these practices.

161.   By reason of the illegal conduct of Quiznos as alleged herein, Plaintiffs and the Class are entitled to damages in an amount to be proven at trial and then treble pursuant to 15 U.S.C.§ 15, and to permanent injunctive relief prohibiting Quiznos' unlawful tying conduct.

# FOURTH CLAIM FOR RELIEF

# IN VIOLATION OF PENNSYLVANIA STATUTE

# TITLE 18 CHAPTER 39 § 3921 ON BEHALF OF ALL PLAINTIFFS

162.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

163.    The aforementioned practices of Defendants were and are in violation of the Pennsylvania Statute Title 18 Chapter 39 § 3921.

164.    Specifically, Defendants have contracted, combined, or conspired with one or more other persons or parties to unreasonably constrict trade and/or commerce, or by corning trade through the exercise of unlawful transferring or controlling real estate or property of another or any interested therein with intent to benefit any party not entitled thereto to establish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this Commonwealth for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce.

165.    As a result of the conduct described above, Plaintiffs and the Class have sustained and will continue to sustain losses and damages to their businesses and property in the form of, among other things, the supra-competitive prices for Essential Goods that they were for to pay as part of Defendants' unlawful and anticompetitive conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

166.    By reason of Quiznos' violation of Pennsylvania Statute Title 18 Chapter 39 § 3921 as alleged herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

167.    Plaintiffs and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, and all other available relief for their injuries caused by these violations pursuant to this statute.

## FIFTH CLAIM FOR RELIEF

## IN VIOLATION OF PENNSYLVANIA STATUTE

## TITLE 18 CHAPTER 39 §3922 ON BEHALF OF ALL PLAINTIFFS

168.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this complaint as if sets forth in full.

169.    The aforementioned practices of Defendants were and are in violation of the Pennsylvania Statute Title 18 Chapter 39 § 3922.

170.    Quiznos, through its agents and representatives, and in connection with the offer and/or sale of its franchises as set out in this complaint, employed a scheme or pattern of conduct, through which it has directly or directly deceived the class Plaintiffs, in violation of 18 PACS § 3922.

171.     Furthermore, in perpetuating this fraud and deceit, Quiznos, through its agents and representatives, has made misleading for false statements of material fact or omissions of material facts, including, but not limited to the following:

(A) Quiznos, through its agents and representatives, deliberately understated the costs and expenses of opening and operating a Quiznos franchise;

(B) Quiznos, through its agents and representatives, intentionally misrepresented its encroachment policy with respect to franchise locations, fraudulently stating that it maintains a general rule pursuant to which it does not open up stores within a 3-5 mile radius of each other;

(C) Prior to obtaining Plaintiffs' signatures on the Franchise Agreements, in meetings and written marketing communications, Defendants affirmatively misrepresented the expense data associated with Quiznos franchise through the use of the "Net 2" data, which had no relation to the actual expenses that the Plaintiffs ultimately encountered in operating the franchise, even though they knew that actual expenses would best be demonstrated with what Quiznos calls "Net 3" data; and

(D) Prior to signing the Franchise Agreement, Defendants failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee.

172.    As a result of the conduct described above, Plaintiffs and the Class have sustained and will continue to sustain losses and damages to their businesses and property in the form of, among other things, the supra-competitive prices for Essential Goods that they were for to pay as part of Defendants' unlawful and anticompetitive conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

173.    By reason of Quiznos' violation of Pennsylvania Statute Title 18 Chapter 3922 § 3922 as alleged herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

174.    Plaintiffs and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, and all other available relief for their injuries caused by these violations pursuant to this statute.

## SIXTH CLAIM OF RELIEF

## IN VIOLATION OF PENNSYLVANIA STATUTE

## TITLE 18 CHAPTER 39 § 3926 ON BEHALF OF ALL PLAINTIFFS

175.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

176.    The aforementioned practices of Defendants were and are in violation of the Pennsylvania Statute Title 18 Chapter 39 § 3926.

177.    As set forth in this Complaint, Quiznos violated 18 PACS §3926 by including false or misleading statements of material fact within its disclosure statement, including without limitation, those related to: (a) the true costs of food and supplies; (b) the potential (or lack thereof) to make profit; (c) Quiznos actual approach to encroachment; (d) the effect of being required to purchase food and supplies from Quiznos-mandated suppliers; (e) the actual turnovers rates for the brand; (f) the actual impact of Quiznos' "kickbacks" on the ability of the franchisees to achieve a return on their investment; (g) the true meaning behind Quizno's claim in their UFOC that it uses its buying power "for the benefit of franchisees"; and (h) the contemplated and actual use of advertising fees paid by the franchisees.

178.    Quiznos further violates 18 PACS § 3926 by omitting material facts required to be stated or necessary to make the misleading statements not misleading with business services, including but without limitation, the items identified in the preceding paragraph.

179.    As a result of the conduct described above, Plaintiffs and the Class have sustained and will continue to sustain losses and damages to their businesses and property in the form of, among other things, the supra-competitive prices for Essential Goods that they were for to pay as part of Defendants' unlawful and anticompetitive conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

180.    By reason of Quiznos' violations of the Pennsylvania Statute alleged herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

181.    Plaintiffs and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, and all other available relief for their injuries caused by these violations pursuant to this statute.

## SEVENTH CLAIM OF RELIEF

## IN VIOLATION OF PENNSYLVANIA STATUTE

## TITLE 18 CHAPTER 41 § 4104 ON BEHALF OF ALL PLAINTIFFS

182.    Plaintiffs repeat and reallege each of the following paragraphs of this complaint as if set forth in full.

183.    The aforementioned practices of Defendants were and are in violation of the Pennsylvania Statute Title 18 Chapter 41 § 4104.

184.    Quizno's through its agents and representatives and in connection with the filing offer and/or sale of its franchises as set out in this complaint has engaged in acts, practices, and courses of business which operate as a fraud and/or deceptive act, practice or course of business upon the class including but not limited to the following:

(A) Quizno's through its representative's agents and employees, made false or misleading written statement with intent to deprive,

(B) Quizno's through its representative's agents and employees, tampered and altered documentation specific to the terms of the Franchise Agreements,

(C) Quizno's through its representatives, agents and employees, falsified and fraudulently forged Plaintiffs Martrano's signature on crucial franchise documents including but not limited to the Franchise Agreement.

185.    As a result of the conduct described above, Plaintiffs have sustained and will continue to sustain losses and damages to their businesses and property in the form of, among other things, the supra-competitive prices for Essential Goods that they were for to pay as part of Defendants' unlawful and anticompetitive conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

186.    By reason of Quiznos' violation of Pennsylvania Statute Title 18 Chapter 41 § 4104 as alleged herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

187.    Plaintiffs and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, and all other available relief for their injuries caused by these violations pursuant to this statute.

## EIGHTH CLAIM OF RELIEF

## IN VIOLATION OF PENNSYLVANIA STATUTE

## TITLE 18 CHAPTER 41 § 4107 ON BEHALF OF All PLAINTIFFS

188.    Plaintiffs repeat and reallege each of the following paragraphs of this complaint as if set forth in full.

189.    The aforementioned practices of Defendants were and are in violation of the Pennsylvania Statute Title 18 Chapter 41 § 4107.

190.    Specifically, Defendants have contracted, combined, or conspired with one or more other persons to unreasonably constrict trade and/or commerce, or have attempted to establish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this Commonwealth for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce.

191.    Additionally, Defendants have leased or made a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, or services, whether patented or unpatented, for use, consumption, enjoyment, or resale, or fix a price charged thereof, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, suppliers, or other commodity or service of a competitor or competitor of seller, where the effect to such lease, sale or contract for such sale or such

condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

192.    Quizno's through its agents and representatives and in connection with the filing offer and/or sale of its franchises as set out in this complaint has engaged in acts, practices, and courses of business which operate as a fraud and/or deceptive act, practice or course of business upon the class including but not limited to the following:

(A) Quizno's through its agents and representatives, takes or attempts to take more than the represented quantity of any commodity or services when as buyer he furnishes the weight or measure;

(B) Quizno's through its agents and representatives makes false or misleading statement whether verbal or written in any advertisement or disclosed in any document that addresses the public or to a substantial segment thereof for the purpose of promotioning the purchase or sale of property, services, credit, or securities.

(C) Quizno's through its agents and representatives, failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services, and other materials that must be purchased from Quiznos or its approved suppliers.

193.    As a result of the conduct described above, Plaintiffs and the Class have sustained and will continue to sustain losses and damages to their businesses and property in the form of, among other things, the supra-competitive prices for Essential Goods that they were for to pay as part of Defendants' unlawful and anticompetitive conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

194.    By reason of Quiznos' violation of Pennsylvania Statute Title 18 Chapter 41 § 4107 as alleged herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

195.    Plaintiffs and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, and all other available relief for their injuries caused by these violations pursuant to this statute.

## NINTH CLAIM FOR RELIEF

## IN VIOLATION OF PENNSYLVANIA STATUTE

## TITLE 18 CHAPTER 41 § 4108 ON BEHALF OF ALL PLAINTIFFS

196.    Plaintiffs repeat and reallege each of the following paragraphs of this complaint as if set forth in full.

197.    The aforementioned practices of Defendants were and are in violation of the Pennsylvania Statute Title 18 Chapter 41 § 4108.

198.    Specifically, Defendants have contracted, combined, or conspired with one or more other persons to unreasonably constrict trade and/or commerce, or have attempted to establish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this Commonwealth for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce.

199.    Quizno's through its agents and representatives and in connection with the filing offer and/or sale of its franchises as set out in this complaint has engaged in acts, practices,

and courses of business which operate as a fraud and/or deceptive act, practice or course of business including but not limited to the following:

(A) Quizno's representatives agents and employees, with or without consent of their employer accepted or attempted to accept rewards and kickbacks which benefited or influenced their demeanor of conduct in direct or indirect business dealing and relations,

(B) Quizno's through its representatives, agents and employees makes false or misleading statements whether verbal or written in any advertisement or disclosed in any document addressed to the franchisee hidden markups and kickbacks directly beneficial to those representatives, agents and employees,

(C) Quizno's through its representatives, agents and employees, failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services, and other materials that must be purchased from Quiznos or its approved suppliers.

200.    As a result of the conduct described above, Plaintiffs and the Class have sustained and will continue to sustain losses and damages to their businesses and property in the form of, among other things, the supra-competitive prices for Essential Goods that they were for to pay as part of Defendants' unlawful and anticompetitive conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

201.    By reason of Quiznos' violation of Pennsylvania Statute Title 18 Chapter 41 § 4108 as alleged herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

202.    Plaintiffs and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, and all other available relief for their injuries caused by these violations pursuant to this statute.

## TENTH CLAIM OF RELIEF

## INTENTIONAL FRAUD (FRAUD IN THE INDUCEMENT) ON BEHALF OF ALL PLAINTIFFS

203.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

204.     As alleged with specificity in this Complaint, Defendants knowingly made false statements of fact to, and omitted or concealed true statements of fact from the Plaintiffs. With respect to each such true statement alleged to have been omitted or concealed by the Defendants, the Defendants owed each Plaintiff a duty to disclose the truth of such omitted or concealed fact.

205.    The statement and omissions of the Defendants as alleged herein were untrue.

206.     Defendants knew or should have known that their affirmative statements as alleged herein were false, and that their omissions or concealments were deceptive by virtue of being incomplete.

207.    The Defendants made the false statements, and engaged in the omissions and concealments, with the intent to defraud the Plaintiffs and in order to induce the Plaintiffs to rely on the statements omissions and concealments.

208.    Each Plaintiff believed the false statements made to him or her, or believed that no facts existed inconsistent with Defendant's omissions and concealments, and acted in reliance upon those beliefs to his or her detriment.

209.    As a result of their detrimental reliance on Defendants' fraudulent statement and omissions, Plaintiffs and the Class have been damaged in the future in an amount to be proven at trial.

## ELEVTH CLAIM FOR RELIEF

## BREACH OF CONTRACT ON BEHALF OFALL PLAINTIFFS

210.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

211.    The UFOCs presented to Plaintiffs represented that Quiznos would "negotiate purchase agreements with suppliers for the benefit of Franchisees." Pursuant to the terms of each Plaintiff's franchise agreement, the representations of Quiznos in the UFOC are made part of each franchise agreement between the parties and by the express terms of each franchise agreement are considered binding on franchisor in connection with the subject matter of the agreement.

212.    By using its control over the suppliers from whom Quiznos allows franchisees to purchase products, services and materials to increase its own revenues through its kickback scheme, and by failing to use its "market power" due to volume purchase for the benefit of franchisees.

213.    Quiznos has further breached its contractual obligations to Plaintiffs and the Class by, among other things: (a) failing to provide promised support and assistance in operating franchises; (b) failing to properly appropriate advertising funds; (c) failing to disclose the relationships it has with approved vendors, including the kickbacks it receives from them; (d) misusing the marketing funds paid by Plaintiffs and the Class for purposes prohibited by the Franchise Agreement; and (e) failing to negotiate prices for food and supplies in a manner meant to benefit Plaintiffs.

214.    As a proximate result of Quiznos' breaches of contract as alleged herein, Plaintiffs and the Class have been damaged in amounts to be proven at trial.

## TWELVTH CLAIM OF RELIEF
## BREACH OF THE CONVENANT OF GOOD FAITH
## AND FAIR DEALING
## ON BEHALF OF ALL PLAINTIFFS

215.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

216.    Every agreement between the Plaintiffs and Quiznos including not only express written provisions, but also those terms and conditions, which although not formally expressed, are implied by law. Such implied terms are as binding as the terms that are actually written into the agreement.

217.    Inherent in all contracts in an implied covenant that the parties will act in good faith and deal fairly with each other in the performance of their respective covenants and obligations under the contract and will not take action that will injure the other party or compromise his belief of the contract.

218.    The obligations of Quiznos to abide by the implied covenant of good faith and fair dealing is heightened by the substantial imbalance of power between Quiznos and Plaintiffs, which imbalance allows Quiznos to implement the business scheme described in detail in this complaint and incorporated by reference.

219.    Quiznos breached the implied covenant of good faith and fair dealing by virtue of the deceptive practices described herein and by acts independent of the deceptive practices. Quiznos has denied Plaintiffs the ability to achieve their reasonable expectations in entering into the franchise relationship.

Dated this 8nd day of August, 2008

**Peter Daley & Associates P.C.**
Attorneys for Plaintiffs

_____/s/ Peter J. Daley II__

Peter J. Daley II
242 Wood St.
California, Pa 15419
Attorney ID # 70244
Telephone :(724-938-8953)
Fax: (724-938-8959)

Verification

I, Joe Martrano, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/_Joe Martrano_____<br>
Joe Martrano

Dated: ___7/2/08_____

Verification

I, Joe Martrano, owner of Tuffy Joes Eatery, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/_Joe Martrano_____
Owner of Tuffy Joes Eatery L.L.C.

Dated: ___7/2/08_____

Verification

I, Terry Shallenberger, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Terry Shallenberger_____
Terry Shallenberger

Dated: ___7/2/2008_____

Verification

I, Terry Shallenberger, owner of Tuffy Joes Eatery, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

_____/s/____Terry Shallenberger_____

Owner of Tuffy Joes Eatery L.L.C.

Dated: ____7/2/2008_____

Verification

I, Rene Vela, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Rene Vela_____
Rene Vela

Dated: __7/2/2008_____

Verification

I, Rene Vela, owner of Enon Heights Enterprises, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Rene Vela_____
Owner of Enon Heights Enterprises
L.L.C.

Dated: ___7/2/2008_____

Verification

I, Gwen Vela, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Gwen Vela_____
Gwen Vela

Dated: __7/2/2008_____

Verification

I, Gwen Vela, owner of Enon Heights Enterprises, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

_____/s/___Gwen Vela_____
Owner of Enon Heights Enterprises
L.L.C.


Dated: ___7/2/2008_____

Verification

I, Robert Yannito, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/_Robert Yanitto_____
Robert Yannito

Dated: __7/2/2008_____

Verification

I, Robert Yannito, owner of Park Plan Development, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

_____/s/_Robert Yannito_____
Owner of Park Plan Development
L.L.C.

Dated:___7/2/2008_____

Verification

I, Patrick McGovern, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/_Patrick McGovern_____
Patrick McGovern

Dated: __7/2/2008_____

Verification

I, Patrick McGovern, owner of Park Plan Development, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/_Patrick McGovern_____

Owner of Park Plan Development L.L.C.

Dated: __7/2/2008_____

Verification

I, Charles McGovern, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/S/_Charles McGovern_____
Charles McGovern

Dated: __7/2/2008_____

Verification

I, Charles McGovern, owner of Park Plan Development, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

                    ____/s/_Charles McGovern_____
                    Owner of Park Plan Development L.L.C.

Dated: _7/2/2008_____

Verification

I, Ron Miller, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/_Ron Miller_____
Ron Miller

Dated: __7/2/2008_____

Verification

I, Ron Miller, owner of Miller Enterprises, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

\_\_\_/s/\_Ron Miller_____
Owner of Miller Enterprises L.L.C.

Dated: \_\_7/2/2008_____

Verification

I, Andrew Schry, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/_Andrew Schry_____
Andrew Schry

Dated: __7/2/2008_____

Verification

I, Andrew Schry, Owner of Schry Holdings, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Andrew Schry_____
Owner of Schry Holdings L.L.C.

Dated: __7/2/2008_____

Verification

I, John Sciarrino, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__John Sciarrino_____
John Sciarrino

Dated: __7/2/2008_____

Verification

I, John Sciarrino, Owner of Sciarrino Ventures, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__John Sciarrino_____
Owner of Sciarrino Venture L.L.C.

Dated: __7/2/2008_____

Verification

I, Jason Wojdyla, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Jason Wojdyla_____
Jason Wojdyla

Dated: __7/2/2008_____

Verification

I, Jason Wojdyla, Owner of Wojdyla Enterprises, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Jason Wojdyla_____
Owner of Wojdyla Enterprises Inc.

Dated: __7/2/2008_____

Verification

I, Theodore Broadwater, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

                                                      ___/s/__Theodore Broadwater_
                                                      Theodore Broadwater


Dated: __7/25/2008_____

Verification

I, Theodore Broadwater, Owner of BATY Enterprises L.L.C., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

_____/s/___Theodore Broadwater_____
Owner of BATY Enterprises L.L.C.

Dated: ___7/25/2008_____

Verification

I, Yvonne Broadwater, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

\_\_\_/s/\_\_Yvonne Broadwater_____

Yvonne Broadwater

Dated: \_\_7/25/2008_____

Verification

I, Yvonne Broadwater, Owner of BATY Enterprises L.L.C., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

_____/s/__Yvonne Broadwater_____
Owner of BATY Enterprises L.L.C.

Dated: __7/25/2008_____

Verification

I, Boyd Bagwell, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Boyd Bagwell_____

Boyd Bagwell

Dated: __8/01/2008_____

Verification

I, Boyd Bagwell, Owner of BATY Enterprises L.L.C., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

____/s/___Boyd Bagwell_____
Owner of BATY Enterprises L.L.C.

Dated: __8/01/2008_____

Verification

I, Ashley Herre-Bagwell, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/___Ashley Herre-Bagwell_____<br>Ashley Herre-Bagwell

Dated: __8/01/2008_____

Verification

  I, Ashley Herre-Bagwell, Owner of BATY Enterprises L.L.C., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

  This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.


            ___/s/__Ashley Herre-Bagwell_____
            Owner of BATY Enterprises L.L.C.


Dated: __8/01/2008_____

Verification

I, Christopher D. Novak, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Christopher D. Novak_____
Christopher D. Novak

Dated: __7/25/2008_____

Verification

I, Christopher D. Novak, Owner of Sub-a-delic Inc., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.


        /s/   Christopher D. Novak
        Owner of Sub-a-delic Inc.


Dated:   7/25/2008

Verification

I, Christi Novak, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Christi Novak_____
Christi Novak

Dated: __7/25/2008_____

Verification

I, Christi Novak, Owner of Sub-a-delic Inc., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Christi Novak_____
Owner of Sub-a-delic Inc.

Dated: __7/25/2008_____

Verification

I, Richard D'Amico, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

\_\_\_/s/\_\_Richard D'Amico\_\_\_\_\_
Richard D'Amico

Dated: \_\_7/25/2008_____

Verification

I, Richard D'Amico, Owner Richard A. D'Amico Enterprises L.L.C., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Richard D'Amico____
Owner of Richard A. D'Amico
Enterprises L.L.C.

Dated: __7/25/2008_____

Verification

I, Caren D'Amico, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Caren D'Amico_____
Caren D'Amico

Dated: __7/25/2008_____

126

Verification

I, Caren D'Amico, Owner Richard A. D'Amico Enterprises L.L.C., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

_____/s/___Caren D'Amico_____
Owner of Richard A. D'Amico
Enterprises L.L.C.

Dated: ___7/25/2008_____

Verification

I, Daniel Grolemund, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

                ___/s/__Daniel Grolemund_____
                Daniel Grolemund

Dated: __7/25/2008_____

Verification

I, Daniel Grolemund, Owner, trading and doing business as Quizno's., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__ Daniel Grolemund_____
Owner, T/D/B/A as Quizno's

Dated: __7/25/2008_____

Verification

I, William Synder, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__William Synder_____
William Synder

Dated: __7/25/2008_____

## Verification

I, William Synder, Owner of L&B L.L.C., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.


___/s/__William Synder____
Owner of L&B L.L.C.


Dated: __7/25/2008_____

Verification

I, Linda Synder, do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Linda Synder_____
Linda Synder

Dated: __7/25/2008_____

132

Verification

I, Linda Synder, Owner of L&B L.L.C., do hereby verify that the averments for the within Complaint are true and correct to the best of my knowledge, information and beliefs.

This statement is made subject to the penalties of 19 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

___/s/__Linda Synder_____
Owner of L&B L.L.C.

Dated: __7/25/2008_____