IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


JOE MARTRANO and TERRY           )
SHALLENBERGER, *et al.*,          )
                                  )
                    Plaintiffs,   )
                                  )
              v.                  )      Civil Action No. 08-0932
                                  )
THE QUIZNO'S FRANCHISE CO.,       )      Magistrate Judge Lisa Pupo Lenihan
L.L.C., *et al.*,                 )
                                  )
                    Defendants.   )


## OPINION AND ORDER


## I. OVERVIEW

As set forth below, this is a prospective State-wide class action for relief in consequence

of the Defendants' alleged illegal and exploitive manipulation of a fast-food "toasted sandwich"

franchise system.

Plaintiffs attest that they and other Pennsylvania Quiznos franchisees (the "Franchisees")

were (a) fraudulently induced to purchase Quiznos franchises by Defendants' misrepresentations

and omissions as to the true nature of the contractual relationship and the financial prospects

(which were allegedly substantially diminished by, *e.g.*, Defendants' intentional over-saturation

of the market, arbitrary definition of "trade areas", and misrepresented or undisclosed business

practices); and (b) subjected to illegal, deceptive and/or exploitive practices, including (i) exploitive charges for needed and even unneeded products/services which franchisees are required to purchase from Quiznos-related and certain other suppliers; (ii) mandated acceptance of customer merchandise discount coupons, without franchisor reimbursement; (iii) misuse of "advertising fees" charged to franchisees; and (iv) policies/practices regarding, *e.g.*, inspections and operational standards, designed to decrease/eliminate Quiznos obligation to compensate franchisees for their purchases of mandated products, and utilized to punish/rebuke franchisees openly critical of Defendants, in implicit suppression of franchisees' speech and association.

The Second Amended Complaint (hereafter the "Complaint") largely mirrors allegations made against all or many of the Defendants in other State-wide (or, in one case, national) class actions previously filed.[1] The over-arching allegation of these Complaints is that Defendants, not content with the profitability of a nationwide network of honestly/legitimately franchised "toasted sandwich" businesses, operated and expanded the Quiznos franchise empire via fraudulent and exploitive sales/contracting and business practices; and with (a) disregard for the long-term viability of its individual franchise stores, and (b) the primary intent of inflating Quiznos short-term/apparent profitability and, correspondingly, its sale value.[2] Defendants

---

[1] In general, where said Complaint does not mirror those filed in actions brought by other counsel, it raises misguided and unmaintainable causes of action, and includes ofttimes rambling language that is legally incorrect and sometimes indecipherable.

[2] In Westerfield v. Quiznos Franchise Co., LLC, 2008 WL 2512467, *10 (E.D. Wis. Apr. 16, 2008), discussed fully *infra*, the Court summarizes the franchisees' allegations that :

through their intentional misrepresentations and omissions, the defendants fraudulently induced them to enter into agreements that allow Quiznos to compel them to purchase the services, goods and materials essential to their businesses at grossly inflated prices from which Quiznos directly or indirectly profits. Then,

maintain here, as elsewhere, that (a) they made explicit disclosures to each prospective

franchisee and (b) the franchise documents - including the Uniform Franchise Offering Circular

(the "UFOC") and the Franchise Agreement, each of which Plaintiffs signed[3] - contain

disclosures, extensive non-reliance/disclaimer provisions, and significant limitations on

---

when they can no longer withstand the losses caused by Quiznos' exploitation and
go out of business, plaintiffs allege that Quiznos obtains releases of any claims
against it by threatening the franchisees with a lawsuit to enforce provisions of
the Franchise Agreement that purport to render them liable for payment of
royalties over the entire 15-year term of the Agreement. The closures are then
used to facilitate the movement of a lengthy list of equally deceived franchisees
awaiting store locations, into the same, now-vacant and bankrupt locations.
Though such a practice would seem counter to the interests of a franchisor whose
own income is dependent upon the success of its franchisees, plaintiffs allege that
Quiznos' actual motivation is not to establish stable and economically strong
franchisees for the long term. Instead, plaintiffs allege, the defendants' real
motivation is 'to inflate Quiznos' profitability and make it more attractive to
potential buyers and investors, toward the ultimate goal of allowing the Schadens
and other Quiznos insiders to sell their ownership interest for billions of dollars.'

The first of these franchisee class actions was filed in 2006. The Quiznos franchise
empire is alleged to have begun with acquisition of the brand by the Schadens in 1992, at which
time there were 18 stores. Quiznos was operated as a public company from 1994 through 2000,
during which time it grew to over 1000 stores worldwide. The Schadens then wished to take the
company private again and asserted a "fair value" of $8.50 a share, which was challenged by the
outside shareholders and reset by the Court at $32.50, in a ruling that found the proxy statement
to have been "an exercise in obfuscation." See, e.g., Brunet v. Quizno's Franchise Co., LLC,
No. 07-CV-01717 (D. Colo.), Docket No. 118, Amended Complaint at ¶¶ 85-86. Quiznos then
allegedly stopped operating as a legitimate franchise operation and became an enterprise directed
toward inflating its apparent profitability for resale (through aggressive nationwide sales of
franchises, abuses of marketing and advertising funds to capitalize national advertising and
system growth, and profits in the mandated supplier business). Id. In April 2006, J.P. Morgan
paid $585 Million for a 49% interest in Quiznos. Id. at ¶ 99.

---

[3] Memorandum in Support at 13 (noting that the UFOCs were "signed by the plaintiffs")
(quoting Siemer v. Quizno's Franchise Co, LLC, 2008 U.S. Dist. LEXIS 25907 at *18)).

litigation; and are determinative.[4]

Currently pending before the Court are the Defendants' Motions to Dismiss. This Court will grant the Defendants' Motions to Dismiss Plaintiffs' claims for antitrust violations and violations of Pennsylvania criminal code provisions. It will deny said Motions as to all other matters. In so holding, the Court concurs with the <u>Westerfield</u> Court's ultimate rejection of Defendants' contentions that they are entitled to dismissal of the franchisees' RICO and/or fraud in the inducement claims on the basis of the franchise documents. The Court is troubled by some of what it has read;[5] and it notes that (taking the allegations in the light most favorable to Plaintiffs), one or more of those documents could ultimately be found not only to have been obtained through fraud on - or an unconscionable exploitation of - the Plaintiffs, but even to have been obtained by Defendants for the purpose of facilitating a subsequent fraud on the Court.

---

[4] <u>See</u>, *e.g.*, Defendants' Memorandum of Law In Support of Motion to Dismiss at 3 (asserting that "the claims attempted . . . fly in the face of the disclosures each Plaintiff was provided in advance of his or her election to become a Quiznos franchisee, and are contradicted by the explicit terms of the parties' agreements"); <u>id.</u> (asserting that "the UFOC and the Franchise Agreements expressly disclosed information on which several of the claims are based, and Plaintiffs thus cannot claim they were not aware of this information").

[5] Owing in part to the limited/selective disclosure of related decisions in the Defendants' pleadings, and Defendants' sometimes misleading characterization of decisions discussed, and in part to general inadequacies of Plaintiff's Brief in Opposition, the Court has now familiarized itself with the pleadings in *all* of the pending related cases. <u>See</u> *infra* Section II. <u>Cf.</u> <u>Sands v. McCormick</u>, 502 F.3d 263, 268 (3d Cir. 2007) ("Generally, in ruling on a motion to dismiss, a district court relies [only] on the complaint, attached exhibits, and matters of public record.").

## II. **RELATED LITIGATION**

There has been significant litigation between Quiznos and its franchisees in the United States and Canada over the past several years. The actions are principally of two types: (1) those on behalf of some/all of the more than 3,000 individuals who purchased franchise opportunities but were unable to open a store within the contractual time frame and were deemed by Quiznos to have forfeited their investment monies;[6] and (2) franchisees who, like Plaintiffs *sub judice*,

---

[6] These individuals, generally referred to as the "sold but not opened" or "SNO" classes, commonly invested approximately $20,000 to $25,000 but never obtained a restaurant.

These cases include most notably <u>Bonanno v. The Quiznos Franchise Co. LLC</u>, Case No. 06-CV-2358, currently pending before Judge Arguella (to whom the case was reassigned from Judge Daniel in October, 2008) in the District of Colorado. <u>Bonanno</u> is a putative *national* class action alleging that Quiznos generated approximately $75 Million in franchise fees from these investors. It alleges that Quiznos fraudulently sold rights to operate franchises in areas where it did not/would not have available/feasible locations, resold the same trade areas to multiple franchisees after coercing franchisees to switch trade areas, unreasonably denied site approvals, intentionally concealed the fact that the large majority of franchises sold would never be open for business, and made other misrepresentations. <u>Bonanno</u> was removed from the New Jersey State Court to the District Court of that jurisdiction and, in March 2006, was transferred to the Colorado District Court on Defendants' Motion and pursuant to the forum selection clause of the franchise agreements. Defendants' Motion to Dismiss was denied in its entirety by Judge Daniel, largely on grounds that (1) the allegations of the Complaint (including claims for common law fraud, breach of contract, and breach of a duty of good faith and fair dealing) were sufficient for plaintiffs to proceed on their claims, and (2) Defendants' defenses based on contract language were premature prior to the Court's consideration of evidence on unenforceability. <u>See</u> 2008 WL 638367 (D. Colo. March 5, 2008). Plaintiffs' Motion for Class Certification was recently denied by Judge Arguello, who held the franchise agreements' class action waiver enforceable under Colorado law. <u>See</u> Defendants' Suggestion of Decision. <u>Cf.</u> discussion *infra*. Judge Arguello's decision is currently on interlocutory appeal to the Tenth Circuit and the case has been stayed on Order following a Joint Unopposed Motion.

<u>See also</u> <u>Elhilu v. Quiznos Franchise Co., LLC</u>, Case No. 06-CV-07855, currently pending before Judge Cooper in the Central District of California on behalf of SNO franchisees in that State. This Complaint alleges that - contrary to Quiznos representations - the franchisees were offered locations in already-filled or economically-depressed areas. It asserts that of approximately 1200 California franchises purposefully over-sold, 600 ultimately opened, and 300 were profitable. By Opinion of April 3, 2008, the Court denied Defendants' Motion to

suffered losses in their operation of a Quiznos store allegedly due to Defendants' conduct.

The Defendants are, as here, generally represented by Cheng Cohen LLC. In actions on behalf of the latter group of franchisees (those similarly situated to the Plaintiffs before this Court), the Plaintiffs are commonly represented by Marks & Klein, LLP. And of these cases, the most pertinent and persuasive is <u>Westerfield v. Quiznos Franchise Co., L.L.C.</u> (E.D. Wis.), No. 06-C-1210, before Judge William Griesbach.

In <u>Westerfield</u>, the plaintiffs (a prospective class action of Wisconsin franchisees) sued a similarly extensive group of Quiznos-affiliated entities and individuals, (a) alleging violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962 (c) ("RICO");[7] violations of antitrust laws; breach of contract; unjust enrichment; breach of the duty of good faith and fair dealing; fraudulent inducement; promissory fraud; strict liability misrepresentation; economic duress; illusory contract; breach of fiduciary duty; and violations of Wisconsin statutes regarding fair dealership, deceptive trade practices and franchise investments; and (b) seeking declaratory judgment. In November, 2007 Judge Griesbach initially granted Defendants' Motion

---

Dismiss, concluding that dismissal could not be based on a (1) contractual statute of limitations bar given the factual issues and questions of, *e.g.,* equitable tolling; (2) reasonable reliance/parol evidence bar where fraud in the inducement was sufficiently alleged; (3) failure to sufficiently plead unfair competition and other fraud claims under Rule 9(b), which must be read in harmony with Rule 8; (4) contractual restriction on claims against the Schaden Defendants, which would be unenforceable as against public policy; as would (5) contractual restrictions on punitive damages or class allegations (citing California's Civil Code provisions against contracts with the objective of exempting someone for responsibility for their own fraud). <u>See</u> Docket No. 69. The case was in Alternative Dispute Resolution by stipulation of the parties and a Motion for Preliminary Approval of a Settlement Class for the California SNOs was filed on May 11, 2009.

[7] RICO provides a private civil action to recover treble damages for injuries resulting from a defendant's "racketeering activities" in violation of RICO's substantive criminal provisions. <u>See</u> 18 U.S.C. § 1964(c).

to Dismiss on plaintiffs' RICO, antitrust, and fraudulent inducement claims, and declined to exercise pendant jurisdiction over the remaining state law claims.  See Westerfield v. Quiznos Franchise Co., L.L.C., 527 F. Supp.2d 840 (E.D. Wis. 2007).

On reconsideration five months later, however, Judge Griesbach determined that he had manifestly erred in concluding that plaintiffs' claims of reasonable reliance on Defendants' alleged fraudulent misrepresentations and omissions were fatally undermined, as a matter of law, by the disclosures, disclaimers and non-reliance provisions of the franchise documents.  Rather, Judge Griesbach determined, there are fact questions necessarily "left for trial, or at least a more complete development of the record", and the franchise documentation is not dispositive, where (1) plaintiff's allegations fall within RICO's broad prohibition against false or misleading statements made in expectation of benefit from another's detrimental reliance; and (2) applicable state law includes the Restatement (Second) of Contracts provision that "exculpatory clauses are unenforceable on public policy grounds where the alleged harm is caused intentionally or recklessly".  See Westerfield v. Quiznos Franchise Co., L.L.C., 2008 WL 2512467, **7-9 (E.D. Wis.  Apr. 16, 2008).  Judge Griesbach therefore vacated his earlier Opinion and granted the Westerfield plaintiffs leave to file an Amended Complaint.[8]

---

[8]  As he granted leave to amended, Judge Griesbach declined to address Quiznos additional arguments in support of its Motion to Dismiss at that time.  The Amended Complaint was filed in May, 2008 and no longer includes claims for antitrust violations.  See Westerfield v. Quiznos Franchise Co., L.L.C., No. 06-C-1210, Docket No. 136.  Defendants' Motion to Dismiss the Amended Complaint was filed in October, 2008, and is currently pending.  See id., Docket No. 145-146.  The Wisconsin Court set a briefing schedule on Class Certification from May through August, 2009.  However, on May 15, 2009, Plaintiffs filed a Motion seeking to stay the action pending the Tenth Circuit's decision in Bonanno.  See supra n. 6.  Said Motion was granted on May 21, 2009.  Judge Griesbach indicated, nonetheless, that he would still resolve the pending Motion to Dismiss and any related Motions.  See Docket No. 179.

The other prospective class actions on behalf of franchisees who purchased and operated Quiznos franchises include:

**A.** **Siemer v. The Quiznos Franchise Co.**, 07-CV-0271, before Judge Pallmeyer in the Northern District of Illinois, is comprised of essentially the same claims, similarly-situated parties (*i.e.*, a state-wide class of Quiznos franchisees), and same counsel as the previously-filed Westerfield action.[9]  In a succinct Opinion in late March 2008, Judge Pallmeyer cited extensively to, reiterated/concurred in, and largely followed Judge Griesbach's handling of the Quiznos class-action litigation; that is, she applied the same analysis in dismissing without prejudice the antitrust, RICO and fraud claims, and declining pendant jurisdiction over the remaining state law claims.[10]  As noted above, Judge Griesbach  reversed his decision on the plaintiffs' RICO and fraud claims two weeks later.

Moreover, Judge Pallmeyer's March 2008 Opinion gave the Illinois franchisees leave to file an Amended Complaint within thirty (30) days.  See id. at * 11.  Here then, as in Westerfield, an Amended Complaint maintaining the RICO and fraud claims was filed last

---

[9]  Defendants' December 2008 Memorandum in Support states, as the *coup de grâce* of its introductory summation of the asserted grounds for dismissal, that "other District Courts have rejected the same antitrust, fraud and RICO claims which Plaintiffs' [*sic*] attempt to assert here." Memorandum in Support at 2.  The pleading proceeds to assert, without mention of the Westerfield case or other significant information, that the Complaint *sub judice* is "virtually identical to the Complaint . . . which was filed in Siemer . . ., and which was dismissed on March 31, 2008."  Cf. *infra* n. 11.

[10]  See Siemer v. Quiznos Franchise Co., LLC, 2008 WL 905874, ** 5, 7 (N.D. Ill. Mar. 31, 2008) (reaching "the same result that Judge Griesbach did", *i.e.*, that in light of franchise document disclosures there was "no tenable argument" of reasonable reliance); id. at *8 (similarly holding that "[t]he court concurs with Judge Griesbach that it is unreasonable for Plaintiffs to claim reliance" in light of disclaimer and non-reliance provisions of the UFOC and Franchise Agreement); id. at ** 9-11 (concurring in "analysis [by which] Judge Griesbach found the market described" in the antitrust claims to be inappropriate).

Spring, followed by Defendants' October 2008 Motion to Dismiss.  Also as in Westerfield, a Motion to Stay was filed pending the Tenth Circuit's decision in Bonanno, which Motion was granted by the Siemer Court on May 26, 2009. [11]

   B. **Brunet v. The Quiznos Franchise Co. LLC**, Case No. 07-CV-01717, before Judge Brimmer (to whom it was reassigned from Chief Judge Nottingham) in the District of Colorado, is a putative *nationwide* class action[12] comprised of essentially the same claims,[13] similarly-situated parties, and same counsel in Westerfield.  Defendants' October, 2008 Motion to Dismiss and Plaintiffs' February, 2009 Motion to Certify the Class were filed, and the record indicates that the parties were in private mediation "for a nationwide resolution."  See Docket Nos. 124-25; 2009 WL 4511873 (D. Col. Oct. 01, 2008) (extension of dispositive motion and discovery deadlines).  On May 22, 2009, the Court stayed its proceedings on the Plaintiffs' Motion, pending the Tenth Circuit's decision in Bonanno, and denied all pending Motions without prejudice to refile.  See Docket No. 252.

---

[11] Defendants' Memorandum in Support omits mention of  the Siemer Court's concurrent grant of leave to amend to restate the claims, and subsequent case developments relevant to their misleadingly crabbed assertion that franchisees' claims were "dismissed" (implying that they were no longer pending) in that jurisdiction. Counsel are cautioned that zealous advocacy must be tempered by observance of the duty of candor toward a tribunal.

[12] The representative plaintiffs in Brunet include franchisees from California, Maine, Colorado, New York, Florida, Massachusetts, Mississippi, Washington, Ohio, Texas, Georgia and Kentucky.

[13] The claims alleged include violations of RICO, the Colorado Consumer Protection Act, breach of contract, breach of the duty of good faith, unjust enrichment, fraud in the inducement, promissory fraud, economic duress, illusory contract, breach of fiduciary duty, and a request for declaratory judgment on unconscionability.  See Docket No. 118, Amended Complaint.

### III. **FACTUAL AND PROCEDURAL HISTORY**

In addition to the factual background discussed *supra*, the Court notes the following significant factual and procedural history. As is appropriate in considering Defendants' Motions to Dismiss, the Court views all facts in the light most favorable to the Plaintiffs:

This action has been filed against the following Defendants:

(1) Nine Quiznos-related entities (the "Quiznos Entities") - The Quiznos Franchise Company, LLC; Quiznos Franchising LLC; Quiznos Franchising II LLC (hereafter the "Franchise Entities"); The Quiznos Master LLC; QFA Royalties LLC; QZ Finance LLC; QIP Holder LLC; TQSC LLC; and Cervantes Capital LLC;[14]

(2) Two father and son corporate majority shareholders and officers/directors: Richard F. Schaden and Richard E. Schaden; and

(3) Two Quiznos Pennsylvania employees: Kevin Casey and John Lubarski.

Plaintiffs are allegedly generally unsophisticated, often with little or no business experience or understanding of the implications of the Quiznos non-negotiable franchise documents. Although the UFOCs contained information about numbers of persons becoming

---

[14] The "Quiznos Named Entities" (*i.e.*, those including "Quiznos" in their name or the identifying letter "Q" in their acronym name) are inter-related Delaware limited liability companies. The Quiznos Franchise Entities and Royalties Entity have been franchisors for Quiznos franchises at various times. The Quiznos Master entity licensed intellectual property to the franchise system, and has been the parent of a Franchise Entity. See Brunet Amended Complaint. Cervantes Capital is also a Delaware limited liability company, allegedly under common control of, and owning a majority interest in one or more of, the Quiznos entities. The relationships between the Quiznos Named Entities (including assignments of franchise agreements) appear to have been both fluctuating and complex.

and ceasing to be Quiznos franchisees, Plaintiffs allege that they were not provided information

sufficient to enable them to understand the high failure rates.

Plaintiffs also allege that they were fraudulently induced to contract on the basis of

misrepresentations and omissions regarding the franchisee-franchisor's contractual relationship

as to services and supplies. The UFOC represents that:

> [Quiznos] and [its] affiliates have the right to receive payments from suppliers on account of their dealings with [franchisee] and other Franchisees and to use the amounts we receive without restriction (unless we or our affiliates agree otherwise with the supplier) for any purpose we or our affiliates deem appropriate. *We and our affiliates negotiate purchase arrangements with the suppliers for the benefit of Franchisees, which often include volume discounts.* Some suppliers pay us and/or our affiliates fees for products purchased through these negotiated agreements, and willingness to pay us and/or our affiliates may be a condition of our approval of a supplier.

See Defendants' Memorandum of Law In Support of Motion to Dismiss ("Defendants'

Memorandum in Support") at 4 (quoting Ex. B, Representative UFOC at Item 8, p. 28)

(emphasis added).[15]  Moreover, Plaintiffs assert that Quiznos sales representatives told them that

Quiznos would use the franchisees' aggregate buying power to obtain volume discounts, which

would be passed on to the franchisees.  See Second Amended Complaint at ¶ 71.

The Quiznos UFOC  includes disclaimers stating that salespersons were not authorized

"to furnish any oral or written information concerning the actual or potential sales, income or

profits of a Quiznos restaurant", and that "actual financial results [were] likely to differ from

---

[15]  See also Defendants' Memorandum in Support at 2 ("The primary flaw in each of Plaintiffs' claims is that each Plaintiff, before signing the franchise agreement, received and presumably reviewed, a uniform franchise offering circular ('UFOC'), which made clear that in the Quiznos system, as in many if not most franchise systems, *the franchisor limits sources of supply to leverage the buying power of the system as a whole*.") (emphasis added).  Cf. id. n. 2 (stating that the "disclosure document Quiznos is required to provide to prospective franchisees is now know as a franchise disclosure document ('FDD')").

[average gross sales figures] presented".  <u>See</u> Defendants' Memorandum in Support at 4 (quoting Representative UFOC at Item 19, pp. 54-55).

Similarly, the Quiznos Franchise Agreement, "a copy of which was included in the UFOC each plaintiff received, [was] consistent with the UFOC's disclosures."  <u>Id.</u> at 5.  The Franchise Agreement provided that it "contain[ed] the entire agreement between the parties . . . and there [were] no other oral or written representations (except for those made in the Franchise Offering Circular that Franchisee received from Franchisor), understandings, or agreements between Franchisee and Franchisor concerning the subject matter of [the] agreement." Defendants' Memorandum in Support at 5 (quoting § 23.2 <u>Entire Agreement</u>).  It also included a caution regarding the "substantial risks" of a franchise venture, as dependent "upon [the] franchisee's ability" and "active participation"; reiterated that no assurance or warranty of potential success or likely earnings had been given; and reiterated that Franchisor would not be bound by anything apart from statements, *representations* or other communications "set forth in [the Franchise Agreement] *and in any offering circular* supplied to the franchisee".  <u>See</u> Defendants' Memorandum in Support at 6 (quoting Ex. A, Franchise Agreement at § 23.12) (emphasis added).  <u>Compare id.</u> at 2 (asserting that "in their written and fully integrated franchise agreements . . each Plaintiff . . . disclaimed receiving or relying on any representation, promise or assurance *not contained in the franchise agreement itself*") (emphasis added).

Finally, "[t]o make certain that no franchisee entered into a franchise agreement in reliance on anything other than the UFOC's disclosures and the express terms of the franchise

agreement",[16] each franchisee was required to sign a "Disclosure Acknowledgment Statement" (hereafter the "Disclosure Statement") providing that (1) s/he was cognizant of the business risks; (2) s/he had reviewed, and had an opportunity to consult with legal counsel regarding, the franchise investment, UFOC and other documents; that (3) his/her decision was not " predicated upon any oral representations, assurances, warranties, guarantees or promises made by the Franchisor or any of its officers, employees or agents (including any franchise broker) as to the likelihood of success of the franchise", and that (4) "except as contained in the Franchisors' UFOC", the franchisee "ha[d] not received any information from the Franchisor or any of its officers, employees or agents (including any franchise broker) concerning actual, average, projected or forecasted franchise sales, profits or earnings."  See Disclosure Acknowledgment Statement, attached to Ex. A. to Defendants' Memorandum in Support.   The Disclosure Statement continues as follows:

> If the Franchisee believes that it has received any information concerning actual, average, projected or forecasted franchise sales, profits or earnings other than those contained in the UFOC, please describe these in the space provided below or write "None."

Id.

Defendants pointedly assert, in their December, 2008 Motion before this Court, that "Each Plaintiff was asked directly to disclose any representation he had received other than those contained in the UFOC.  In the space provided, each and every one of the plaintiffs wrote 'None.'" Defendants' Memorandum in Support at 7.  Defendants are, however, neglectful of their duty to this Court when they fail to disclose the evidence in other related cases that this

---

[16]  Defendants' Memorandum of Support at 6.

response was required - at the signing stage - to complete the transaction, *i.e.*, it was the "only acceptable" answer. See, e.g., Siemer, 2008 WL 904874 at * 9 (explaining that "Plaintiffs apparently learned, after filing in Wisconsin, that Quiznos issued instructions *requiring* potential franchisees to write 'None' on the space provided in the Disclosure Statement") (emphasis added); Westerfield, Case No. 06-C-1210 (E.D. Wis.), Docket No. 118, Plaintiffs' Brief in Support of Motion to Alter or Amend Judgment at 8-9 (discussing documents produced by Quiznos, including "Instructions For Completing Franchise Agreement" that direct employees/agents that "Franchisee must write 'none' in on blank lines" of Disclosure Statement).[17]

Plaintiffs similarly and more generally allege that they were otherwise pressured/coerced into accepting take-it-or-leave it terms.

The Second Amended Complaint in this action sets forth the following claims: Counts I and II - RICO; Count III - Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, by reason of violation of the Sherman Act, 15 U.S.C. § 1 (the "antitrust claim"); Count IV through IX -18 Pa.C.S.A. §§ 3921, 3922, 3926 and 18 Pa.C.S.A. §§ 4104, 4107, 4108 (the "Pennsylvania Criminal Code claims"); Count X - Fraud in the inducement; Count XI - Breach of contract; and Count XII - Breach of the implied covenant of good faith and fair dealing. Plaintiffs seek declaratory and injunctive relief, as well as damages. For the reasons set forth below, Counts III through IX will be dismissed as to all Defendants.

---

[17] See also discussion *infra*.

## IV. <u>STANDARD OF REVIEW; CHOICE OF LAW</u>

### A. **Standard of Review**

In considering a motion to dismiss pursuant to Rule 12(b), the Court must accept all allegations as true, draw all reasonable inferences therefrom, and construe the facts thus set forth in the light most favorable to the non-moving party. <u>See</u>, *e.g.*, <u>Gomez v. Toledo</u>, 446 U.S. 635, 636 n. 3 (1980); <u>Rocks v. City of Philadelphia</u>, 868 F.2d 644, 645 (3d Cir. 1989). As the Federal Rules of Civil Procedure require "notice" pleading, the claims must "make out a claim upon which relief can be granted." <u>Alston v. Parker</u>, 363 F.3d 229, 233 n. 6 (3d Cir. 2004) (quoting <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506, 512 (2002) (noting that the "standard relies on liberal discovery rules . . . to define facts and issues and to dispose of unmeritorious claims"). In light of recent precedent, the Complaint - while it need not contain "detailed factual allegations" must also contain more than a "formulaic recitation of the elements of a cause of action" and must state a claim that is plausible on its face. <u>Ashcroft v. Iqbal</u>, 2009 WL 1361536, **12-13 (U.S. May 18, 2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007) and providing further guidance on the standard set forth therein); <u>see also</u> <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 231 (3d Cir. 2008) (holding that the "factual allegations must [also] be enough to raise a right to relief above the speculative level").

As Defendants observe, an exception to the general rule of notice exists for claims of fraud and claims sounding in fraud. Rule 9(b) of the Federal Rules of Civil Procedures requires that these claims be pled "with particularity", and is intended to give defendants notice of the claims against them and reduce the number of frivolous suits. <u>See</u> Defendants' Memorandum in

Support at 8 (citing <u>Key Equity Investors, Inc. v. Sel-Leb Mktg.</u>, 2007 U.S. App. LEXIS 21392 (3d Cir. Sept. 6, 2007)). A plaintiff is not, however, required to plead "the date, place or time of the fraud, so long as plaintiff uses an alternative means of injecting precision and some measure of substantiation into [his/her] allegations." <u>Seville Indus. Machinery v. Southmost Machinery</u>, 742 F.2d 786, 791 (3d Cir. 1984) (holding that Court must apply heightened pleading standards of Rule 9(b) in accordance with rules underlying purposes - to put defendant on notice of misconduct alleged and to guard against "spurious charges of immoral or fraudulent behavior").

Finally, documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiffs' complaint and are central to the claims. <u>See</u> Defendants' Memorandum in Support at 3 n. 3 (noting that "[t]he UFOC and franchise agreements are properly considered" for these reasons) (citing <u>Pryor v. NCAA</u>, 288 F.3d 548, 560 (3d Cir. 2002).[18] The Court may examine those documents without converting a motion to dismiss into a motion for summary judgment.

### B. Choice of Law

As a preliminary matter, this Court notes that although the franchise agreements at issue provide that disputes are to be litigated in Colorado and governed by Colorado law, Defendants have not sought enforcement of those provisions. Indeed, to the contrary, Defendants made no request for enforcement of those provisions in their Motions to Dismiss or Memorandum of Law in Support thereof, and cited to the law of Pennsylvania and this Circuit in their supportive

---

[18] Defendants assert, and Plaintiffs do not dispute, that the "representative copies" of the franchise agreement and portions of a March 2004 UFOC are "substantially the same, if not identical" to the terms and documents at issue in this case. <u>See</u> Defendants' Memorandum in Support at 3, n. 4 (referring to Exhibits A and B thereto).

pleadings, with no suggestion of conflict.[19]  Accordingly, the Court will apply the law of the

Plaintiff's residence and forum state to those issues raised in the Motion to Dismiss and

governed by state law.  See Westerfield v. Quiznos Franchise Company, LLC, 527 F. Supp.2d

840, 849 n. 2 (applying Wisconsin law in similar circumstance).[20]  But see Defendants'

Suggestion of Decision and Sur-Reply re Suggestion of Decision (stating that Colorado law

governs the enforceability of a class action waiver in the franchise agreement).

To the extent that Defendants may, in future, assert that Colorado law controls a

particular analysis (as when, *e.g.*, Defendants have recently obtained a favorable interpretation of

Colorado law on that point), this Court suggests (without deciding) that in the case *sub judice*

Defendants may have waived the Franchise Agreement's forum selection and choice of law

provisions when they failed to move for transfer or to raise enforcement of/indicate reliance

upon such provisions in their responsive pleading.  See, *e.g.*, National Grange Mutual Ins. Co. v.

Goldstein, Heslop, Steel, Capper, Oswalt & Stoehr, 2005 WL 1805667, *6 (3d Cir. Aug. 2,

2005) (holding that party could not rely on choice of law where it had been waived by failure to

raise it

---

[19]  Cf.  Defendants' Reply Brief in Support of Motion to Dismiss ("Defendants' Reply Brief") at 2 (asserting that Plaintiffs' ignored "both Pennsylvania and Colorado law"); id. at 6 (mentioning, among agreement's procedural provisions, "Colorado forum applying Colorado law").

[20]  Cf., *e.g.*, Siemer, Case No. 07-C-2170, Docket No. 68, Defendants' Sur-Response in Further Support of Motion to Dismiss at 5 n.3 (dismissing Plaintiff's objections to Judge Griesbach's initial dismissal of the common law fraud claims in Westerfield as "concerning state law that [did] not control", *i.e.*, Wisconsin vs. Illinois).

in responsive pleading); <u>id.</u> ("Under Pennsylvania law, issues involving choice of law are not jurisdictional and may be waived if not raised.") (citing 42 Pa. C.S.A. § 5327(a)).[21]

## V. <u>ANALYSIS</u>

### A. <u>Counts I and II - Civil RICO Claims</u>

Plaintiffs assert two claims under RICO predicated on allegations of mail and/or wire fraud actionable as violations of 18 U.S.C. § 1962(c):[22]

First, Plaintiffs allege that Defendants conducted an "association in fact" enterprise, and fraudulently induced them to purchase Quiznos franchises by intentional misrepresentations and/or omissions regarding (1) the true nature of the contractual relationship and (2) other matters impacting the financial prospects of the franchises. There are allegations that Quiznos made written misrepresentation, had policies/practices of oral misrepresentation, and fraudulently withheld material information. (The alleged misrepresentations and/or omissions relate, *e.g.*, to information concerning above-market markups on required services/supplies, "trade areas", and market over-saturation.)

---

[21] <u>Cf.</u> *supra* (discussing case histories of related cases). As noted therein, Defendants transferred <u>Bonnano</u> to the District of Colorado; but after the Judge then assigned to the case denied Defendants' Motion to Dismiss, Defendants stopped seeking transfer of subsequent cases, and generally invoked forum state law in their legal arguments. Defendants' position as to the governing law in these cases should not be permitted to shift and spring according to the vicissitudes of interim rulings.

[22] Section 1962(c) of the RICO statute renders it unlawful for persons "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

Second, Plaintiffs further allege that, once the contracts were fraudulently obtained, Defendants then exploited their control and economic power over their franchisees to extract exorbitant/unjustifiable payments. More specifically, and as discussed above, under the terms of the franchise agreements, Plaintiffs were required to purchase necessary (and even unnecessary) products/services from Quiznos-related or Quiznos-mandated suppliers. Plaintiffs allege that, rather than sharing in the benefits of a "good deal" negotiated by Quiznos to leverage/reflect the enterprise's volume-buying power, as represented, they were subjected to substantial over-market charges, which were imposed against Plaintiffs' interests and solely in advancement of Quiznos (*i.e.*, Quiznos profited from the excess payments either directly when the supplier was a Quiznos affiliate, or indirectly via "kickbacks" from its other suppliers).[23]

Plaintiffs allege that both schemes - the scheme to fraudulently induce individuals to purchase franchises, and the scheme to fraudulently extract from franchisees exorbitant payments for goods and services, were carried out through the use of the United States mail and interstate wire facilities - thus making them actionable under RICO as a violation of 18 U.S.C. § 1962(c).

Defendants move to dismiss these RICO claims with assertions that (1) as to any misrepresentations, it was unreasonable as a matter of law for Plaintiffs to rely on representations after stating in writing that they were not, and as to any fraudulent omissions, Quiznos "was not under any duty to disclose" and any omissions claimed were addressed in the UFOCs; (2) more broadly, Plaintiffs fail to adequately allege either (i) any "racketeering activity" or pattern or (ii)

---

[23] Compare Memorandum in Support at 13-14 (characterizing claim as "simply that the products sold by Quiznos or its affiliates were overpriced . . . . . [O]verpricing is not fraud").

mail/wire fraud under Rule 9(b) and/or have failed to adequately allege a RICO enterprise; and (3) Plaintiffs lack standing.  See Memorandum in Support at 13-14 & n. 9; 17.[24]

### 1.  Misrepresentation and/or Fraudulent Omission

Plaintiffs identify specific misrepresentation in the UFOC, reliance on which was not waived by the plain language of the contractual documents.  See discussion *supra* (noting that neither Franchise Agreement nor Disclosure Statement waives reliance on representations made in the Agreement or the UFOC).  To the extent Plaintiffs have additional claims under RICO turning on misrepresentations which the franchise documents purport to be waived, this Court concludes, as has Judge Griesbach, that it would be inappropriate - in light of all the facts alleged - to grant dismissal as a matter of law.  See Westerfield, 2008 WL 2512467, *9 (concluding that it was clear that dismissal would be premature and that "disclaimers and non-reliance clauses [were] not dispositive of plaintiffs' civil RICO claims").[25]

---

[24] Defendants introduce the RICO analysis of their Memorandum in Support as follows: "Like the Sherman Act Claims, the RICO claims advanced by plaintiffs are identical to the claims which the Seimer plaintiffs asserted and which were dismissed." Memorandum of Support at 12-13 (following with multiple citations to Seimer). The six-page analysis that follows makes no mention of the Westerfield case, the Seimer Court's repeated reliance on and/or concurrence with Judge Griesbach's initial Opinion, the reversal of that Opinion - two weeks after publication of the Seimer Opinion - for "manifest error", or the permitted amendment of the complaint and refiling of a Motion to Dismiss in Seimer itself.  Once again, the Court finds it necessary to remind counsel of the duty of candor toward a tribunal.

[25] Cf. id. (noting that "more than the contract language is needed to defeat a claim of fraud" and that "[t]he case law . . . suggests that the degree of sophistication of the plaintiffs should also be considered").

Defendants assert that they were under no duty to disclose and that any omissions "claimed were clearly addressed within the UFOCs signed by plaintiffs." <u>See</u> Memorandum in Support at 13. It is quite possible that they are in error. For example: Defendants' UFOC representation that they would negotiate terms of the purchase of services and supplies "for the benefit of" their franchisees is quite particular and express. If Defendants understood this representation to have its facially-apparent meaning, but had no intent to conduct their service/supply related dealings for the benefit of Quiznos franchisees, and did not, they committed fraud by affirmative misrepresentation of an existing fact.[26] If they understood the representation to have this meaning, intended to perform in accordance with it, and did not, they breached their Franchise Agreements. If, however, Defendants' position is - as their pleadings suggest it may be - that the UFOC language did *not* have its facially-apparent meaning, *i.e.*, that it did not oblige Quiznos to advance franchisees' interests in service/supply-related dealings but left Quiznos free to conduct those dealings solely to its own benefit, which it did, then Defendants may well have had a duty to disclose this interpretation, *i.e.*, to disabuse the reasonable reader of the predictable misunderstanding. <u>See</u> Defendants' Reply Brief at 7 (acknowledging that a claim of fraudulent inducement by failure to disclose is adequately pled where it alleges that "Defendants knew that plaintiffs were about to enter into the franchise agreements under a mistake of fact, [and] that the facts allegedly concealed by Defendants were

---

[26] <u>See, e.g.</u>, <u>Precision Printing Co. v. Unisource Worldwide, Inc.</u>, 993 F. Supp. 338, 356 (W.D. Pa.1998) ("[A] promise which the promisor had no intention of keeping at the time he made it may be actionable as fraud."). <u>Cf.</u> <u>Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investments</u>, 951 F.2d 1399, 1410 (3d Cir.1991)(quoting <u>Brentwater Homes, Inc. v. Weibley</u>, 471 Pa. 17, 369 A.2d 1172, 1175 (1977) ("[a] statement of present intention which is false when uttered may constitute a fraudulent misrepresentation of fact.")).

peculiarly and exclusively within their knowledge such that plaintiffs could not reasonably have been expected to discover them, or that plaintiffs would reasonably expect disclosure of the allegedly concealed facts") (citing this Court's Opinion in <u>GNC Franchising, Inc. v. O'Brien</u>, 443 F. Supp.2d 737, 739 (W.D. Pa. 2008)).[27]

## 2. **Adequacy of Allegations under RICO and Rule 9(b)**

To plead a RICO violation, Plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. <u>See</u>, *e.g.,* <u>Lum v. Bank of America</u>, 361 F.3d 217, 223 (3d Cir. 2004). To plead a pattern of racketeering, plaintiff must allege at least two predicate acts, which may include violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. The mail fraud statute is violated by, *e.g.*, use of the mail to carry out a scheme that involves "some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." <u>Lum</u>, 361 F.3d at 223.

### a. **Predicate Acts and Pattern of Racketeering**

Defendants assert that Plaintiffs have "failed to [plead] a single predicate act" because the Complaint does not (a) "allege that any of the Defendants mailed . . . any matter for the purpose of their alleged scheme" or (b) "contain allegations of agency to support liability against the defendants." Memorandum in Support at 15.[28] The Court finds that Plaintiffs' allegations of

---

[27] <u>See also</u> <u>Westerfield</u>, 527 F. Supp.2d at 849-50 (concluding that party to business transaction has duty to disclose fact under same circumstances)(citing <u>Kaloti Enterprises, Inc. v. Kellogg Sales Co.</u>, 699 N.W.2d 205 (2005)); Restatement (Second) of Torts § 551 (holding that party to business transaction is under a duty to exercise reasonable care to disclose matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading).

[28] <u>Compare</u> Defendants' Memorandum in Support at 14 n.9 (asserting that Plaintiff's allegations that individual Defendants "'acted as the agent and representative of Quiznos

predicate acts of racketeering activity (*i.e.*, the Complaint's details indicating the nature of the fraudulent misrepresentations and omissions alleged, as well as the related franchise business practices and consequent harms to the franchisees therefrom) are sufficient to put Defendants on notice of the precise misconduct surrounding the allegation of fraud asserted against them and to guard against spurious charges of immoral or fraudulent behavior as required under the standard in this Circuit. See *supra*; In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).[29]

More specifically, the Complaint alleges that the franchisees of a nation-wide franchise enterprise regularly purchased supplies and services pursuant to an arrangement procured and maintained through fraud. It is not necessary at this time to identify individual **mailings**.[30] See generally Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir. 1995); id. at 1294 (holding that alleged fraudulent scheme continued, with additional predicate acts for RICO purposes, each time

---

[defined elsewhere as all of the Quiznos entities], such that his conduct is attributable to one or more of the Defendants' clearly fails to comply with Rule 9(b)'s particularity requirements") (quoting Complaint ¶¶ 46-47).

[29] See also Bonanno, 2008 WL 838367 at *4 (observing, in denying Quiznos Motion to Dismiss claim for common law fraudulent inducement, that Rule 9(b) "'only requires identification of the circumstances constituting fraud or mistake'", meaning that the plaintiffs should sufficiently designate the nature of the misrepresentations, by whom, to whom, when, and how they furthered the alleged fraud - which they had in "alleg[ing] numerous instances of fraud") (quoting Monus v. Colorado Baseball 1993, Inc., 1997 WL 723338, *3 (10th Cir. 1996)); Elhilu, Case No. 06-CV-07855 (C.D. Cal.) Docket No. 69, April 03, 2008 Order Denying Motion to Dismiss at 6 (noting that under Rule 9(b)'s particularity requirement **"**[t]he allegations must be specific enough to give defendant notice of the particular misconduct which is alleged to constitute the fraud" but plaintiffs need not "identify every speaker who made representations to them" where there was "more than sufficient detail in the Complaint to enable defendants to formulate a defense").

[30] Cf. Siemer, Case No. 07-C-2170 (N.D. Ill.), Docket No. 68, Defendant's Sur-Response in Further Support of Motion to Dismiss at 9 n. 10 (noting that Siemer Complaint ¶ 109 alleges that UFOCs and Franchise Agreement "were sent via mail").

defendant "made a questionable charge or [through its allegedly fraudulent invoices] received compensation to which [it was] not entitled") (quoted in HT of Highlands Ranch, Inc. v. Hollywood Tanning Sys., Inc., 2008 U.S. Dist. LEXIS 97523, *28 (D.N.J. Dec. 1, 2008) (concluding that alleged RICO scheme was not completed when plaintiff entered into lease agreement with defendant, but continued with subsequent mailings of fraudulent invoices in furtherance of overbilling scheme).  Similarly, as to agency and/or individual Defendants' participation, Plaintiffs have alleged that conduct attributed to the individual Defendants was integral to and consistent with a regular, on-going and nation-wide fraud.  The allegations are therefore adequate to put Defendants on notice of the conduct underlying the RICO claims and to address Rule 9(b)'s concerns regarding the *in terrorem* risk of nonspecific charges of fraud.[31]

Defendants' assertion that Plaintiffs fail to adequately plead facts suggestive of a pattern is also rejected, for Plaintiffs allege acts with the same/similar purposes, results, participants, victims, and/or methods of commission.

### b.  Enterprise

Defendants further assert that Plaintiffs fail to allege "the required structure, hierarchy or control" as to the asserted association-in-fact enterprise.  Id. at 15-16 (citing Price v. Amerus

---

[31]  See also Kronfeld v. First Jersey Nat'l Bank, 638 F.Supp. 1454, 1465 (D.N.J. 1986) (observing that "when the transactions are numerous and take place over an extended period of time, less specificity in pleading fraud [may be] required").  Cf.  HT of Highlands, U.S. Dist. LEXIS 97523 at *32 (denying motion to dismiss where "[p]laintiff's allegations regarding the objectives and composition of the conspiracy, and [Defendant]'s conduct in advancing those objectives "'contain[ed] sufficient information . . . to enable the opposing side to prepare an adequate responsive pleading'") (quoting Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989)).

Annuity Group Co., 2006 U.S. Dist. LEXIS 35980 (E.D. Pa. Jun. 2, 2006) for principle that allegations of business relationships and conspiracy are insufficient to RICO liability where parties were not "organized in a fashion that would enable them to function as a racketeering organization for other purposes"). The cases cited in the Memorandum in Support are patently distinguishable, as they generally involved defendants whose relationships were too attenuated, unstable or fluid to ground the RICO claim. It appears from the Plaintiffs' allegations that the relationships amongst these Defendants were markedly different; at a minimum, they were certainly not too attenuated as a matter of law. Moreover, the Supreme Court has quite recently clarified the broad interpretation to be given to the concept of an "association-in-fact" racketeering enterprise. See Boyle v. United States, 2009 WL 1576571 (U.S. June 8, 2009) (holding that while enterprise must be shown to have a formal or informal organization framework and to function as a continuing unit, it need not be shown that it has a distinct heirarchical structure beyond that inherent in the pattern of its racketeering activity).

And they assert that Plaintiffs fail to allege an enterprise "separate and distinct from the defendants themselves, as is required." Memorandum in Support at 16.[32] To the contrary, as detailed *supra*, Plaintiffs have alleged an institutionalized pattern of fraud conducted by a network of Quiznos-affiliated entities and named individuals involved in control/operation of the franchise system. They have, therefore, alleged facts sufficient at this stage to suggest (i) an on-going association-in-fact entity; (ii) composed of Quiznos, its affiliates, officers, agents, and/or

---

[32] See also Reply Brief at 13-14 (asserting that the Complaint's assertions "fail to demonstrate that defendants engaged in anything other than the operation of normal business affairs"). The Court hopes that Defendants do not truly believe that the scope of conduct alleged in the Complaint constitutes "normal business affairs."

employees "function[ing] as a continuing unit"; and (iii) existing "separate and apart from the pattern of activity in which it engages". See United States v. Console, 13 F.3d 641, 650 (3d Cir. 1993) (discussing the elements of a RICO enterprise under United States v. Turkette, 452 U.S. 576, 583 (1981)). Moreover, in this Circuit it is sufficient at the motion to dismiss stage that Plaintiffs state what they believe to constitute a RICO enterprise. See, e.g., HT of Highlands Ranch, Inc. v. Hollywood Tanning Systems, Inc., 2008 U.S. Dist. LEXIS 97523, *32 (citing to several decisions and noting that plaintiffs need not allege the requisite "enterprise" elements to survive a motion to dismiss). And "'the proof of the enterprise may 'coalesce' with the proof of the pattern [of racketeering activity], i.e., [ ] the different conclusions may be inferred from proof of the same predicate acts . . . ." Id. at *33 n.12 (quoting United States v. Pelullo, 964 F.2d 193, 212 (3d Cir. 1992).

### 3. **Plaintiffs' Standing**

Finally, Defendants assert that Plaintiffs lack RICO standing because they have not "properly allege[d] proximate cause." Memorandum in Support at 17 (quoting Anza v. Ideal Steel Supply Corp., 126 S.Ct. 1991 (2006)).[33] See also id. at 17-18 (asserting, in a mischaracterization of the language and scope of the Second Amended Complaint, that the claims fail for lack of allegations of proximate cause because "plaintiffs assert that defendants induced [them] to become Quiznos franchisees, but do not allege how any alleged

---

[33] In Anza the Supreme Court held that *where the alleged fraud was not on the plaintiffs*, it would be extremely difficult to assess the proximate cause between the defendant's sales at below the legally-authorized price (a fraud on the state), and the business cost to the competitor-plaintiff in terms of lost sales attributable to defendant's set-price violations. Cf. Defendants' Reply Brief at 14 (acknowledging issue in Anza as plaintiff's inability to establish proximity of its harm to defendant's "tax fraud"). The case is patently inapposite.

misrepresentations - let alone [ ] wire or mail transmissions - allegedly [*sic*] damaged them" and because "Plaintiffs alleged damages from alleged overcharging").

To the contrary, Plaintiffs have alleged that they "suffered losses as a result of the unlawful conduct of Quiznos". Second Amended Complaint ¶¶ 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34. More generally, a fair reading of the Complaint makes it clear that Plaintiffs allege that they have suffered losses in the operation of Quiznos franchises - losses that they would not have incurred had they not been induced to become franchisees.[34]

## B. Count III - Antitrust Claim

Plaintiffs assert that Defendants violated the Sherman Act, 15 U.S.C. § 1, by requiring that franchisees purchase supplies and services from Quiznos-affiliated and Quiznos-mandated vendors.[35] They claim that these Quiznos "tying arrangements" are either illegal *per se*, or otherwise unreasonably restrain competition. This Court concurs with Judge Griesbach's incisive analysis on this claim, and his conclusion that the Quiznos franchisee plaintiffs' antitrust claim of

---

[34] Cf. Westerfield, 2008 WL 2512467, *9 (referring to "the uncertainty in federal law as to the significance of the element of reliance to a civil RICO claim") (citing Anza, 126 S.Ct. at 2007 (Thomas, J., concurring in part and dissenting in part) ("[T]he mere fact that the predicate acts underlying a particular RICO violation happen to be fraud offenses does not mean that reliance, an element of common-law fraud, is also incorporated as an element of a civil RICO claim.") Two months later, in June, 2008, the Supreme Court held that a reliance element is not incorporated into RICO. See Bridge v. Phoenix Bond, 128 S. Ct. 2131 (2008) (no required showing of reliance).

[35] Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1.

illegal tying under the Sherman Act should be dismissed.  See Westerfield, 527 F.Supp.2d at 858 (concluding that claim should be dismissed absent some suggestion that Quiznos exercised substantial market power in area of "equivalent investment opportunities"); see also Siemer, supra (concurring with the Westerfield analysis).  Indeed, the Court notes that Plaintiffs' Brief in Opposition does not include any defense against dismissal of this Count.

A tying arrangement is an agreement by a party to sell a product "'only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 462 (1992) (quoting Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 (1958)).  It violates antitrust law if the seller, by virtue of its appreciable market power, exploits its control of the first, or "tying" product "to force the buyer into the purchase of a [second, or] tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  Westerfield, 527 F.Supp.2d at 856 (quoting Will v. Comprehensive Accounting Corp., 776 F.2d 665, 669 (7th Cir.1985) (quoting Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2 (1984)).

Plaintiffs claim that Quiznos illegally ties the sale of its franchises (the tying product) to the subsequent sale of supplies and services (the tied products).  And they allege that because Quiznos enjoys substantial market power in the "Quick Service Toasted Sandwich Restaurant Franchise" market, the tying arrangement is unlawful.  But Plaintiffs' claim of exploitation by control of the tying product market rests on an unreasonably narrow definition of that market.

This Court concludes, as did the Courts in <u>Westerfield</u> and <u>Siemer</u>, that the artificially-narrow definition of the relevant market, not as, *e.g.*, the fast-food franchise market or even the fast-food sandwich franchise market, but as the "Quick Service Toasted Sandwich Restaurant" franchise market, fails to consider "reasonable inter-changeability and cross-elasticity of demand" and "does not encompass all interchangeable substitute products".[36]  Because Plaintiff's relevant market is legally insufficient, the Motion to Dismiss will be granted on this Count.  <u>See  Queen City Pizza v. Domino's Pizza, Inc.</u>, 124 F.3d 430, 436 (3d Cir.1997) (affirming dismissal of Sherman Act claims for failure to plead a valid relevant market).

## C.  Counts IV through IX - Pennsylvania Criminal Code Claims

Counts IV through IX of Plaintiffs' Second Amended Complaint allege causes of action under Pennsylvania penal code provisions for theft by unlawful taking, theft by deception, theft of services, and other criminal violations.  As Defendants correctly observe, the Code gives no authority for a private cause of action and none has been implied.  <u>See</u> Memorandum in Support at 22 (citing <u>D'Errico v. DeFazio</u>, 763 A.2d 424, 430 (Pa. Super. 2000)).  Plaintiffs' Brief Opposing

---

[36]  <u>Westerfield</u>, 527 F. Supp.2d at 856; <u>see also</u> <u>id.</u> at 858 ("[A]t the minimum - a franchisor market power assessment requires reference to all alternatives available to the potential consumer in a broad line of business endeavors.") (quoting Alan Silberman, <u>The Myths of Franchise "Market Power"</u>, 65 Antitrust L.J. 181, 206 (1996)); <u>Tominaga v. Shepherd</u>, 682 F.Supp. 1489, 1494 (C.D. Cal.1988) (stating that in assessing tying claim against combination chicken/pizza franchise "[p]ossible relevant markets include take out pizza franchises, fast food franchises or restaurant franchises in general"); Defendants' Memorandum in Support at 10-11 (noting that a "relevant market" for purposes of antitrust analysis cannot consist of a particular trademarked franchise business).

Defendants' Motion to Dismiss provides no cogent argument to the contrary. Accordingly, these Counts will be dismissed.[37]

### D. Count X - Fraud in the Inducement/Negligent Misrepresentation

Defendants contend that Plaintiffs' claim for fraud or negligent misrepresentation should be dismissed because (1) all alleged misrepresentations are either "contradicted by the UFOC or franchise agreement" or are merely "statements of future promises or 'puffery'"; (2) Plaintiffs have alleged no duty to disclose, as they have alleged neither a fiduciary or special relationship between the parties nor an undiscoverable latent defect;[38] (3) Plaintiffs could not, in light of their contractual non-reliance provisions, justifiably rely on "statements other than those in the franchise agreements and written UFOCs"; and (4) Pennsylvania's "gist of the action" doctrine precludes Plaintiffs from recasting "ordinary breach of contract claims into tort claims". Defendants' Memorandum in Support at 18-21. Defendants' Reply Brief adds an assertion that by failing to specifically identify misrepresentations by specific individual Defendants and by

---

[37] The Court notes that this action does not raise statutory protections to which the franchisees may be entitled under the allegations of the Complaint. Cf. *e.g.*, Bonanno, 2008 WL 638367 at *3 (concluding that plaintiffs residing in other states had standing to bring claim under Colorado Consumer Protection Act regulating commercial activities and practices, where plaintiffs alleged fraudulent scheme involving Quiznos conduct in Colorado (including policies and decisions instituted there)).

[38] See Memorandum in Support at 19-20. Cf. Defendants' Reply Brief at 7 ("Contrary to plaintiffs' assertions, . . . defendants are not asking this Court for an order finding no duty to disclose exists. Rather, in this motion, defendants simply assert that no duty to disclose has been alleged in the complaint."); id. (stating that although the Complaint alleges a duty to disclose, it does not identify the facts giving rise to such duty). Compare Memorandum in Support at 12-13 (citing as persuasive authority Siemer, in which "Plaintiff's [RICO] claims based on fraud [by omission]" failed "because Quiznos was *not under any duty* to disclose") (emphasis added).

providing "too vague a description of the when and where" of any misrepresentations, Plaintiff's claims are in violation of Rule 9(b).  See Reply Brief at 8.

The Motion to Dismiss with respect to this claim fails for the reasons discussed by Judge Griesbach in Westerfield and set forth below:

**1.  Defenses of Contradiction, Future Promise or Puffery**

Defendants assert this claim must fail because (a) the UFOC provided appropriate information from which allegedly material information, *e.g.*, store closure and turn-over rates, could be obtained/extrapolated, and informed prospective franchisees of the existence of service/supply restrictions from which Quiznos would benefit; (2) any claims or opinions regarding future revenues or profitability, or promises of assistance, were non-actionable as relating "to future or contingent events, expectations, or probabilities"; and (3) other statements were mere puffery.  Memorandum in Support at 18-19 (quoting Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994)).[39]

To the contrary, and as discussed fully above, it appears to this Court at this time that a reasonable jury could find that the Defendants made actionable misrepresentations as to, *e.g.*, Quiznos service and supply dealings with its franchisees.

---

[39]  See also Reply Brief at 9 (citing, oddly, to Vaughn v. Gen. Foods Corp., 797 F.2d 1204, 1411 (7th Cir. 1986) as "controlling" case law to effect that statements regarding "viability" of franchise were "not a guarantee of a particular degree of success").  As the citation is followed by Wisconsin case law, the Court presumes that the citations (and characterizations) were drawn from pleadings before the Wisconsin Court.  Cf. *supra* n. 21.

## 2. **Duty to Disclose and Adequancy of Disclosures**

First, Defendants' assertions to the contrary notwithstanding, Plaintiffs have sufficiently alleged circumstances giving rise to a duty to disclose. <u>See</u> discussion *supra* at Section V(A)(1).

Second, Defendants are also incorrect in asserting that Plaintiffs' claims should be dismissed because Quiznos made the appropriate disclosures. <u>See, *e.g.*,</u> Memorandum in Support at 2 (stating that the UFOC provided to each Plaintiff "made clear that in the Quiznos system, as in many if not most franchised systems, the franchisor limits sources of supply *to leverage the buying power of the system as a whole*") (emphasis added).[40] A disclosure that Quiznos would make some profit from "leverag[ing] the buying power of the system as a whole", *i.e.*, that it would take a piece/percentage of a good deal for all, is not a disclosure that Defendants would, as alleged, impose commercially unreasonable/exploitive costs for supplies and services on its franchisees, *i.e.*, that it would extract profit at its franchisees' expense. Indeed, such language appears to create a reasonable expectation to the contrary.

## 3. **Effect of Non-Reliance Provisions of the Franchise Documents**

Defendants further assert that Plaintiffs' claims are precluded by the documents which they signed which disclaimed reliance "upon any statements other than those in the franchise agreements and written UFOCs." Memorandum in Support at 20 (citing Franchise Agreement, Ex. A § 23.2); <u>id.</u> (citing <u>Cutrone v. Daimler-Chrysler Motors Co., LLC</u>, 2005 U.S. App. LEXIS 28423 (3d Cir. Dec. 21, 2005) ("[plaintiff's] fraud claim is similarly doomed, as the integration clause in the parties' 2000 franchise agreement prevents its assertion")).

---

[40] <u>See also</u> <u>id.</u> (noting that the UFOC disclosed that "the franchisee was required to use approved suppliers, that those approved suppliers may be affiliates of the franchisor, [and] that the franchisor made money through those sales").

However, perhaps the most important basis for Plaintiffs' claim of fraud – the UFOC statement that Quiznos negotiates with suppliers to obtain discounts for the franchisees' benefit – was explicitly excepted from the Agreement's disclaimer.

The Court notes that other Courts considering this issue have refused to enforce the Franchise Agreement disclaimer provisions on the ground either that public policy forbids contractual preclusion of liability for *intentional* misconduct, such as fraud - see Westerfield, 2008 WL 2512467, *9 (noting that the Court's "conclusion . . . that the disclaimer and non-reliance clauses [did] not preclude plaintiffs' fraud claims [was] even more clear with respect to plaintiffs' state law claim of fraud" under Restatement (Second) of Contracts § 195(1), providing that "exculpatory clauses are unenforceable on public policy grounds where the alleged harm is caused intentionally or recklessly"); or that a party cannot waive the right to sue for fraud in the inducement by a provision in the contract whose validity is challenged - see Elhilu v. Quiznos Franchise Co., LLC, No. 06-CV-07855 (C.D. Cal. Apr. 03, 2008), Docket No. 69 - Order Denying Motion to Dismiss at 5 (citing Blankenheim v. E.F. Hutton & Co., 217 Cal. App.3d 1463, 1471-3 (1990)).

More generally, this Court is in complete agreement with the just and insightful observations of the Massachusetts Supreme Court, as quoted in Judge Griesbach's Opinion:

> As a matter of principle it is necessary to weight the advantages of certainty in contractual relations against the harm and injustice that result from fraud. In obedience to the demands of a larger public policy the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it. No one advocates a return to outworn conceptions. The same public policy that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of contractual devices.  In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been

33

made and in fact are false but for which he would not have made the agreement. To deny this possibility is to ignore the frequent instances in everyday experience where parties accept, often without critical examination, and act upon agreements containing somewhere within their four corners exculpatory clauses in one form or another, but where they do so, nevertheless, in reliance upon the honesty of supposed friends, the plausible and disarming statements of salesmen, or the customary course of business. To refuse relief would result in opening the door to a multitude of frauds and in thwarting the general policy of the law.

Westerfield, 2008 WL 2512467, *10 (quoting Anderson v. Tri-State Home Imp. Co., 67 N.W.2d 853 (Wis. 1955)(quoting Bates v. Southgate, 31 N.E.2d 551, 558 (Mass. 1941)).

Because the disclaimer does not purport to nullify an important representation on which Plaintiffs' fraud claim is based in substantial part, Plaintiffs are entitled to go forward with that claim; and it is not necessary at the present stage for the Court to decide whether, in view of the foregoing considerations, the disclaimer provision may be unenforceable with respect to other representations.

Finally, this Court cannot let Defendants' invocation of the disclaimer, and particularly Defendants' emphasis on the apparent opportunity to identify other statements relied upon, pass without commenting on the deceptive nature thereof. If, as has been alleged, Quiznos pursued a policy of requiring all franchisees to write "none" in the blank ostensibly provided for identification of statements relied upon, then the inclusion of a blank to be filled in by the franchisee in lieu of a pre-printed provision amounts to a sham, whose apparent purpose is to mislead a subsequent reviewer, such as this Court, into believing that Quiznos' unilaterally-prescribed disclaimer language was actually authored without constraint by the franchisees.

**4. Effect of Pennsylvania's Gist of the Action Doctrine**

Defendants assert that this Count is barred by Pennsylvania's gist of the action doctrine. "Generally, the gist-of-the-action doctrine precludes a party from raising tort claims where the essence of the claim actually lies in a contract that governs the parties' relationship."  Sullivan v. Chartwell Investment Partners, LP, 873 A.2d 710, 718 (Pa. Super. 2005).  "[T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus."  Redevelopment Authority of Cambria County v. International Insurance Co., 454 Pa. Super. 374, 685 A.2d 581, 590 (1996) (en banc), quoted in Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103 (3d Cir. 2001).  Accordingly, a claim is limited to contract law when "the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts."  Bash v. Bell Telephone Co., 601 A.2d 825, 830 (1992).

The Pennsylvania Superior Court has applied the gist of the action doctrine to claims for fraud in performance of a contract, but not to claims for fraud in the inducement.  See Sullivan, 873 A.2d at 719 ("Following a thorough analysis of the issue, the eToll Court concluded that the gist-of-the-action doctrine would apply to bar a claim for fraud in the performance of a contract. However, it also observed that the gist-of-the-action doctrine would not necessarily bar a fraud claim stemming from the fraudulent inducement to enter into a contract.") (citing eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa. Super. 2002)).  See also Air Products and Chemicals, Inc. v. Eaton Metal Products Co., 256 F. Supp.2d 329, 341 (E.D. Pa. 2003), quoted in

<u>Sullivan</u>, 873 A.2d at 719 (noting that "fraud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists").[41]   This distinction becomes somewhat problematic, however, where the alleged misrepresentations that induce a contract also constitute promises that form the contract's terms.

In <u>Williams v. Hilton Group PLC</u>, 93 Fed. Appx. 384 (3d Cir. 2004) (*per curiam*), the court affirmed dismissal under the gist of the action doctrine of fraud claims involving breach of an exclusive negotiation agreement despite evidence that the defendant never intended to honor its promise of exclusivity.   However, the <u>Williams</u> court did not have the benefit of the Superior Court's subsequent decision in <u>Sullivan</u>, which permitted a claim for fraud in the inducement predicated upon the same promises that it found to be sufficient to make out a contract claim.   As the <u>Sullivan</u> court explained,

> Appellant alleged that Appellee fraudulently and/or negligently agreed to perform obligations that it never intended to perform in order to induce Appellant to agree to the proposed changes . . . . .   Accordingly, we conclude that since Appellant's tort claims relate to the inducement to contract, they are collateral to the performance of the contracts and therefore, are not barred by the gist-of-the action doctrine.

<u>Sullivan</u>, 873 A.2d at 719.  This conclusion undercuts the majority holding in <u>Williams</u>, and supports the dissent's view that under the Pennsylvania cases, where there is "fraudulent intent,

---

[41]   The Court in <u>Air Products</u> further explained that "fraud to induce a person to enter a contract is generally collateral to (i.e., not 'interwoven' with) the terms of the contract itself".  256 F. Supp.2d at 341.

i.e. a subjective and undisclosed intent not to perform, a fraud claim is stated." Williams, 93 Fed. Appx. at 390 (Becker, J., dissenting).[42]

Moreover, the Williams majority recognized that the gist of the action doctrine "appears to call for a fact-intensive judgment as to the true nature of a claim", and accordingly its per curiam opinion was explicitly limited to "the particular facts presented". Williams, 93 Fed. Appx. at 386, 387. Those facts involved sophisticated parties who embodied the precise undertakings at issue in their agreement. See id. at 387 ("Williams and Ladbrokes are sophisticated parties who were well able to protect their rights in relation to this matter by contract, and they attempted to do so"); id. at 390 (Becker, J., dissenting) (describing majority opinion as barring an action in tort "whenever fraudulent misrepresentations to induce a contract result in specific duties outlined in the later contract between sophisticated parties"). See also Penn City Investments, Inc. v. Soltech, Inc., 2003 WL 22844210, *3 (E.D. Pa. Nov. 25, 2003) (quoted as "instructive" in Williams, 93 Fed. Appx. at 386) (holding fraudulent inducement claim barred because "pre-contractual statements concerned specific duties that the parties later outlined in the contract").

The present case is distinguishable from Williams due to the alleged un-sophistication of Plaintiffs and the Class, and the failure of the Agreement to specify the duties allegedly undertaken by Quiznos with respect to supplier dealings. Defendants cannot have it both ways. If, as Defendants contend, the Agreement imposes no duty on Quiznos to refrain from unreasonable profiteering in its approved supplier dealings, then it would seem clear that claims

---

[42] The Pennsylvania Superior Court's holding in Sullivan, as the most recent ruling of the intermediate appellate court, "must be accorded significant weight and should not be disregarded absent persuasive indication that the highest court would rule otherwise." U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co., 80 F.3d 90, 93 (3d Cir. 1996).

of misrepresentation or omissions concerning such profiteering find their "gist" in the law of fraud, not contract. That is, the socially-imposed duty not to induce another party to enter a contract by misrepresenting contractual terms or practices does not become subsumed within the consensual duty to abide by a contract if the terms and practices at issue never become part of the contract. Accordingly, considering the alleged facts and inferences therefrom in the light most favorable to Plaintiffs, the Court concludes that the fraud claims are not barred by the gist of the action doctrine.

## E. Counts XI and XII - Breach of Contract and Breach of the Convenant of Good Faith and Fair Dealing

### 1. Breach of Contract

Defendants assert that Plaintiffs' breach of contract claim must be dismissed because (a) "[t]he UFOC is neither a contract nor is it incorporated by reference into the franchise agreement", and, independently, (b) "Plaintiffs fail to adequately allege what contractual obligations Quiznos supposedly breached." Memorandum in Support at 22.[43] Defendants then summarize Plaintiffs' contract claims as turning on Quiznos failure to: negotiate supplier agreements for franchisees' benefits in accordance with the UFOC; disclose relationships with vendors and rebates received; provide promised support/assistance in operations; and properly appropriate advertising funds. Id. at 22-23 (citing Complaint ¶¶ 215-217). The Court finds Defendants' assertions misguided.

---

[43] See also Reply Brief at 16 ("[T] he UFOC does not form the basis of a claim for breach of contract. Accordingly, plaintiffs' alleged breaches of contract arising out of the provisions of the UFOC fail to state a claim . . . .").

The Franchise Agreement at issue contains an integration clause. The Court, therefore, in considering the Motions to Dismiss, looks first to the express contract language and whether it is open to any question sufficient to maintain this claim. In general, the contractual purpose of an integration clause is to set forth the parties' intent to exclude from contractual effect anything outside the four corners of the written agreement. As this Franchise Agreement expressly *encompasses* the signed UFOC, it is far from clear that statements in the UFOC were excluded by such apparently inclusive language.[44] The Agreement's express contemplation that franchisees may rely upon statements in the UFOC could be read (in the light most favorable to Plaintiffs) to mean that the parties had a binding expectation - that is, an agreement - that those representations would be fulfilled, *e.g.*, that Quiznos would negotiate for services/supplies on the franchisees' behalf.[45]

## 2. Breach of the Covenant of Good Faith and Fair Dealing

Even if the Franchise Agreement were interpreted to have excluded the UFOC's representations/promises, so that no express promise to act in the franchisee's interests in volume service/supply negotiations was deemed to be within the parties' mutual contractual understanding, that same duty could certainly flow from an implied covenant to act fairly in

---

[44] Cf. Memorandum in Support at 20-21 (stating that Plaintiffs could not justifiably rely on "statements other than those in the franchise agreements and written UFOCs" with citations to integration clause cases).

[45] Cf. Siemer, 2008 WL 905874 at *11 ("[T]he UFOC and Franchise Agreement each contain disclaimers and non-reliance clauses . . . . In the Franchise Agreement, each Plaintiff signed an integration clause agreeing not to rely on any statements not contained in the UFOC or Franchise Agreement. . . ."). This language also suggests that Judge Pallmeyer considered these signed Quiznos documents to reflect the parties' contractual undertakings and reliances.

administering a contractual right to bargain on behalf of the franchisees.  More generally, to the extent that any of the contractual breaches alleged by Plaintiffs is not founded upon an express undertaking in the Agreement (and is not ruled out by an express right granted therein), the contractual duty against which Quiznos conduct should be measured may be supplied by the principle that a franchisor must deal fairly with its franchisees.

Defendants raise, again under the law of the forum state,[46] the objection that "Pennsylvania does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing."  Memorandum in Support at 24 (citing Corestates Bank v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999)).

> The Restatement (Second) of Contracts, § 205, expressly provides that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and in its enforcement."   And the Pennsylvania Courts have repeatedly embraced this fundamental principle of the Restatement.  See, e.g., Frickert v. Deiter Bros. Fuel Co., 347 A.2d 701, 705 (Pomeroy, J. concurring); Atlantic Richfield Co. v. Razumic, 390 A.2d 736, 740-41 (Pa. 1978); Bethlehem Steel Corp. v. Litton Indus. Inc., 488 A.2d 481, 600 (Pa. 1985) (Zappala, J., Opinion in Support of Reversal) ("We have previously accepted as the law of this Commonwealth the principle stated in [§ 205] . . . .") (citing Razumic); Germantown Mfg. Co. v. Rawlinson, 491 A.2d 138, 148 (Pa. Super. 1985); Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. 1992) (citing Frickert); Stamerro v. Stamerro, 899 A.2d 1251 (Pa. Super. 2005) ("Additionally, this 'Commonwealth has accepted the principle in [§ 205] that 'every contract imposes upon each party a duty of good faith and fair dealing . . . .'") (quoting John B. Comonos, Inc. v. Sun Co., Inc., 831 A.2d 696, 705-6 (Pa. Super. 2003)).

GNC Franchising, Inc. v. O'Brien, 443 F. Supp.2d 737, 750 (W.D. Pa. 2006).

---

[46] Cf. Bonanno, 2008 WL 638367, *6 (noting, in denying Quiznos Motion to Dismiss claim for breach of implied covenant of good faith and fair dealing, that "Colorado law imposes a duty of good faith and fair dealing in every contract" which may attach to "'honor [the parties'] reasonable expectations" and that "may be relied upon 'when the manner of performance under a specific contract term allows for discretion on the part of either party'") (citations omitted).

Notwithstanding the breadth of the Restatement's formulation, cases have recognized three potential limitations on the scope of the duty of good faith and fair dealing. First, it has been suggested that the duty may only apply in certain contexts. See, e.g., Creeger Brick and Building Supply, Inc. v. Mid-State Bank and Trust Co., 560 A.2d 151, 153 (Pa. Super. 1989) ("In this Commonwealth the duty of good faith has been recognized in limited situations."). It is far from clear that any Pennsylvania cases declining to impose the particular obligations urged under the rubric of good faith and fair dealing truly stand for the proposition that in the class of contractual relationships at issue the parties may dispense with fairness and good faith altogether. It is even less likely that Pennsylvania courts would hold that the duty only applies to a few "limited situations", and that parties in the great run of contracts remain free to perform them unfairly and in bad faith.

In any event, even if the governing rule were that the duty does not apply in a particular situation unless and until the courts declare that it does, this limitation need not detain us because the Pennsylvania Supreme Court has explicitly recognized a franchisor's "obligation to deal with its franchisees in good faith and in a commercially reasonable manner." Razumic, 390 A.2d at 742. See also Creeger, 560 A.2d at 153 (distinguishing lending contract from franchise, and noting Razumic's imposition of "a duty of good faith . . . upon franchisors in their dealings with franchisees"); Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 618 (3d Cir. 1995) (quoting Creeger and

recognizing that "an independent contractual duty to act in good faith 'has been imposed upon franchisors in their dealings with franchisees'").[47]

The second limitation discussed by the caselaw is that even if a duty is present, it might not give rise to an independent cause of action.  See, e.g., Northview Motors, Inc. v. Chrysler Motors Corporation, 227 F.3d 78, 91 (3d Cir. 2000) (observing that "[i]n practice, however, the courts have recognized an independent cause of action for breach of a duty of good faith and fair dealing only in very limited circumstances").  This limitation might be seen as simply a more nuanced , refined and ultimately accurate version of the limitation discussed in cases like Creeger.  This refinement resolves the apparent contradiction between the limitation and the broadly stated rule:  It is quite possible to uphold a duty of good faith in "every contract", while at the same time limiting extra-contractual enforcement of that duty to particular circumstances.   This limitation also has no real impact on the claims herein.  At least in the circumstances of this action, so long as the franchisor has an enforceable obligation to deal fairly with the franchisees by, *e.g.*, passing on savings from aggregate supplier deals, it is of no moment whether the implied duty underlying the obligation is viewed as an independently enforceable duty or merely as the source of an interpretive gloss on the franchisor's contractual undertakings.

---

[47]   The policies underlying recognition of the implied duty of good faith and fair dealing are particularly  apposite to the relations of the present parties.  See Bicycle Corp. Of America v. Meridian Bank. 1995 WL 695090, *4 (E.D. Pa. Nov. 21, 1995) (explaining that the doctrine is intended to "simplif[y] arrangements between contracting parties by prohibiting one party from acting solely for his own benefit and to the detriment of the entire agreement ", and observing that it is intended to "prohibit opportunistic behavior" not specifically addressed in the contract).

The third limitation suggested by the cases is that the implied duty of good faith may not override express contractual provisions. See Witmer v. Exxon Corp., 434 A.2d 1222 (Pa. 1981) (finding no sustainable bad faith claim where franchisor acted within express terms of written agreement).[48]  This limitation is likewise inapplicable here, as the Agreements contain no express terms governing the extent to which Quiznos may exploit its control of supplier contracting. Cf. Whitmer, 434 A.2d at 1227 ("The Razumic standard serves the valuable purpose of defining contractual relationships which have been left unexpressed by the parties.").

Accordingly, the Court concludes that the Franchise Agreements should be read to include an implied covenant of good faith and fair dealing in the parties' performance of their contractual duties.

———————————

[48]  This Court does not read Witmer as overruling Razumic or limiting it to the termination context.

> To the contrary, no language in Witmer suggests any disagreement with the Court's prior citation to § 205 of the Restatement and its concomitant recognition of a duty of good faith in every contractual undertaking. Nor does Witmer suggest disagreement with Razumic's holding that a franchisor has a broad duty to deal with its franchisees in good faith. Rather, it merely distinguishes the circumstances before it and declines to apply Razumic's "articulat[ion]" of the standards for franchisor conduct to a non-termination, express-written-provision case.

GNC Franchising, 443 F. Supp.2d at 752. Cf. Robert W. Emerson, Franchise Contract Clauses and the Franchisor's Duty of Care Toward its Franchisees, 72 N. Car. L. Rev. 905, 931-32 & n. 113 (1994) ("The same policy reasons for having a 'good cause' termination standard apply to a franchisor's use of certain other franchise agreement provisions [in which] the franchisee is arguably at the mercy of the franchisor, and the franchisee's bargaining position is weakened severely by its sunk costs at risk."); Cottman Transmission Syst., LLC v. Kershner, 536 F.Supp.2d 543, 555 (E.D. Pa. 2008) (concluding that even if Pennsylvania Supreme Court were to limit duty to franchise termination cases, an "indirect termination" by, e.g., failure to provide necessary and promised support, leaving franchisees "unable to maintain a viable store" would be encompassed).

### 3.  **Proper Defendants**

Finally, Defendants allege that "Plaintiffs improperly identify 'Quiznos' (who they define as each of the eight [Quiznos Named Entities]) as the Defendant in their breach of contract claim", while "[m]ost of the Quiznos entities included in [that] definition were not parties to the franchise agreement."  Memorandum in Support at 23, n.15.  The Court agrees with Defendants that Plaintiffs cannot enforce their contract claims against persons who were neither actually nor apparently parties to the Agreement.  In view of the complex relationships among these Defendants, however, apparently including assignment of or successorship to the franchisor role under the Agreements, at present the Court will not dismiss any Quiznos Named Entity Defendant.  Defendants are invited, after an appropriate opportunity for discovery, to reassert their request for dismissal in the form of a motion for partial summary judgment, accompanied by evidence that the particular moving Defendants were not, actually, apparently or constructively, parties to any of the Agreements at issue herein.  Similarly, although Defendants also assert that Quiznos Franchising II LLC, Quiznos Master LLC, QZ Finance LLC and QIP Holder should be entirely dismissed from the case in the absence of allegations of a contractual relationship or more specified conduct on their parts, see Memorandum in Support at 28, the Court concludes that there are sufficient questions as to corporate relationships, participation in a RICO association, and other issues to warrant discovery (following which these Defendants may also reassert their request for dismissal *in toto*).

**F. Contractual Bar to Class Action**

Defendants request severance of Plaintiffs' claims, asserting that Plaintiffs are barred from participating in a class action or a consolidation pursuant to § 21.4 of the Agreement.[49]  In support thereof, Defendants have proffered the recent decision of the United States District Court for the District of Colorado in Bonanno, wherein the Court considered the enforceability of the class action waiver under Colorado law.  See Bonanno v. The Quiznos Franchise Co., No. 06-cv-2358 (D. Colo. Apr. 20, 2009).  Defendants assert that Colorado law should govern the effect of the class action waiver in the present action as well, in view of the Agreement's specification of Colorado law in a choice-of-law provision.  However, it appears clear to this Court that whether private contractual arrangements bind or constrain a federal court's procedures is a question of federal law.[50]

"[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."  Liberty Mut. Ins. Co. v. Treesdale, Inc., 419 F.3d 216 (3d Cir. 2005), quoting Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427 (1996).  Although classification of a law as 'substantive' or 'procedural' for this purpose is "sometimes a challenging endeavor", id., "[c]oncerning matters covered by the Federal Rules of Civil Procedure, the characterization

_____

[49]  Defendants also seek enforcement of a purported waiver of punitive damages. However, Defendants appear to cite no authority whatsoever for their assertion that Plaintiffs have contractually waived their rights to any claim for punitive relief.  See Memorandum in Support at 27-28.  Accordingly, this portion of their Motion will be denied.

[50]  As discussed *supra*, this Court is aware that this issue is on appeal in the Tenth Circuit. However, it does not appear that the Colorado District Court or the parties on appeal have addressed the applicability of federal law to the class action waiver issue.  In this Court's view, the federal law question is a threshold question.

question is usually unproblematic: It is settled that if the Rule in point is consonant with the Rules Enabling Act, 28 U.S.C. § 2072, and the Constitution, the Federal Rule applies regardless of contrary state law." <u>Gasperini</u>, 518 U.S. at 427 n.7.  Thus,

> When a situation is covered by one of the Federal Rules ... the court has been instructed to apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions.

<u>Hanna v. Plumer</u>, 380 U.S. 460, 471 (1965), <u>quoted in</u> <u>Stewart Organization, Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 27 (1988).

Consolidated and class-wide adjudication are clearly procedural devices governed by specific Federal Rules.  <u>See</u> Fed. R. Civ. P. 23, 42.[51]  Accordingly, the question before the court is whether giving effect to a purported waiver of consolidated or class-wide adjudication would comport with the language and purpose of those Rules.  For the reasons explained below, this Court concludes that it would not.

This Court has, after extensive review, located no case authorities addressing the proper role of contractual waivers by the parties in class action or consolidation determinations under Rules 23 or 42.  Virtually all of the reported cases on contractual class action waivers involve mandatory arbitration clauses, a circumstance that renders them patently distinguishable from the present case.[52]  Simply stated, whether the parties may effectively agree, as a matter of State contract law, to constrain the procedures to be followed in a privately-contracted dispute

---

[51]  Indeed, the <u>Bonanno</u> court explicitly recognized the purely procedural nature of class certification:  "Federal Rule 23 clearly remains a procedural tool, not a substantive or jurisdictional right".  <u>Bonanno</u>, <u>supra</u>, slip op. at 24.

[52]  See, e.g., <u>Homa v. American Express Co.</u>, 558 F.3d 225 (3d Cir. 2009).

resolution has little apparent bearing on whether such an agreement also constrains a federal court's application of its own rules, whose authority derives from a federal statute (and ultimately from the Constitution) rather than from a private contract.[53]

The Court does find guidance, however, in cases considering the effect of contractual forum-selection agreements on federal venue. In <u>Stewart Organization</u>, the Supreme Court "rejected the . . . contention that the effect . . . of a forum selection clause should be a matter purely of contractual interpretation governed by state law", instead requiring the district court to "determine whether to give the clause effect by transferring the case to . . . the contractually specified forum" by applying on the standards laid out in the federal change of venue statute, 28 U.S.C. § 1404(a) . <u>Jumara v. State Farm Ins. Co.</u>, 55 F.3d 873, 878 (3d Cir. 1995). The Court accordingly concluded that [t]he forum-selection clause, which represents the parties' agreement as to the most proper forum, should receive neither dispositive consideration . . . nor no consideration . . . , but rather the consideration for which Congress provided in § 1404(a)." <u>Stewart Organization</u>, 487 U.S. at 31. Thus, rather than being treated as a binding agreement

---

[53] This Court has also identified cases considering the enforceability of state statutory restrictions on class actions in certain contexts. <u>See</u>, <i>e.g.</i>, <u>O'Keefe v. Mercedes-Benz USA, LLC</u>, 214 F.R.D. 266, 285-86 (E.D. Pa. 2003) (concluding that state law ban was a procedural (and not a substantive) law, and so "not binding on a Federal Court under the <u>Erie</u> doctrine", which directs that federal court sitting in diversity enforce federal procedural law). <u>But compare</u> <u>In re Automotive Refinishing Paint Antitrust Litig.</u>, 515 F.Supp.2d 544-551 (E.D. Pa. 2007) (concluding that state antitrust statute's class action ban, which was substantive law and not in conflict with Rule 23, was applicable in federal court) <u>with</u> Erwin Chemerinsky, <i>Federal Jurisdiction</i>, § 5.3 at 317 (Aspen Law & Business 4th ed. 2003) ("[I]t is now clearly established that the Federal Rules of Civil Procedure . . . are to be applied by the federal court, even if there is a conflicting state requirement and even if the application of the federal Rule might determine the outcome of the case."). Cases regarding state statutory limitations that are part and parcel of a right of action are not, however, analogous to the private contractual limitation at issue <i>sub judice</i>.

overriding otherwise applicable venue standards, "a forum selection clause is treated as a manifestation of the parties' preferences as to a convenient forum", which is a factor encompassed within the framework of § 1404.  Jumara, 55 F.3d at 880.[54]

Unlike the situation with venue / forum selection, in which the parties' expressed preferences are accorded substantial weight in the governing statutory framework, the parties' preferences with respect to class certification or consolidation are not among the factors encompassed within the framework of Rule 23 or Rule 42.  Thus, as the Bonanno court observed, "the history of class litigation reflects that the Courts, not the parties, determine whether a suit should proceed on a class basis.  Courts make this decision as a matter of judicial efficiency . . . ."  Slip op. at 26.  Similarly, consolidation is a matter to be decided by the Courts, not the parties, based on the Courts' view of efficiency.  See, e.g., Gentry v. Smith, 487 F.2d 571, 581 (5th Cir. 1973) ("The stated purpose of Rule 42(a) is to 'avoid unnecessary costs or delay', and hence the decision to invoke the rule is entirely within the discretion of the district court as it seeks to promote the administration of justice.") (citing, *inter alia*, Ellerman Lines, Ltd. v. Atlantic Gulf Stevedores, Inc., 339 F.2d 673, 675 (3d Cir. 1964)).[55]

More particularly, if the prerequisites of Rule 23(a) are satisfied, whether a class action may be maintained turns on whether injunctive or declaratory relief is warranted for the whole

---

[54]  In Jumara, the Third Circuit observed that validity of a forum selection clause under federal law "requires that there have been no 'fraud, influence, or overweening bargaining power'".  Jumara, 55 F.3d at 880, quoting The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12-13 (1972).

[55]  In Ellerman Lines, the Third Circuit stated that Rule 42(a) "confers upon a district court broad power, whether at the request of a party or upon its own initiative, to consolidate causes for trial as may facilitate the administration of justice."  339 F.2d at 675.

class by defendants' conduct on  grounds that apply generally to the class, or whether common questions predominate over individual questions and a class action is superior to other methods of adjudication.  See Fed. R. Civ. P. 23(b)(2), (3).[56]  These controlling standards make no mention of whether a class action is preferred by the parties.[57]  Likewise, as long as actions involve a common question of law or fact, Rule 42(a) contemplates issuance of consolidation orders "to avoid unnecessary cost or delay" - a standard that also does not call for consideration of the parties' preferences.[58]  Under both Rule 23 and Rule 42, the ultimate governing standard is furtherance of efficient judicial administration, which leaves no room for enforceability of private agreements among litigants to forego the efficiencies potentially afforded by consolidated or class adjudication.

---

[56]  Plaintiffs have alleged that this lawsuit may be maintained as a class action pursuant to both Rule 23(b)(2) and Rule 23(b)(3).  See Second Amended Complaint ¶¶ 78, 79.

[57]  It might be contended that a contractual class action waiver should be treated as a request for exclusion from the class, consideration of which is contemplated within the governing framework under Rule 23(c)(2)(B)(v).  However, such exclusion is not permitted from a class certified under Rule 23(b)(2).  See Advisory Committee Note to 2003 Amendment, subdivision (c)(2) ("There is no right to request exclusion from a . . . (b)(2) class.").  And although class members have the right to opt out of a Rule 23(b)(3) class, Rule 23 contemplates that they will be afforded the opportunity to elect whether to request exclusion only following receipt of a detailed, court-approved notice that clearly states, inter alia, the nature of the action and the class claims or issues.  See Fed. R. Civ. P. 23(c)(2)(B).  Treating a blanket class action waiver secured by a potential defendant before any claims or issues had arisen as a request for exclusion by the potential class member would contravene not only the letter of Rule 23's notice provision but also its evident purpose to encourage informed, timely election of participation or exclusion.

[58]  It would be surprising indeed if parties could override a judicial consolidation order simply by agreeing that they prefer to have their own separate adjudication.  *A fortiori*, parties should not be held effectively to have precluded consolidation by agreeing to such a preference in advance.

This is not just an academic issue.  Defendants' invocation of the Agreement's class action / consolidation waiver could potentially force this and other courts to hold separate trials of dozens, or hundreds, or even thousands of cases involving extensively overlapping issues.[59]  Such a result is flatly inconsistent with the governing Rules, which are to be "construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.

Because this Court finds that as a matter of federal law the parties' waivers are ineffective to override the court's discretion to certify a class under Rule 23 or consolidate proceedings under Rule 42, it is unnecessary to address Plaintiffs' contention that such waivers are void due to unconscionability under State law.[60]

## G.  Defendants' Remaining Assertions Regarding Defenses

---

[59]  Compare Bonanno, slip op. at 24:

There is no question that class actions serve the goals of judicial efficiency and practicality by making multi-party litigation more expeditious and economical. See Califano [v. Yamasaki], 442 U.S. [682, ] 701 [(1979)] ("[T]he class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.") . . . .

[60]  If a valid class action or consolidation waiver were entitled to be accorded weight in a federal court's decision under Rule 23 or Rule 42, however, this Court would conclude that, as with other defenses subject to Plaintiffs' unconscionability claim, the validity of the waivers herein cannot or should not be determined in the present procedural posture of the case.  See infra.

The remainder of Defendants' Memorandum in Support includes the following additional defenses as a matter of law and on the basis of limitations on litigation set forth in the Franchise Agreement

(1) The individual Defendants, Richard E. Schaden and his son Richard F. Schaden, and the employee-Defendants should be dismissed because the Agreement states that the Plaintiffs will not advance claims arising out of the Franchise Agreement against the "shareholders, directors, officers, employees, and agents of Franchisor and its affiliates."  Memorandum of Law at 25 (quoting Franchise Agreement, Ex. A, § 21.4);[61]

(2) Plaintiffs' claims are time-barred by the one year contractual limitation period set forth in the Franchise Agreement, providing that "[e]xcept with regard to Franchisee's obligation to pay Franchisor and its affiliates Royalty payments, the Marketing and Promotion Fee and other advertising fees, and other payments due from Franchisee pursuant to this Agreement or otherwise, any claims between the parties must be commenced within one (1) year . . . ."  Id. at 26 (quoting Ex. A § 21.4);[62] and

(3) Plaintiffs are not entitled to a jury trial because the Agreement contains a waiver of such right by all parties acknowledging the "mutual benefit of uniform interpretation" of the

---

[61]  Defendants cite Compass Tech., Inc. v. Tseng Labs, Inc., 71 F.3d 1125, 1131 (3d Cir. 1995) for the general proposition that clear written agreements should be enforced.  Cf.  Elhilu, Case No. 06-CV-07855 (C.D. Cal.) Docket No. 69, April 03, 2008 Order Denying Motion to Dismiss at 8 (denying Motion to Dismiss claims against Schaden Defendants because a contract to "exempt anyone from responsibility for his own fraud . . . [is] against the policy of the law.") (citing California Civil Code § 1668).

[62]  Defendants cite Smith v. Am. Equity Ins. Co., 235 F. Supp.2d 410, 412 (E.D. Pa. 2002) for the general proposition that a bi-lateral one-year contractual limitations period may be reasonable.  But, as discussed infra, the limitations period in the present case is not the same as to both parties' interests.

Agreement and related disputes.  Id. at 28-29 (quoting Ex. A § 21.2) (citing, *e.g.*, Cottman, 2007 U.S. Dist. LEXIS 1892 at *9).

The Court observes that Plaintiffs' Complaint raises overarching questions of unconscionability which may render some or all of the franchise documents and their contractual provisions unenforceable.  The Defendants' alleged practices of selling/over-selling/re-selling and exploiting Quiznos franchises through a combination of fraudulent representations/omissions**,** onerous contractual provisions and operational practices, and "strong-arming" which frequently resulted - as assertedly intended - in little or no franchisee profit and ultimate default, appear to be just the sort of overreaching that the doctrine of unconscionability is meant to guard against.

Under Pennsylvania law, "a contract or term is unconscionable, and therefore avoidable, where there was a lack of meaningful choice in the acceptance of the challenged provision and it unreasonably favors the party asserting it.  The aspects entailing lack of meaningful choice and unreasonableness have been termed procedural and substantive unconscionability, respectively." *See* Salley v. Option One Mortgage Corp., 925 A.2d 115, 119 (Pa. 2007) (citations omitted).[63]

Defendants assert that the Franchise Agreements are neither procedurally nor substantively unconscionable as a matter of law.  First, they contend the Agreements are not procedurally unconscionable because Plaintiffs have not alleged "evidence of unequal bargaining power or economic compulsion."  Reply Brief at 3 (citing Bonanno v. Quiznos Master LLC, 2006

---

[63]  The law of Colorado on unconscionability is essentially the same as that of Pennsylvania: "In order to support a finding of unconscionability, there must be evidence in the record of some overreaching on the part of one of the parties, such as that which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on the part of the second party, together with contract terms unreasonably favorable to the first party."  Bonanno, 2008 WL 638367 at *9.

US App. LEXIS 85131, *15-16 (Dist. N.J. Nov. 17, 2006). However, the Second Amended Complaint expressly alleges (at ¶ 62) that "Quiznos exploits its overwhelming bargaining power to require the franchisees to sign unconscionably one-sided adhesive franchise agreements, without any potential for negotiation of their terms." This allegation is plainly sufficient at the pleading stage.

Defendants also contend that the Agreements are not procedurally unconscionable because Plaintiffs had other choices, and the "fact that the agreement was presented on a 'take-it or leave-it' basis does not make it *per se* unconscionable or unenforceable, even if the parties are in unequal bargaining power". Reply Brief at 4 (citing Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 265 (3d Cir. 2003)). That a contract of adhesion is not *per se* unconscionable does not entail that it is necessarily enforceable, however. Instead, the "take-it-or-leave-it" presentation should be taken to establish lack of meaningful choice and thereby satisfy the procedural unconscionability element so that the contract will be unenforceable if and only if the substantive unreasonableness element is also met.[64]

Second, Defendants argue that the Agreements are not substantively unconscionable because the terms do not "so unreasonably favor the party with the greater bargaining power" or "shock the conscience". Rather, the terms "are procedural provisions, for the most part mutual, and they have been enforced by state and federal courts in Pennsylvania, Colorado, and nationwide." Reply Brief at 6.

---

[64] Cf. Homa v. Amer. Express Co., 558 F.3d 225, 231 (3d Cir. 2009) (noting that contract bore "the hallmarks of a contract of adhesion [where] it was 'presented on a take-it-or-leave-it basis, . . . in a standardized printed form, [and] without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars'") (quoting Muhammad v. County Bank of Rehoboth Beach, Del., 912 A.2d 88, 96, 99 (N.J. 2006)).

Considered separately, the procedural provisions at issue might not be unconscionable. The Court notes, however, that the drastically shortened limitations period in particular is not mutual, since it excepts out monetary claims by the franchisor, with no apparent reason other than to strengthen the franchisor's hand in the event of a dispute. More significantly, when considered as a whole, it appears quite plausible that the Agreement is so one-sided as to be substantively unconscionable, especially if, as Defendants contend, it affords the franchisor unbounded discretion to impose onerous supplier transactions on the franchisees. See Streams Sports Club, Ltd. v. Richmond, 457 N.E.2d 1226, 1232 (Ill. 1983) (finding that a contract is unconscionable when, viewed as a whole, "it is improvident, oppressive, or totally one-sided") (quoted in Siemer, 2008 WL 905874, at *8).[65]

The Court concludes that Defendants' Motion on these matters is at best premature and, accordingly, will be denied. See Bonanno, 2008 WL 638367 at *9-10 (denying Quiznos requests to strike jury demand and dismiss the Schaden defendants where there was "no evidence in the record" regarding the validity of plaintiffs' waiver of their right to a jury trial or "with respect to whether or not the franchise agreements [were] unconscionable").

## VI.  CLASS CERTIFICATION AND NOTICE

By its Order of December 23, 2008, this Court denied Plaintiffs' Motion for Class Certification without prejudice to refile following its ruling on Defendants' Motion to Dismiss.

---

[65] In Siemer, Judge Pallmeyer concludes that "none of the clauses contained within the UFOC or the Franchise Agreement" warranted a finding of unconscionability, observing - erroneously - that Judge Griesbach had also "found the plaintiffs' claims of unconscionability unpersuasive." 2008 WL 904874, *8 & n.3.

That being so, Plaintiffs are now granted leave to refile a Motion for Class Certification in their discretion. The Court further notes, however, that adequacy of representation is generally an important consideration in class certification. An exhaustive review of the franchisee plaintiffs' pleadings in this and all other similar litigation suggest that considerations of adequacy of representation in the best interest of the class (including indications of Plaintiffs' presently sole counsel's degree of familiarity/expertise in a multitude of complicated and nuanced areas of the law) will be particularly relevant in this case.

An appropriate Order will follow.


Dated: June 15, 2009

_____
Lisa Pupo Lenihan
United States Magistrate Judge